# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.  04-20778-CR-JORDAN

**UNITED STATES OF AMERICA,**

**vs.**

**KENT FRANK,**

**Defendant.**

_____ /

## GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT'S MOTIONS TO DISMISS

The United States of America, by and through R. Alexander Acosta, United States

Attorney for the Southern District of Florida, Wendy Waldron, Trial Attorney for the United

States Department of Justice, and Jonathan Lopez, Assistant United States Attorney for the

Southern District of Florida, respectfully submits this consolidated response to Defendant Kent

Frank's Motion to Declare Title 18 U.S.C. Section 2423(c) Unconstitutional and Therefore to

Dismiss, Motion to Declare Title 18 U.S.C. Section 2423(f) and Title 18 U.S.C. Section 2423(c)

Unconstitutional as Applied and Therefore to Dismiss Counts 1 Through 5, and Motion to

Declare 18 U.S.C. Section 2251A(b)(2)(A) Unconstitutional as Applied and Therefore Dismiss

Counts 6 through 9.

For the reasons set forth below, the Government respectfully submits that the Court

should deny Frank's motions.

## I.     STATEMENT OF FACTS

The Defendant, Kent Frank, is a United States citizen who has taken no steps to renounce

his citizenship. All of the Defendant's international travel at issue was undertaken using a United States passport (a copy of which is attached as Attachment A). Frank made at least two trips via commercial airlines from the United States to countries in Asia, including Cambodia, during the time period beginning September 16, 2003, through January 1, 2004. Frank left the United States and traveled to Cambodia on or about September 16, 2003, and returned from Asia to the United States on or about October 9, 2003. Frank left the United States and again traveled to Cambodia during this time frame on or about November 23, 2003, and remained in Asia through January 1, 2004, the date of his arrest by the Cambodian authorities. Frank also traveled to Thailand and Vietnam during this period.

During the above-referenced travel to Cambodia, the Defendant engaged in sexual acts with the four girls referred to in the Indictment as Minor A, Minor B, Minor C and Minor D (collectively, the "Minor Girls"). There is a factual dispute about the ages of the Minor Girls during the relevant time period.[1] For the purposes of this motion, however, the Government is not relying on any showing that the Minor Girls were under fifteen years old and will assume that the Minor Girls were sixteen years old.

On January 1, 2004, Cambodian police, acting on a tip, raided the room in the Golden Bridge Hotel where the Defendant was staying in Phnom Penh. In the building they found girls' clothing, a camera, two digital micro drives for the camera, a computer, and other miscellaneous items. The Minor Girls were found in the vicinity of the building and later interviewed by Cambodian and United States law enforcement. The Defendant was taken to the Cambodian

---

[1] The Government will take the position that the girls were fourteen or fifteen years old at the time of these incidents, whereas the Defendant takes the position that the girls were sixteen or older.

2

police station and interviewed. At the police station, the Defendant admitted that he met the girls at a bar and on several occasions paid them to come to the building and have sex with him. The Defendant also admitted that he took nude and sexually explicit pictures of them during those times.

Several images retrieved from the micro drives found with the Defendant's camera show the Defendant engaging in a sexual act with Minor A on September 24, 2003. These images of Minor A had not been deleted. One of these images was reviewed by the Court and is referred to in the Court's Amended Pretrial Detention Order as Government Exhibit 3. In addition to the images of Minor A, the micro drives contain multiple images of Minors B, C and D, posing naked and displaying their genitals in sexually suggestive poses. These include sexually explicit images that had not been deleted. The micro drives also contain other images of the Minor Girls and other unknown minor girls in various stages of undress and naked and lascivious poses. Some of these images had been deleted and were recovered by forensic examiners. Others had not been deleted, and included pictures during the time frame alleged in the indictment showing apparently prepubescent girls posing naked and displaying their genitals in sexually suggestive poses.

During the Defendant's trip to Asia between September 16, 2003 and October 9, 2003, the Defendant paid Minor A money so that she would engage in sexual intercourse with him. The Defendant also took or caused to be taken visual depictions of Minor A engaged in sexually explicit conduct. The Defendant also paid Minor A for sex during his trip to Cambodia during the time period between November 23, 2003, and January 1, 2004.

During his travel to Asia between November 23, 2003, and his arrest on January 1, 2004,

3

the Defendant paid money to Minor B, Minor C and Minor D so that they would engage in sexual intercourse with him. The Defendant also took visual depictions of Minors B, C and D engaged in sexually explicit conduct. The Defendant also paid Minor B for sex during his earlier trip to Cambodia during the time period between September 16, 2003 and October 9, 2003.

The foreign travel of the Defendant during 2003 is shown by the Immigration and Customs Enforcement Treasury Enforcement Communications System ("TECS") records attached hereto (Attachment B). These records show a pattern of repeated trips between United States and other regions, including Southeast Asia. The defendant typically stayed in the United States for two to three months and then left the country for two to three months. Specifically, the TECS records for 2003 show that the defendant was in the United States from December 28, 2002 to February 27, 2003, when he flew outbound to Tokyo, Japan.[2] The defendant remained outside the United States for just over a month and then returned to Los Angeles from Bangkok, Thailand on April 2, 2003. The TECS records show that Frank then remained in the United States between April 2, 2003, and May 8, 2003, at which point he flew outbound to Bangkok, Thailand. The defendant remained outside of the United States until he returned from Bangkok on July 21, 2003.

Frank remained in the United States for approximately two months before taking the first of the two trips at issue in the present case, when he flew through San Francisco to Taipei, Taiwan on September 17, 2003. Frank remained overseas for less than one month, returning from Taipei to Los Angeles on October 9, 2003. Between this return and his next trip to Asia,

---

[2] The records only show the first destination after leaving the United States and not any countries subsequently visited.

4

Frank traveled between Miami and San Jose, Costa Rica on two separate occasions.  Frank then

took the second trip to Asia at issue in this case on November 24, 2003, flying from Los Angeles

to Bangkok.

The defendant also possessed a current Florida drivers licence at the time of the offense

(Attachment C), was registered to vote in Miami-Dade County (Attachment D), and maintained

several bank accounts and credit cards using mailing addresses in Miami, Florida and

Dunwoody, Georgia.  Attached hereto is an excerpt of the billing records for a Mastercard credit

card (account beginning 5411) issued to the defendant by Citibank, a United States corporation

having offices in Sioux Falls, South Dakota.  (Attachment E).  The credit card records show that

Frank used his Mastercard for numerous transactions in Thailand and Cambodia between

September 17 and October 7, 2003.  These include purchases at pharmacies, gas stations and

super markets in Cambodia during the time period involved in the indictment.[3]

These records also show purchases in the United States and Costa Rica between October

9 and November 23, 2003.  These transactions include the purchase, on November 7, 2003, of

plane tickets for a return trip to Asia; the records indicate that this purchase was made from the

Miami area.

The Defendant's Mastercard statement further shows purchases in Thailand, Vietnam and

Cambodia during the time period between November 25, 2003, and December 28, 2003.  These

purchases on the Citibank Mastercard include payment for a hotel in Bangkok on November 26,

2003, purchases in Vietnam between November 28, 2003, and December 1, 2003, and purchases

---

[3] The column on the left shows transaction date and the column on the right shows the
date that the transaction was posted to the account.

in Cambodia between December 6, 2003, and December 28, 2003. The Cambodian purchases

include payment by U.S. credit card for pharmacies, restaurants, and super markets. These

records also indicate that the defendant used his Mastercard to pay a $12.04 tab at Sharky Bar

and Restaurant in Cambodia on December 6, 2003, and to withdraw $3,000 at Canadia Bank in

Cambodia on December 13, 2003. Sharky's is the bar where Frank allegedly met the minor girls

listed in the indictment.

Receipts, ticket stubs, and other miscellaneous items seized from the defendant's room in

Cambodia corroborate the credit card and TECS records obtained by investigators in the United

States. Copies of select items seized from the Defendant's hotel room on January 1, 2004 are

attached hereto (Attachment F). These items include signed receipts showing that the Mastercard

was used for purchases at a super market and at Sharky Bar and Restaurant in Cambodia on

December 6, 2003. They also include a signed receipt showing that the Defendant's Mastercard

was used for the $3,000 cash advance in Cambodia on December 13, 2003.

## II.    THE STATUTES AT ISSUE

### A.    Title 18, United States Code, Section 2423(c)

Title 18, United States Code, Section 2423(c), included in the Prosecutorial Remedies

and Other Tools to end the Exploitation of Children Today Act of 2003 ("PROTECT Act"), 117

Stat. 650, extends the reach of "sex tourism" statutes to criminalize acts taking place entirely

outside of the United States. Section 2423(c), entitled "Engaging in illicit sexual conduct in

foreign places," allows for the prosecution of "[a]ny United States citizen or alien admitted for

permanent residence who travels in foreign commerce, and engages in any illicit sexual conduct

with another person." The phrase "illicit sexual conduct" is further defined in Section 2423(f) to

6

include a sex act with a person under 18 years of age that would be illegal under chapter 109A (if the act took place in the special maritime or territorial jurisdiction of the United States) or a commercial sex act (as defined in 18 U.S.C. § 1591) with a person under 18 years of age.

**B.      Title 18, United States Code, Section 2251A**

Title 18, United States Code, Section 2251A, entitled "[s]elling or buying of children", provides, in relevant part, that "[w]hoever purchases or otherwise obtains custody or control of a minor ... with intent to promote ... the engaging in of sexually explicit conduct by such minor for the purpose of producing any visual depiction of such conduct" shall be punishable under the statute. See 18 U.S.C. § 2251A(b)(2). Section 2251A(c)(1) further provides that this statute applies when "in the course of the conduct described in such subsections the minor or the actor traveled in or was transported in interstate or foreign commerce."

**III.   SUMMARY OF ARGUMENT**

The Defendant's facial challenge to Section 2423(c) is based on the claim that this section is beyond Congress's Constitutional power to enact legislation, violates international law, and violates the due process clause of the Fifth Amendment to the United States Constitution. The Defendant's challenge to the application of Section 2423(c) in this case appears to be based only on an alleged due process violation.[4] The Defendant does not ask the court to invalidate Section 2251A(b)(2)(A) on its face, but instead argues that the application of this provision to his actions is beyond Congressional power and violates his due process rights.

Both legislative provisions under which Frank is charged are valid exercises of the

---

[4] The Commerce Clause is not mentioned until the last page of Frank's motion to declare Section 2423(c) unconstitutional as applied.

powers conferred on Congress by the United States Constitution.  These powers include the commerce power and the treaty power, and should assessed in light of Congress's broad power to regulate the conduct of its citizens overseas and to legislate in areas touching on foreign relations.

In acting to prohibit the commercial sexual exploitation of minors by United States citizens overseas, Congress stayed well within its Constitutional authority.  And while United States laws that are otherwise constitutional need not comply with international law to be valid, the statutes at issue in this case and their application to the Defendant are supported by established principles of international law.  Moreover, the punishment of the commercial sexual exploitation of minors complies with specific international obligations voluntarily undertaken by both the United States and Cambodia.

The prosecution of United States citizens for acts taking place overseas does not violate the due process clause, either generally or on the facts of this case.  Citizenship alone provides a sufficient basis for the constitutional exercise of jurisdiction over the Defendant.  Even if citizenship alone were not sufficient, the Defendant's frequent travel to and from the United States and his use of money derived from American sources, including credit cards, to pay for his transport to Cambodia and goods and services while in Cambodia subject him to the laws of the United States.

Moreover, that sex with a person over fifteen years of age does not fall under the particular statute under which the Defendant was charged in Cambodia is not material to the assessment of the Defendant's claims.  This case involves the commercial sexual exploitation of minors.  There is no indication that commercial sexual activity with a person of any age is legal

8

in Cambodia, much less that compliance with Cambodian law somehow required the Defendant
to engage in commercial sexual activity while in Cambodia. Far from imposing its will on the
citizens of Cambodia, the United States is acting through the laws at issue in this case to regulate
the conduct of our own citizens overseas. In doing so, we may be able to reduce the number of
United States citizens who use their American passports and considerable relative wealth to
travel to poor, troubled countries such as Cambodia and fuel the growing market in which
children are bought and sold for sex.

## IV.    ARGUMENT

### A.    Section 2423(c) is Constitutional

Acts of Congress are presumed to be constitutional. See, e.g., Munn v. Illinois, 94 U.S.
113, 124 (1876) ("Every statute is presumed to be constitutional."). Accordingly, "[t]he courts
ought not to declare one to be unconstitutional, unless it is clearly so. If there is doubt, the
expressed will of the legislature should be sustained." Id. at 124.

A facial challenge to a statute, such as that made by the Defendant, is "the most difficult
challenge to mount successfully, since the challenger must establish that no set of circumstances
exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987).
See also United States v. Ballinger, 395 F.3d 1218, 1225, n. 2 (11th Cir. 2005) (en banc) (quoting
Salerno, 481 U.S. at 745). Thus, courts must exercise caution and reluctance before striking
down a statute. See Parker v. Levy, 417 U.S. 733, 760 (1974) (holding that courts must be
"reluctant[ ] to strike down a statute on its face where there [are] a substantial number of
situations to which it might validly be applied"); Erznoznik v. City of Jacksonville, 422 U.S. 205,
216 (1975) (emphasizing caution before striking down state statute as facially unconstitutional).

The Defendant has fallen far short of showing that there is no set of circumstances under which Section 2423(c) would be valid.  His facial challenge to the statute must therefore fail.

### 1.   Congress Intended for Section 2423(c) to Apply to Extraterritorial Acts

Congress has the authority to enact laws that extend beyond the territorial boundaries of the United States.  See, e.g., EEOC v. Arabian American Oil Co., 499 U.S. 244, 248 (1991)("Aramco") (superceded by statute, Civil Rights Act of 1991, Pub. L. No. 102-166,  § 109(c), 105 Stat. 1071, 1078 (1991)), citing Foley Bros., Inc. v. Filardo, 336 U.S. 281, 284-285 (1949).  As stated by the Supreme Court in Aramco, "whether Congress has in fact exercised that authority in these cases is a matter of statutory construction."  499 U.S. at 248.  Legislation is generally presumed to apply only within the territorial jurisdiction of the United States "unless a contrary intent appears."  Id.  See also Sale v. Haitian Ctrs. Council, Inc., 509 U.S. 155, 173 (1993).  In determining whether Congress intended to make a statute apply extraterritorially, it is proper to consider "all available evidence" about the reach of the statute, including its text, structure, and legislative history.  Sale, 509 U.S. at 177.  A statute may therefore apply to extraterritorial acts even if such intent is not made explicit by the text of the statute.

That Congress intended for 18 U.S.C. § 2423(c) to apply extraterritorially is apparent on the face of the statute.  Section 2423(c) is limited to travel in foreign commerce rather than also including travel in interstate commerce.  In addition, Section 2423(c) is entitled "Engaging in illicit sexual conduct in foreign places."  See Almendarez-Torres v. United States, 523 U.S. 224, 234 (1998) ("We also note that 'the title of a statute and the heading of a section' are 'tools available for the resolution of doubt' about the meaning of a statute.") (internal citations omitted).  Because there is no ambiguity that this statute applies to acts committed outside of the

United States, the Court should conclude its analysis. See Freytag v. Comm'r, 501 U.S. 868, 873 (1991) ("When we find the terms of a statute unambiguous, judicial inquiry should be complete except in rare and exceptional circumstances.").

Even if Congressional intent to apply Section 2423(c) beyond the territorial borders of the United States is not plain from the face of the statute, such intent becomes clear upon consideration of "all available evidence," including structure and legislative history.  This intent becomes especially clear when Section 2423(c) is read alongside Section 2423(b).  Section 2423(b), which criminalizes, in part, travel in foreign commerce "for the purpose of engaging in illicit sexual activity," requires that the Government prove a direct connection between the travel in foreign commerce and the illicit sexual activity.  Because criminal intent must be formed while the defendant is still in the United States, Section 2423(b) is not truly a statute with extraterritorial application. By contrast, Section 2423(c) replaces the phrase "for the purpose of" with "and," thereby making the substantive criminal act engaging in illicit sexual conduct after having traveled in foreign commerce.  The language of Section 2423(c) should be interpreted in a manner that avoids making other provisions, such as Section 2423(b), redundant.  See Freytag, 501 U.S. at 877 (noting that courts should avoid interpreting a statute so as to make another statute redundant); see also Ballinger, 395 F.3d at 1236 (where possible, statutes should be construed so that "no clause, sentence, or word shall be superfluous, void or insignificant") (internal citations omitted).

The legislative history of Section 2423(c), passed as part of the PROTECT Act, also shows the clear extraterritorial reach of this statute.  Congress passed the provision now contained in 18 U.S.C. § 2423(c) to address difficulties with then-existing 18 U.S.C. § 2423(b),

11

which "requires the government to prove that the defendant traveled with the intent to engage in the illegal activity. Under this section [the new 2423(c)], the government would only have to prove that the defendant engaged in illicit sexual conduct with a minor while in a foreign country." H.R. Conf. Rep. 108-66, 108th Cong., 1st Sess. 2003, reprinted in 2003 U.S.C.C.A.N. 683, 686.

Because the extraterritorial reach of Section 2423(c) is clear, it is not necessary for the Court to consider the more detailed factors used by courts to determine whether the extraterritorial application of a statute is reasonable under international law. These factors, which include the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated and the likelihood of conflict with regulation by another state, are discussed in United States v. Vasquez-Velasco, 15 F.3d 833 (9th Cir. 1994), which is cited by the Defendant. See Vasquez-Velasco, 15 F.3d at 840, n. 2 (citing Restatement (Third) of Foreign Relations Law of the United States § 403(2)). As noted in the Vasquez-Velasco decision, "[i]n determining whether a statute applies extraterritorially, we also presume that Congress does not intend to violate principles of international law. Thus, *in the absence of an explicit Congressional directive*, courts do not give extraterritorial effect to any statute that violates principles of international law." 15 F.3d at 839 (emphasis added). Section 2423(c) clearly applies extraterritorially, and in fact has no clear application within the territorial bounds of the United States. A detailed assessment of the various jurisdictional principles recognized under international law therefore does not illuminate the issues before the Court.

Case law in the Eleventh Circuit recognizes that, where possible, the exercise of

12

extraterritorial jurisdiction should comport with international law.  See, e.g., United States v. Plummer, 221 F.3d 1298, 1307 (11th Cir. 2000); Garcia-Mir v. Meese, 788 F.2d 1446, 1453 (11th Cir. 1986) (citing Murray v. The Schooner Charming Betsy, 6 U.S. (2 Cranch) 64 (1804)). Courts have also recognized, however, that "public international law is controlling only 'where there is no treaty and no controlling executive or legislative act or judicial decision....'" Garcia-Mir, 788 F.2d at 1453 (quoting Paquete Habana, 175 U.S. 677, 700 (1900)).  Similarly, in United States v. Yousef, the court emphasized that Congress is "not bound by international law" in determining the reach of extraterritorial statutes, and that "if [Congress] chooses to do so, it may legislate with respect to conduct outside the United States, in excess of the limits posed by international law." 327 F.3d 56, 86 (2nd Cir. 2003)(internal quotations omitted).

As will be discussed more fully below, however, international law fully supports the exercise of jurisdiction under Section 2423(c).  As noted by the Defendant, international law recognizes the exercise of criminal jurisdiction by a nation under five general principles.  These include the territorial, national, protective, universality, and passive personality principles.  See, e.g., Rivard v. United States, 375 F.2d 882, 885 (5th Cir. 1967).[5]  Of these, territoriality and nationality are the most widely-accepted bases for the exercise of extraterritorial jurisdiction. Restatement (Third) of Foreign Relations Law of the United States ("Restatement") § 402 cmt. a.

Defendant, in his motion, focuses primarily on factors considered by courts when a statute with unclear extraterritorial reach is sought to be applied to acts committed by a foreign national  overseas.  These cases assess whether such jurisdiction is proper on the theory that such

---

[5] The Eleventh Circuit is bound by Fifth Circuit decisions handed down prior to September 30, 1981.  Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981).

acts have effects within the territorial boundaries of the United States. See, e.g., Vasquez-Velasco, 15 F.3d at 839-841 (holding that territorial effects and protective principles supported U.S. prosecution of a foreign national for the murder in Mexico of American tourists thought to be DEA agents); United States v. Felix-Gutierrez, 940 F.2d 1200, 1204 (9th Cir. 1991) (finding that application of statute without clear extraterritorial reach to the foreign murder of a DEA agent by a foreign national was supported by territorial effects and protective principles of international law). These cases involve an expansion of the basic territorial principle. See, e.g., Rivard, 375 F.2d at 886 (recognizing that the territorial effects principle of jurisdiction is a broader application of the territorial principle).

The territorial effects principle is distinct from the nationality principle, and the analysis and case law applicable to one is not necessarily applicable to another. See, e.g., United States v. King, 552 F.2d 833, 851 (9th Cir. 1976) (noting that "[i]n upholding statutes with extraterritorial impact, courts have recognized that the territorial concept of jurisdiction is neither exclusive nor a full and accurate characterization of the powers of states to exercise jurisdiction beyond the confines of their geographical boundaries"). Controlling precedent in the Eleventh Circuit recognizes that, under international law, nationality alone supports the exercise of extraterritorial jurisdiction. See United States v. Mitchell, 553 F.2d 996, 1001 (5th Cir. 1977) (noting that "citizenship alone is generally recognized as a relationship sufficient to justify the exercise of jurisdiction by a state.") (citing Restatement (Second) of Foreign Relations Law of the United States (1965) § 30). See also Blackmer v. United States, 284 U.S. 421, 437 (1932); Plummer, 221 F.3d at 1307. There are numerous instances where courts have found that a statute was not intended to reach extraterritorial conduct. See, e.g., Mitchell, 553 F.2d at 1001; United States v.

14

Gatlin, 216 F.3d 207, 211 (2nd Cir. 2000). The nationality principle is so entrenched, however, that the undersigned trial attorney has found no case where a court found that the application of a clearly extraterritorial federal statute to a United States national violated international law.

### 2.   Section 2423(c) is Within Congress's Subject Matter Jurisdiction

The Defendant claims that Section 2423(c) is facially invalid, and that it is beyond any constitutional power held by Congress. Article III, Section 2, of the United States Constitution states that if an offense is "not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." The Constitution therefore contemplates that Congress may exercise jurisdiction over offenses committed outside of any State and will therefore need to establish venue provisions for such offenses (as it has in 18 U.S.C. § 3238, governing "[o]ffenses not committed in any district"). There are several sources of Congressional power to exercise extraterritorial jurisdiction. Each is sufficient to support the statutes at issue in this case.

### i.   Congressional Power Based on Citizenship

There is an important line of cases indicating that the power of the United States to criminalize the extraterritorial acts of its nationals is inherent in sovereignty, and stands apart from powers enumerated in the Constitution. While it is not necessary to rely on citizenship as a basis of subject matter jurisdiction in this case, the case law acknowledging this source of Congressional power should influence the Court's assessment of Congressional authority to enact Section 2423(c) under enumerated powers such as the commerce clause and treaty powers.

The Supreme Court has stated broadly that, while Congressional legislation is generally construed to apply only *within the territorial jurisdiction* of the United States unless a contrary

15

intent appears, "the question of its application, so far as citizens of the United States in foreign countries are concerned, *is one of construction, not of legislative power*." Blackmer, 284 U.S. at 437 (emphasis added). In Blackmer, the Supreme Court upheld the contempt conviction of the defendant, a United States citizen, for failing to comply with a criminal subpoena that was served on him while he was a resident of France. As discussed below, the Court in Blackmer also addressed whether the assertion of extraterritorial jurisdiction over a United States citizen comported with due process. See id. at 438. The Court in Blackmer did not limit its decision to the constraints imposed by the due process clause, however, and also discussed legislative power over United States citizens overseas as being a "power inherent in sovereignty." 284 U.S. at 255. See also United States v. Lansky, 496 F.2d 1063, 1067 (5th Cir. 1974). Blackmer, and numerous decisions following in its path, discuss citizenship as a source of Congressional legislative power and not just as a factor that makes the exercise of power derived from another source constitutional.

In United States v. Mitchell, 553 F.2d 996, 1001 (5th Cir. 1977), the court addressed whether Congress intended the Marine Mammal Protection Act to apply to actions by United States citizens in the territorial waters of other Nations. Mitchell held that while the Act did extend to violations of the Act in the "high seas" or non-territorial waters, it did not extend to the taking of protected mammals in the waters of other sovereign states. Id. at 1004. In reaching this decision, the court in Mitchell explicitly recognized that Congress could have exercised authority over the acts of United States citizens in foreign territorial waters if it had chosen, and that this power would have been based on Congressional authority to control the conduct of American citizens overseas. *Id. at 1001 (citing* Blackmer *and stating that "*[t]he Supreme Court has held

16

repeatedly that the legislative authority of the United States over its citizens extends to conduct by Americans on the high seas and even within the territory of other sovereigns").

Similarly, the Second Circuit in Gatlin held that the territorial provisions of 18 U.S.C. § 7(3) did not generally extend to the acts of United States citizens on "lands reserved or acquired for the use of the United States" in a foreign nation. United States v. Gatlin, 216 F.3d 207, 211 (2nd Cir. 2000). In doing so, however, the Gatlin opinion assumed that such an extension would have been within Congressional power, stating that Congressional authority to regulate the conduct of its nationals outside the territorial boundaries of the United States is undisputed and that therefore "the issue in this case is one of congressional intent – that is, statutory construction – *not of congressional power*." Id. (emphasis added). See also United States v. King, 552 F.2d 833, 850-52 (9th Cir. 1976) (stating that there is "no constitutional bar to the extraterritorial application of penal laws" and suggesting that authority over United States citizens overseas is a source of Congressional legislative power); United States v. Walczak, 783 F.2d 852, 854-55 (9th Cir. 1986) (treating nationality principle as a sufficient basis for the exercise of subject matter jurisdiction).

In addition to being based on the broad power to punish the acts of United States citizens overseas, the extraterritorial reach of federal criminal laws is grounded in the inherent power to legislate in external affairs and matters touching on foreign relations. The Supreme Court plainly drew this distinction in United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 315 (1936), in which it recognized the "differences between the powers of the federal government in respect to foreign or external affairs and those in respect of domestic or internal affairs." As the Court explained, the "broad *statement that the federal government can exercise no powers except those*

17

specifically enumerated in the Constitution ... is categorically true only in respect to our internal affairs." 299 U.S. at 315-16.

In United States v. Lopez, 514 U.S. 549, 549 (1995), the Supreme Court reiterated that the "Constitution creates a Federal Government of enumerated Powers." This "first principle" was, however, described by the Court as stemming from the division of power between the States and the Federal Government; the Court in Lopez went on to quote James Madison, noting that "[t]he powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite." Id., quoting The Federalist No. 45, pp. 292-293 (C. Rossiter ed. 1961). The Lopez decision further ties its discussion of enumerated powers to concern for the preservation of the power of the States by emphasizing that "a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." Id., quoting Gregory v. Ashcroft, 501 U.S. 452, 458 (1991).

That the Supreme Court's sweeping recognition of federal power in external affairs survived Lopez was recognized by a panel of the Ninth Circuit Court of Appeals in United States v. Hernandez-Guerrero, 147 F.3d 1075 (9th Cir. 1998) cert. denied, 119 S. Ct. 433 (1998). In Hernandez-Guerrero, the court upheld Congress's authority to pass criminal immigration legislation, relying on the fact that, although the immigration power is not enumerated in the Constitution, it has been "universally acknowledged that Congress possesses authority over immigration policy as 'an incident of sovereignty.'" 147 F.3d at 1076 (quoting Chae Chan Ping v. United States, 130 U.S. 581, 609 (1889)). The court in Hernandez-Guerrero further explained that Congress's power to enact criminal immigration laws derives from a concern for "our

18

relation with foreign countries" and that, therefore, Congress is not bound by the "rigid constraints" that limit its power in domestic contexts. 147 F.3d at 1077. Because Congressional authority to enact the immigration legislation at issue in <u>Hernandez-Guerrero</u> was firmly based in Congress's inherent power over immigration, the court explicitly declined to rely on Congress's enumerated power under the foreign commerce clause. <u>Id</u>. at 1078.

Congress's exercise of broad, non-enumerated powers over United States citizens appears most clearly in the foreign murder statute found at Title 18, United States Code, Section 1119. Section 1119(b) provides that "[a] person who, being a national of the United States, kills ... a national of the United States while such national is outside the United States but within the jurisdiction of another country shall be punished as provided under sections 1111, 1112, and 1113." Subsection (c) (2) of Section 1119 further provides a prosecution should not proceed unless the Attorney General determines that "the conduct took place in a country in which the person is no longer present, and the country lacks the ability to lawfully secure the person's return. A determination by the Attorney General under this paragraph is not subject to review." The determination by the Attorney General is not an element of the crime and does not raise Fifth Amendment due process concerns. <u>See</u> <u>United States v. Wharton</u>, 320 F.3d 526, 533 (5th Cir. 2003).

Section 1119(b) makes no mention of Congress's power to regulate foreign commerce or any other enumerated power. It should also be noted that, although the statute also requires that the victim is also a United States citizen, this requirement invokes the passive personality principle and not the nationality principle in international law. <u>See, e.g.</u>, <u>Rivard</u>, 375 F.2d at 885, n. 9 (describing the passive personality principle as jurisdiction based on the nationality *of the*

victim); See also United States v. Benitez, 741 F.2d 1312, 1316 (11th Cir. 1984) (invoking the

passive personality principle to uphold the prosecution of a Colombian citizen convicted of

killing a U.S. government agent in Colombia), cert. denied, 471 U.S. 1137 (1985).  The passive

personality principle is less well-established than the nationality principle as a basis for the

exercise of extraterritorial jurisdiction.  Restatement § 402 cmt. a.

The only published case addressing a challenge to Section 1119 on the grounds that it is

beyond the subject matter jurisdiction of Congress appears to be United States v. White, 51

F.Supp.2d 1008 (E.D. Ca. 1997).  The defendant in White was a United States citizen and

civilian who was arrested by Japanese authorities for the death of her two-year-old son, who was

also an American citizen.  51 F.Supp.2d at 1010.  The Japanese authorities declined to prosecute

the defendant and she was returned to the United States, where she was soon indicted under

Section 1119.  Id.  The court in White quickly rejected the defendant's claim that Congress is

restricted to enumerated powers in enacting statutes with extraterritorial reach, relying on the

"fundamental" differences between federal power with respect to internal and external affairs.  51

F.Supp.2d at 1010-1011 (citing Curtiss-Wright, 299 U.S. at 315-16).  As recognized by the court

in White in upholding Section 1119, "[i]t is pellucid Congress possesses external sovereignty

authority to pass criminal laws proscribing its nationals' outlaw conduct against other nationals

abroad."  Id. at 1011.

The power to legislate with respect to external affairs, particularly where a United States

citizen is involved, must still be exercised within constraints of other Constitutional provisions

such as the due process clause.  This does not lessen recognition in a long line of cases that the

power to extend federal criminal laws to acts of United States citizens overseas is inherent in

sovereignty.  While it is not necessary to rely on this inherent power, broad judicial recognition of the sweeping nature of this power should direct the Court's assessment of the statutes at issue in this case and should lead to the conclusion that Section 2423(c) is within Congress's constitutional power.

<div align="center">ii.       <u>Congressional Power Derived from the Commerce Clause</u></div>

Congress also possessed the authority to enact Section 2423(c) under the foreign commerce clause. <u>See</u> U.S. Const. Art. I, § 8, cl. 3. ("Congress shall have Power ... To regulate Commerce with foreign Nations.").  Foreign commerce is defined in 18 U.S.C. § 10 as "commerce with a foreign country."  "Foreign commerce" is typically defined in judicial opinions as including commerce or travel between the United States and any other country. <u>See, e.g.</u>, <u>United States v. Montford</u>, 27 F.3d 137, 139-40 (5th Cir. 1994); <u>United States v. Hersh</u>, 297 F.3d 1233, 1245 (11th Cir. 2002), <u>cert. denied</u>, 537 U.S. 1217 (2003).

Congressional power under the foreign commerce clause should be assessed in light of Congress's sweeping powers to regulate the conduct of United States citizens overseas.  This power must also be analyzed in light of the well-established proposition that there are fewer limits on Congressional power to regulate foreign commerce than on its power to regulate interstate commerce. <u>See, e.g.</u>, <u>United States v. Bredimus</u>, 352 F.3d 200, 208 (5th Cir. 2003) ("[t]he Supreme Court has long held that Congress's authority to regulate foreign commerce is even broader than its authority to regulate interstate commerce.") (citing <u>Japan Line, Ltd. v. Los Angeles County</u>, 441 U.S. 434, 448 (1979)).  The broader nature of Congressional authority to regulate foreign commerce stems, in part, from the fact that foreign commerce is "pre-eminently a matter of national concern." <u>Japan Line</u>, 441 U.S. at 448.

<div align="center">21</div>

Regulations such as Section 2423(c) should be accorded as much deference as possible by reviewing courts, because they do not implicate the concerns over powers reserved to the States that figured heavily in the Supreme Court's commerce clause jurisprudence. The Defendant minimizes the extent to which concern over the preservation of state power has shaped the Court's commerce clause jurisprudence. See Defendant's Motion to Declare Title 18 U.S.C. Section 2423(c) Unconstitutional at 10-11.  Contrary to the Defendant's assertions, however, concern over the balance between state and federal power lies at the heart of jurisprudence discussing the limits of Congressional power under the commerce clause. For example, in N.L.R.B. v. Jones & Laughlin Steel Corp., the Supreme Court noted that "the scope of [the commerce] power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them ... would effectually obliterate the distinction between what is national and what is local." 301 U.S. 1, 27 (1937). See also Lopez, 514 U.S. at 549;  United States v. Morrison, 529 U.S. 598, 608-09 (2000).

Section 2423(c) should also be assessed in light of the fact that it regulates economic activity, which "occupies the very core of Congress' commerce authority." Peters, 403 F.3d at 1273, citing United States v. Olin Corp., 107 F.3d 1506, 1510 n. 4 (11th Cir. 1997). The definition of illicit sexual conduct contained in Section 2423(f) includes a commercial sex act with a person under 18 years of age. 18 U.S.C. § 2423(f). The statute also reaches non-commercial sexual acts with a person under 18 if such conduct would violate Chapter 109A. Id.[6]

---

[6] This definition encompasses non-forcible sexual acts with a person less than sixteen years of age and sex by force or threat with a person less than eighteen years of age. See 18 U.S.C. §§ 2241-2243.

A commercial sex act is defined 18 U.S.C. § 1591(c)(1) as a sex act "on account of which anything of value is given to or received by any person." The Statute that the Defendant claims is invalid on its face thus encompasses a whole set of applications directly regulating economic activity, such as the commercial sex acts involved in the instant case. The Supreme Court's recent limitation of Congress's power to legislate pursuant to the commerce clause in cases such as Morrison "casts no doubt" on statutes that directly regulate economic activity. Gonzales v. Raich, 125 S.Ct. 2195, 2211 (2005).

The Supreme Court has identified three categories of activity that Congress may regulate under its commerce power. These are the "use of the channels of interstate commerce," the "instrumentalities of interstate commerce, or persons or things in interstate commerce," and activities that "substantially affect interstate commerce." United States v. Lopez, 514 U.S. 549, 558 (1995) (citations omitted); United States v. Morrison, 529 U.S. 598, 608-09 (2000). The requirements set forth in Morrison for establishing a sufficient nexus between interstate or foreign commerce and the activity regulated applies only to the third category of commerce clause regulation, concerning activities that substantially affect interstate commerce. Morrison, 529 U.S. at 609; Bredimus, 352 F.3d at 206-07.

As noted in the recent decision United States v. Ballinger, 395 F.3d 1218, 1231 (11th Cir. 2005) (en banc), the "in commerce" language typically signifies the first two Lopez categories, which are the channels and the instrumentalities of commerce. The "affecting commerce" language typically invokes the third Lopez category, which is the regulation of activities that substantially affect commerce. Id. The court in Ballinger cautioned that, in interpreting the intended reach of a statute, courts should not stray from the particularized meanings of these

23

terms. Id. at 1233. Thus, a court could not interpret a statute containing the "in commerce" jurisdictional element to be satisfied by a showing that the activities in question affect commerce. Id. at 1232, citing United States v. Am. Building Maintenance Indus., 422 U.S. 271, 280 (1975). With regard to Section 2423(c), it is clear that the requirement that the defendant traveled in foreign commerce could not be met by showing that the defendant's activities affected foreign commerce.

Courts need not be so constrained by the Lopez categories in determining whether a particular statute is within Congress's power under the commerce clause, however, as "it is often the case that more than one category will accommodate a given piece of legislation." United States v. Peters, 403 F.3d 1263, 1271, n.1 (11th Cir. 2005). The court in Ballinger also emphasized this distinction, noting that the "question of whether Congress has the constitutional authority to proscribe [a defendant's] conduct is entirely distinct from the question of whether the statutory language Congress employed actually reached that conduct." Id. The court further explained the difference between the interpretation of statutory jurisdictional elements and the assessment of jurisdictional power, explaining that an amendment removing language requiring interstate travel from the challenged statute "removed interstate travel only as a jurisdictional *requisite*, not as a jurisdictional *ground*. Id. at 1240 (emphasis in original). In the case presently before the Court, Congress possesses sufficient constitutional authority to enact Section 2423(c) under its power to regulate the channels of foreign commerce or its power to regulate activities that substantially affect foreign commerce.

The definition of illicit sexual conduct contained in Section 2423(f) compels the conclusion that there are at least some cases in which Section 2423(c) constitutes a direct

24

regulation of economic activity. Also, although Section 2423(c) does not require that a defendant

possess an illegal purpose at the time of travel, the statute encompasses cases where such intent

is present. The defendant would seemingly have to concede that the application of Section

2423(c) would at least fall within Congress's commerce clause power under these narrow

circumstances. As discussed above, the Defendant's facial challenge to Section 2423(c) must

therefore be denied. See, e.g., Ballinger, 395 F.3d at 1224, n. 2.

In the context of a challenge to Congressional authority under the commerce clause,

Courts have also directed that where a statute contains a jurisdictional element, facial

invalidation is improper. See Ballinger, 395 F.3d at 1228, n. 5 (noting that, when a statute

contains an express jurisdictional element, "courts can 'ensure, through case-by-case- inquiry,'

that each application of the statute is constitutional, and thus the statute should not be struck

down as being facially unconstitutional") (internal citations omitted); United States v. Smith, 263

F.3d 1270, 1273 (11th Cir. 2001), cert. denied, 534 U.S. 1166 (2002) (asserting that the

jurisdictional element of a statute "immunizes" that statute from a "facial constitutional attack.").

Section 2423(c) contains the jurisdictional element that the defendant "travels in foreign

commerce."[7]   For this reason as well, the defendant's facial challenge must fail.

> a.   Section 2423(c) is a Valid Regulation of the Channels and
>       Instrumentalities of Foreign Commerce

The constitutionality of Section 2423(c) was recently upheld by a district court in United

States v. Clark, 315 F.Supp.2d, 1127 (W.D. Wa. 2004). Like Frank, the defendant in Clark had

made frequent trips back and forth between the United States and Cambodia, during which he

---

[7]  Under the citizenship theory discussed above, the "United States citizen" element of
Section 2423(c) can also be categorized as a jurisdictional element.

allegedly engaged in sexual acts with minors. Id. at 1129.  Unlike the instant case, however, the

indictment challenged in Clark only concerned a single trip between the United States and

Cambodia.  Id.[8] The court in Clark rejected the defendant's claim that Section 2423(c) was

beyond Congress's constitutional authority, finding that the statute was within Congress's power

to regulate the channels of foreign commerce. Id. at 1133-34.  Because the court found that

Section 2423(c) was a proper regulation of the channels of foreign commerce, it declined to

decide whether it is also a permissible exercise of Congressional authority to regulate the

instrumentalities of or activities that substantially affect foreign commerce. Id. at 1133, n. 5.

    In reaching this holding, the court in Clark recognized the broader nature of

Congressional power to regulate foreign commerce, noting "[t]his Court has identified no

instance in which the United States Supreme Court invalidated a criminal statute for exceeding

the bounds of Congress's authority to regulate foreign commerce." 315 F.Supp.2d at 1135.  The

Clark decision also emphasized that the regulation of foreign commerce does not implicate the

federalism concerns that were the "principal motivating factor" for the Supreme Court's

decisions limiting the commerce power in Lopez and Morrison.  Id. at 1135-36.

    The Clark decision also highlights the international dimensions of the conduct addressed

by Section 2423(c), explaining:

> [T]his statute addresses a problem of grave international consequences that does affect
> channels of foreign commerce.  The exploitation of children by United States citizens,
> even when that exploitation occurs by those who travel outside of the United States, is
> considered by the President of the United States to be a significant problem that the
> United States has committed to address ... Government action in this area also clearly
> implicates foreign policy and public health concerns.

---

[8]  This trip occurred on May 1, 2003, which was only a few days after the effective date of
the PROTECT Act. Id.

315 F.Supp.2d, 1135. Where, as here, a statute regulates the activities of U.S. citizens overseas in an area touching the foreign relations priorities of the United States, courts should be particularly hesitant to declare such statute to be unconstitutional.

The decision in Clark also noted cases upholding 18 U.S.C. § 1204(a), the International Parental Kidnapping Crime Act ("IPKCA"). One of the cases cited by the court in Clark was United States v. Cummings, in which a panel of the Ninth Circuit Court of Appeals held that the retention portion of the IPKCA was within Congress's authority to regulate the channels of foreign commerce. 281 F.3d 1046, 1049 (9th Cir. 2002). The extraterritorial provision of the statute at issue in Cummings provides, in relevant part, for the punishment of whoever "retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights." 18 U.S.C. § 1204(a). In explaining its holding, the court in Cummings noted that Congressional authority under the commerce clause includes the regulation of non-economic activities that "affect, impede, or utilize the channels of commerce" and that Congress's foreign commerce clause power is even broader than that related to interstate commerce. 281 F.3d at 1048-49.

The court in Cummings upheld the IPKCA on two basic theories. The first was that the child unlawfully retained outside the United States must necessarily have traveled in the channels of foreign commerce to reach the country in which that child is retained. 281 F.3d at 1049. The court noted that "[t]he cessation of movement does not preclude Congress's reach if the person or goods traveled in the channels of foreign commerce." Id. at 1050. The second basis of Congressional authority identified by the court in Cummings was that the wrongful retention of a child outside of the United States creates an impediment to the use of the channels of foreign

27

commerce, because the child "cannot freely use the channels to return." Id.

The IPKCA was also upheld in United States v. Shahani-Jahromi, 286 F.Supp.2d 723 (E.D. Va. 2003), in which the defendant claimed that the retention portion of the IPKCA violated his due process rights and was beyond Congress's power under the commerce clause. In holding that the IPKCA was within Congress's commerce power, the court in Shahani-Jahromi also emphasized that the federalism concern that was a "principal basis" for the Supreme Court's recent limitations on Congress's use of its commerce power was "strikingly absent from this case." Id. at 735. The court further noted that, while child custody is typically an area of state concern, it occurred in the "context of international kidnapping, a quintessentially international problem in need of a national response." Id. at 736, citing Japan Line, 441 U.S. at 448.

In Shahani-Jahromi, the child had been voluntarily taken to Iran by her mother so that wrongful retention was not preceded by wrongful removal. 286 F.Supp.2d at 733. The court nevertheless held that the IPKCA's regulation of non-economic activity taking place outside the channels of commerce was aimed at removing an impediment to travel in foreign commerce and was thus a valid exercise of Congress's authority to regulate the channels of foreign commerce. Id. at 734.

It is important to note that the International Parental Kidnapping statute at issue in Cummings and Shahani-Jahromi does not require that the child was wrongfully removed from the United States, but only that the child was wrongfully retained outside the United States. Therefore, while these decisions refer to the wrongful use or impediment to the use of channels of foreign commerce, they do not support the narrow scope of Congressional power urged by the Defendant in this case. The IPKCA cases illustrate that it is not necessary to show that a *person*

traveled in the commerce with specific illegal intent to fall within Congressional authority to regulate foreign commerce. In fact, the wrongful retention abroad, or constructive prevention of the use of channels of foreign commerce, is more remotely connected to such channels than the actual use by defendants required by Section 2423(c). Defendants such as Frank are actively using the channels and instrumentalities of foreign commerce to go back and forth between the United States and places where they engage in illicit sexual conduct with minors. This is so whether or not they are shown to have possessed the intent to engage in such acts at the outset of their outbound travel.

The court in Clark declined to place much weight on cases upholding 18 U.S.C. §2423(b) as a valid exercise of congressional power under the commerce clause. See 315 F.Supp.2d at 1134. This is because the elimination of the requirement that the defendant travel in foreign commerce "for the purpose of engaging in any illicit sexual conduct" makes these statutory provisions different in significant respects. Id. Because criminal intent must be formed while the defendant is still in the United States, Section 2423(b) is not truly an extraterritorial statute. See, e.g., Bredimus, 352 F.3d at 208 (noting that the substantive criminal act punished by Section 2423(b) is not a sexual act with a minor in a foreign country but travel with the intent to commit such an act). As explained in United States v. Hersh, a "violation of [Section] 2423(b) occurs when a person *travels in foreign commerce for the purpose of engaging in* any illegal sexual act with a minor. The statute does *not* require that actual sexual activity took place [in the foreign country]." 297 F.3d 1233, 1245 (11th Cir. 2002), cert. denied, 537 U.S. 1217 (2003) (emphasis in original). The *actus reus* occurs while the defendant is transit in foreign commerce and the offense is therefore complete before the person arrives in the foreign country. While the

regulation of travel with illegal intent is frequently upheld under Congress's commerce power, it is by no means the only type of activity that Congress can reach through this power. See, e.g., Clark, 315 F.Supp.2d at 1135 (noting that decisions upholding Section 2423(b) and the IPKCA "do not establish the outer limit of congressional authority to regulate channels of foreign commerce.").

There is simply no authority for the assertion that the power of Congress to regulate the channels of interstate or foreign commerce is restricted to situations where the Government demonstrates illegal purpose while in transit through such channels of commerce. In fact, there is controlling case law in the Eleventh Circuit that holds otherwise. The finding that Section 2423(c) is within Congress's power to regulate the channels of foreign commerce is supported if not compelled by the Eleventh Circuit's recent *en banc* decision in Ballinger.

In Ballinger, the defendant appealed his convictions for intentionally destroying religious property, in violation of 18 U.S.C. § 247, which provides in relevant part:

> (a) Whoever, in any of the circumstances referred to in subsection (b) of this section--
> (1) intentionally defaces, damages, or destroys any religious real property, because of the religious character of that property, or attempts to do so;
> shall be punished as provided in subsection (d).
> (b) The circumstances referred to in subsection (a) are that the offense is in or affects interstate or foreign commerce.

See 395 F.3d at 1224, quoting 18 U.S.C. § 247. The statute challenged in Ballinger thus contained no requirement that the defendant traveled in interstate or foreign commerce, or that any such travel was undertaken with the intent to destroy religious property in the destination state. Ballinger held that the challenged statute was within Congress's power to regulate both the channels and instrumentalities of commerce, which "includes the power to prohibit their use for

30

harmful purposes, even if the targeted harm itself occurs outside the flow of commerce and is purely local in nature." 395 F.3d at 1226.[9] The court declined to decide whether the statute might also be upheld as a regulation of activities that substantially affect interstate commerce. Id. at 1227.

While the court in Ballinger described the defendant's travel through multiple states on interstate highways as being "apparently for no other purpose than to burn churches to the ground," the court explicitly rejected the defendant's contention that the *actus reus* of the offense must occur "in commerce" or constitute an attack on an instrumentality of commerce to fall within Congress's commerce power.  Id. at 1226.  In explaining the broad reach of Congress's power to regulate the channels and instrumentalities of commerce, the *en banc* decision in Ballinger noted several statutes falling within Congress's power to regulate the channels and instrumentalities of commerce that do not require travel with a specific illegal purpose.  395 F.3d at 1230, n. 7.  The court described these statutes as undermining the defendant's contention that "Congress can only proscribe *travel* in commerce to commit a crime, not the crime itself."  Id. (emphasis in original).

Ballinger makes it clear that the reach of Congress's power to regulate commerce extends to the use of the channels or instrumentalities of commerce to facilitate the commission of illegal acts, or to "promote ... the spread of any evil or harm to the people of other states from the state of origin."  395 F.3d at 1226 (quoting Brooks v. United States, 267 U.S. 432, 436 (1925)).  The

---

[9] The court in Ballinger primarily addressed the defendant's as-applied challenge to the statute, because his concession that some types of conduct might fall within the permissible scope of the statute was "wholly inconsistent with facial unconstitutionality." 395 F.3d at 1225, n2.

court in Ballinger broadly defines the scope of Congress's power to regulate commerce, asserting

that there is "no doubt that the commerce power contemplates congressional regulation of the

channels and instrumentalities of commerce in order to prevent their use to facilitate harmful

acts, which may be consummated – and whose effects ultimately may be felt – outside the flow

of commerce." 395 F.3d at 1228. This precedent also leaves no room for the argument that a

statute must require proof of illegal intent at the time of travel to fall within Congress's power to

regulate the channels and instrumentalities of commerce.

                                b.     Section 2423(b) is a Valid Regulation of Activities
                                      that Substantially Affect Foreign Commerce

Section 2423(c) is also within Congress's power to regulate activities that substantially

affect foreign commerce. Like the other facets of its commerce power, Congress's authority to

reach activities that substantially affect foreign commerce should be assessed in light of its

greater power over foreign commerce, which does not implicate the federalism concerns

dominant in cases such as Lopez and Morrison.

Courts should consider four general factors when analyzing whether regulated activity

"substantially affects" interstate commerce.[10] These factors are (1) whether the regulated activity

is commercial or economic in nature; (2) whether the statute contains an express jurisdictional

requirement; (3) whether the statute or its legislative history contains congressional findings

articulating the effect of the regulated activity on interstate commerce; and (4) whether the

activity's effect on commerce is direct, as opposed to attenuated. See Morrison, 529 U.S. at 610-

12.

---

[10] It is not clear how the assessment of these factors would apply, if at all, to the assessment of a statute regulating foreign commerce.

Of these factors, the most important is whether a statute regulates commercial activity. See Raich, 125 S.Ct. at 2211 (the limitation in cases such as Morrison "casts no doubt" on statutes that directly regulate economic activity); Smith 403 F.3d 1263, 1273 (noting that "laws aimed directly at economic activity are most likely to satisfy the substantial effects test.") (internal quotations omitted). Section 2423(c) involves the regulation of economic activity in two respects. It requires travel in foreign commerce, which, in the majority of cases, will be done via commercial means. It also prohibits commercial sexual activity with minors. Although Section 2423(c) prohibits non-commercial sexual activity in some cases, the link to commerce is nonetheless clear. Congress has drafted Section 2423(c) and (f) so that some applications will directly regulate economic activity.[11] Furthermore, the link between the prohibited activity and the affect on foreign commerce is not attenuated where defendants travel in foreign commerce and spend money derived from U.S. sources to pay for hotels and even the sexual activity itself.

While Section 2423(c) does not contain Congressional findings regarding the impact of the regulated activity on foreign commerce, courts have recognized that "when the challenged statute regulates activity that is plainly economic in nature, no jurisdictional hook or congressional findings may be needed to demonstrate that Congress properly exercised its commerce power." Smith 403 F.3d 1263, 1273. See also Raich, 125 S.Ct. at 2208.

In Raich, the Court held that the Controlled Substances Act ("CSA") was within Congress's power to regulate activities that substantially affect commerce even where applied to the intrastate growth of marijuana for personal medical consumption. 125 S.Ct. at 2215. In

---

[11] This fact also means that it would be improper to declare the statute facially invalid. As noted above, facial invalidation is also not appropriate where a statute contains an express jurisdictional element. See Smith, 263 F.3d at 1273.

33

reaching its holding, the Court in Raich distinguished the CSA from the statutes struck down in Lopez and Morrison, which "did not regulate economic activity." Id. at 2210. Raich affirmed that Congress can regulate activity that is not itself commercial where such activity is part of a class of activities that is within the reach of federal power. Id. at 2209. Such regulation of non-commercial, intrastate activity furthers the "federal interest in eliminating commercial transactions in the interstate market in their entirety." Id. at 2207.

In assessing Congress's power to enact Section 2423(c) under these standards, it is clear that both the commercial and non-commercial activities covered by this Section further the federal interest in eliminating the international sexual exploitation of minors. Under Raich and other controlling precedent, courts assessing the scope of Congress's authority under the commerce clause "need not determine whether respondents' activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." 125 S.Ct. at 2208.   Congress clearly had a rational basis for concluding that the activities of multiple United States citizens who travel overseas and engage in the commercial and non-commercial sexual exploitation of minors substantially affect foreign commerce. Section 2423(c) should therefore also be upheld under the "substantial affects" prong of Congress's commerce clause power.

iii.     Congressional Authority Based on the Treaty Power

Congress's power to enact Section 2423(c) is also grounded in its authority to pass legislation to implement treaties entered into by the United States. It is well-established that Congress may enact laws implement treaties to which the United States is a party. See U.S. Const. Art. I, § 8, cl. 18; U.S. Const. Art. II, § 2, cl. 2; Missouri v. Holland, 252 U.S. 416, 432

34

(1920). Laws made in pursuance of treaties entered into by the United States are the supreme law of the land, and are subject only to general constitutional constraints such as the protections provided by the Fifth Amendment to the Constitution. See, Missouri v. Holland, 252 U.S. at 433; Reid v. Covert, 354 U.S. 1, 17 (1957) (affirming that while treaties are a source of authority for legislation, the exercise of the treaty power must still observe constitutional prohibitions). The treaty power is thus a specific, enumerated source of authority for Congressional legislation.

Section 2423(c) may be upheld as legislating the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography (hereinafter "Protocol"). Protocol, *opened for signature* May 25, 2000, S. Treaty Doc. No. 106-37, UN Doc. A/RES/54/263 (Attachment G). The Protocol was ratified by the United States Senate on June 18, 2002. See 148 Cong. Rec. S5717-01. Cambodia is also a party to the Protocol. See Status of Ratifications of the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography (Attachment H). The Protocol is designed to advance the purposes of the Convention on the Rights of the Child, which defines a child as a person below the age of eighteen years unless under applicable law the age of majority is attained earlier. See Convention on the Rights of the Child ("Convention"), art. 1, U.N. G.A.O.R. 44th Sess., Supp. No. 49, at 1 (1989) (Attachment I). The Protocol is, however, a separate multilateral treaty from the Convention. While Cambodia has ratified the Convention, the United States has not. See Status of Ratifications of the Convention on the Rights of the Child (Attachment J).

The preamble to the Protocol describes the States Parties as being "[d]eeply concerned at the widespread and continuing practice of sex tourism, to which children are especially

35

vulnerable, as it directly promotes the sale of children, child prostitution and child pornography." The Protocol calls on States Parties to prohibit the sale of children, child prostitution and child pornography as provided for in the Protocol, and defines child prostitution as "the use of a child in sexual activities for remuneration or any other form of consideration." Protocol, art. 2(b). Child pornography is defined as "any representation, by whatever means, of a child engaged in real or simulated explicit sexual activities or any representation of the sexual parts of a child for primarily sexual purposes." Id., art. 2(c).

The Protocol specifically calls on States Party to establish jurisdiction for certain offenses covered by the Protocol, "whether such offences are committed domestically or transnationally or on an individual or organized basis." Protocol, art. 3. These offenses include "accepting ... a child for the purpose of [s]exual exploitation of the child," "obtaining ... a child for child prostitution," and "producing ... child pornography." Id. The Protocol further contemplates that such jurisdiction may be established "[w]hen the alleged offender is a national of that State or a person who has his habitual residence in its territory." Id., art. 4.2(a).

The Protocol thus provides an explicit framework for extraterritorial jurisdiction over United States citizens who engage in sex tourism, and particularly commercial sex acts, while overseas. The Senate's ratification of the Protocol included the declaration that the provisions of the Protocol (other than Article 5) are non-self-executing and that "United States does not intend to enact new legislation to fulfill its obligations under the Protocol." See 148 Cong. Rec. S5717-01, *S5719. This does not, however, constrain future Congressional legislation implementing this multilateral agreement. In addition, courts may find that Congressional authority for certain legislation derives from the treaty power even where Congress has not specifically identified

36

such legislation as implementing a treaty. See, e.g., United States v. Georgescu, 723 F.Supp.912, 918 (E.D. N.Y. 1989) (finding that challenged statute could be "constitutionally justified" as within Congressional authority to implement certain conventions, even though Congress did not expressly indicate its treaty power as the constitutional basis). Section 2423(c) is independently supported by Congress's power to implement treaties to which the United States is a party and should be sustained on this basis.

### 3.     Section 2423(c) is Within Congress's Constitutional Power as Applied to the Defendant

The Defendant does discuss in any detail why Section 2423(c) is purportedly beyond Congressional power as applied to him. In any case, it is clear that the application of Section 2423(c) to Defendant is not beyond Congress's subject matter jurisdiction. As the foregoing discussion illustrates, Congress possesses broad authority to legislate in areas touching on foreign relations, particularly with regard to American citizens overseas. See Curtiss-Wright, 299 U.S. at 315-16; Blackmer, 284 U.S. at 437.

The defendant is an American citizen who, while in Cambodia, allegedly engaged in sexual activity that is specifically prohibited by a statute that applied to him by virtue of his citizenship. This conduct also falls within the express terms of the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography, which is a multilateral treaty ratified by the United States. The Protocol specifically recognizes the power of States Party to exercise extraterritorial jurisdiction over certain acts contained therein, including child prostitution and child pornography.

Section 2423(c), as applied, is also within Congress's authority under the foreign

commerce clause. This statute is within Congressional authority to regulate the channels and

instrumentalities of foreign commerce, which is not limited to use of such channels with intent to

engage in criminal acts. Under Ballinger and other cases interpreting this power, Congress can

regulate the use of the channels and instrumentalities of commerce to *facilitate* prohibited acts.

There is no doubt that where, as here, a defendant travels back and forth between the United

States and foreign countries and engages in illicit commercial sexual activity in those countries,

he is using the channels and instrumentalities of foreign commerce to facilitate his illegal

activity.

Moreover, the images and other evidence in this case even indicate that the defendant

engaged in sexually explicit conduct with the same minors, that is Minor A and Minor B, during

his trip to Cambodia between September 16, 2003 and October 9, 2003 and during his next trip

to Cambodia after November 24, 2003. Between the two trips, the Defendant returned to the

United States and twice traveled between the United States and Costa Rica. See TECS records,

Attachment B. The evidence further shows that the defendant purchased his ticket for the second

trip to Cambodia on November 7, 2003, while in the Miami area between the two trips to Asia

during this time period. See Mastercard Records, Attachment E. While not necessary to sustain

the finding that Section 2423(c) is constitutional as applied in the instant case, these

circumstances support the finding that the Defendant did travel in foreign commerce with the

intent to engage in illicit sexual conduct.

The Statute, as applied, is also within Congressional authority to regulate activity that

substantially affects foreign commerce. The Court in Raich affirmed that Congress can regulate

activity that is not itself commercial where such activity is part of a class of activities that

substantially affect commerce. Id. at 2206-07. The Court further emphasized that in such situations courts have "no power 'to excise, as trivial, individual instances' of the class." Id. at 2209 (internal quotations omitted). Unlike the purportedly non-economic activities of the defendants in Raich, Frank allegedly engaged in commercial sexual activity with minors in Cambodia. His activities were also economic in other respects, in that he took commercial airlines to fly back and forth between the United States and other countries during the relevant time period. As noted elsewhere, the Defendant also used American funding sources, such as his credit cards, to finance these travels; this use included purchases and a $3,000 cash withdrawal on his Mastercard while in Cambodia during the time period in which he allegedly engaged in illicit sexual conduct. The Defendant's activities fall squarely within a class of activities that substantially affect foreign commerce. The Defendant's motion to dismiss must therefore be denied.

### 4.   Section 2423(c) is Valid both Facially and as Applied to the Defendant under the Due Process Clause

The Defendant's facial challenge to Section 2423(c) on due process grounds must also fail, as he cannot show that there is no set of circumstances under which the Act could be validly applied. Although it is the Government's position that the Act comports with due process in almost all circumstances, even the Defendant would seemingly concede that it could be validly applied to a defendant who travels with the intent to commit illegal sexual acts and thereinafter commits acts that are illegal in both the destination country and under Section 2423(c). Given the clear existence of a set of circumstances in which Section 2423(c) would have valid application, the Defendant's facial challenge to the Statute must be rejected.

39

The Defendant appears to suggest that, to avoid ostensible conflict with the laws of other nations, United States law must somehow incorporate foreign laws that differ from our own. See Defendant's Motion to Declare 18 U.S.C. § 2423(c) Unconstitutional at 12, 14. Yet it is exactly this type of variation in the laws around the globe that would make a statute deferring to or incorporating such laws difficult for courts to apply. In Small v.United States, for example, the Supreme Court interpreted the phrase "convicted in any court" in a federal gun possession statute as excluding convictions from foreign courts. 125 S.Ct. 1752, 1754 (2005). In so holding, the Court considered that such an interpretation might "include a conviction from a legal system that its inconsistent with an American understanding of fairness." Id. at 1755. While considering variation in foreign law, the holding in Small was based on statutory interpretation in light of the general presumption that "Congress ordinarily intends its statutes to have domestic, not extraterritorial, application." Id. (internal citations omitted). Small explicitly noted that Congress "remains free to change this conclusion through statutory amendment." Id. at 1758.

There is simply no support for the contention that United States law with extraterritorial application must defer to the laws of other countries. The United States is not required to comply with the lowest common denominator in acting to protect children from sexual abuse. Such an approach would lead to absurd situations where a statute such as Section 2423(c) could not be applied to a United States citizen who sexually abused a twelve-year-old in a country where twelve is the age of consent, or who engaged in sexual acts with a minor who had previously been exploited, in a country where lack of virginity is a defense to sexual abuse laws. That United States law need not incorporate the myriad standards and statutes from other countries is especially so in an area such as the commercial sexual exploitation of children, which is a foreign

40

policy and law enforcement priority for the United States and which is universally condemned. See Clark, 315 F.Supp.2d at 1131, 1133.

To the extent that the defendant's arguments raise a substantive due process challenge, this challenge should be assessed under the deferential rational basis standard. In an analogous case, the defendant in United States v. Plummer, was prosecuted under statutes including the unauthorized transportation outside of the United States of merchandise manufactured in Cuba in violation of 50 U.S.C. Appendix §§ 5(b) and 16 ("TWEA"), for conduct that occurred outside the territorial jurisdiction of the United States. 221 F.3d 1298, 1301. The court in Plummer rejected the defendant's claim that the TWEA regulations were irrational and violated substantive due process in "imposing criminal liability based on 'carrying a Cuban cigar, anywhere in the world.'" Id. at 1308. In rejecting the defendant's substantive due process claim, the court emphasized that judicial deference is especially necessary in areas involving foreign affairs and held that the defendant had not met his burden of showing that the statutory and regulatory provisions at issue were "wholly irrational or unrelated to any legitimate governmental interest." Id. at 1309.

In the case before the Court, Congress could very rationally conclude that Section 2423(c) would play a role in the reduction of the worldwide problem of the commercial sexual exploitation of minors. The broad nature of this problem was recognized, for example, in comments made by Senator Boxer during the ratification of the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography. Senator Boxer noted that the Protocol "requires parties to the treaty to make sure that these acts are fully covered by penal or criminal law" and asserted that the "abuse of children

41

is a global problem. Millions of boys and girls under the age of 18 are bought and sold each year." See 148 Cong. Rec. S5717-01, *S5718.

That Defendant's argument that Section 2423(c) violates Cambodian sovereignty and lacks a rational basis is further undercut by the fact that Cambodia, like the United States, is one of 76 nations that have specifically condemned child prostitution and have undertaken obligations to criminalize such conduct by ratifying the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography. See Status of Ratifications of the Optional Protocol to the Convention on the Rights of the Child on the Sale of Children, Child Prostitution, and Child Pornography (Attachment H). As noted above, the Protocol explicitly calls on States Parties to enact legislation providing for extraterritorial jurisdiction when such acts are committed by their nationals. See Protocol, arts. 3, 4.2(a). Section 2423(c) does not directly regulate the conduct of Cambodian citizens or otherwise interfere with Cambodian sovereignty. Instead, it constitutes an effort by the United States to penalize U.S. citizens who use the benefits of U.S. citizenship, such as passports and money to travel in foreign commerce and contribute to the increasingly international problem of the commercial sexual exploitation of children.

And while the Defendant would have the Court rely on the fact that sex with a sixteen-year-old is not illegal under the Cambodian debauchery statute with which he was originally charged, he has provided no support for the contention that commercial sex or the creation of pornography is legal with a person of any age in Cambodia. Even if such conduct were not criminalized by the laws of Cambodia, the application of Section 2423(c) to the Defendant would not offend due process. Where one government does not criminalize certain conduct and *another*

42

does, there is not a genuine conflict of laws because a defendant can comply with both laws simply by refraining from doing the prohibited acts. In <u>Shahani-Jahromi</u>, for example, the court rejected the Defendant's contention that his due process rights were violated by the extraterritorial application of the IPKCA because his conduct was legal under Iranian law, noting that "this is not a case where Iranian law conflicts with United States law in the sense that defendants compliance with American law required his violation of Iranian Law." 286 F.Supp.2d at 731, n. 16 (contrasting situation with that in <u>Societe Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers</u>, 357 U.S. 197 (1958)). There can be no argument that Cambodian law somehow *required* Frank to engage in commercial sex acts or take sexually explicit photographs with persons under 18.

In the context of federal laws that criminalize conduct that is not illegal under state law, courts routinely reject the contention that the application of the stricter federal standards violates due process. For example, in <u>United States v. Bach</u>, the court held that the defendant's conviction under 18 U.S.C. § 2251 for the production of child pornography involving a sixteen-year-old did not violate the due process clause even though the age of consent in the state where the sexual conduct took place was sixteen. 400 F.3d 622, 628-29 (8th Cir. 2005) <u>cert. denied</u>, 126 S.Ct. 243 (2005). Nor was it relevant that the age of consent under other federal statutes is sixteen. <u>Id</u>. at 629. The court in <u>Bach</u> noted that Congress had previously found that the regulation of child pornography was hampered by the definition of minors as being under sixteen and rejected the defendant's challenge to his convictions under the First and Fifth Amendments, finding that Congress's choice to "regulate child pornography by defining minor as an individual under eighteen is rationally related to the government's legitimate interest in enforcing child

43

pornography laws." Id. Cases such as Shahani-Jahromi, Plummer and Bach indicate that the application of Section 2423(c) to the Defendant would not violate due process even if it were assumed that the minors listed in the indictment were sixteen and that his alleged conduct of engaging in commercial sex acts and creating pornography with those minors did not violate any provisions of Cambodian law.

There is similarly no requirement that a defendant know that his conduct is illegal to constitutionally come within a statute with the *mens rea* element of "knowingly" committing an act, as is required under Section 2423(c). The terms "knowingly" and "wilfully" have well-established meanings in criminal law. The use of the term "knowingly" typically only requires a finding of general intent for conviction, whereas the term "wilfully" typically requires knowledge that the conduct is unlawful, and in certain cases requires knowledge of the specific laws violated. See, e.g., Bryan v. United States, 524 U.S. 184, 192-93 (1998) (noting that the use of "knowingly" in 18 U.S.C. § 924(a)(1) does not refer to a "culpable state of mind or to knowledge of the law" but only requires proof of knowledge of the facts comprising the offense); United States v. Lynch, 233 F.3d 1139, 1141 (9th Cir. 2000) (use of knowingly rather than wilfully reflects Congressional recognition that ignorance of the law is no excuse, stating that "[t]he defendant must know that he is in fact performing an act, whether or not he knows that the act has been criminalized by statute"); United States v. Billie, 667 F.Supp. 1485, 1493 (S.D. Fl. 1987) (noting that Eleventh Circuit pattern jury instructions specifically distinguish "knowingly" from "wilfully;" while wilfully requires specific intent, knowingly requires only general intent).

Courts have also recognized that, to the extent that knowledge that conduct is illegal is required, "[d]espite the fact that most citizens do not keep abreast of every statutory development,

44

that statutes are published and available to the public in the first place means that citizens can fairly be charged with constructive notice of the laws that bind them." United States v. Vasarajs, 908 F.2d 443, 448 (9th Cir. 1990)(citation and quotation omitted). See also Blackmer v. United States, 284 U.S. 421, 438 (1932) (a United States citizen outside the United States is " personally bound to take notice of the laws that are applicable to him and to obey them."). In this case, the Defendant unquestionably traveled back and forth between Cambodia and the United States and thus had access to information about the PROTECT Act and Section 2423(c), which were also available from anywhere in the world on the Internet. See, e.g., http://thomas.loc.gov/ (Library of Congress's legislative website).

While the prosecution of the Defendant in the instant case would comply with due process protections even without actual notice, there is evidence that the defendant had knowledge that the United States could prosecute its citizens for sexual misconduct in Cambodia. The items seized from the defendant's hotel room on January 1, 2004, included several press clippings about arrests of U.S. citizens for sexual exploitation of children. These included an article from the December 29, 2003 *Cambodia Daily*, which said that Maryland resident Richard Arthur Schmidt had been arrested for debauchery in Cambodia and that "[p]olice are working with the Ministry of Interior and the US to arrange Schmidt's extradition for trial in the US" and that "[a]n official from the US Customs Service has arrived in the capital and is monitoring the case." See "Freed Debauchery Suspect Arrested Again" (Attachment K).[12]

---

[12] The Government also notes that the evidence in this case includes sexually explicit images on the memory sticks of Frank's camera of several minors who appear to be prepubescent. In relying on the assertion that the victims in the instant case are purportedly above the age of consent in Cambodia, the Defendant neglects this evidence of the sexual exploitation of other, younger minors.

The Defendant also contends that Section 2423(c) violates the due process clause because "there is no connection between [the] United States and a person who happens to be a U.S. citizen who is living abroad where his legal activity is alleged to have occurred half [way] around the world." This statement does not reflect the applicable law. The court in Clark rejected the defendant's due process challenge to Section 2423(c), citing the nationality principle in international law and also finding that when a crime against a foreign national "is committed by an American citizen or resident alien ... a sufficient nexus exists." 315 F.Supp.2d 1127, 1133. The court further noted that the eradication of commercial sexual exploitation, particularly of children, is a foreign policy and law enforcement priority for the Untied States and that therefore "an American citizen or resident alien could reasonably anticipate being haled into Court in the United States for illicit sexual conduct with a child in a foreign country." Id.

As noted above, the Supreme Court has recognized the sweeping nature of the power of the United States to regulate the conduct of its citizens overseas. See, e.g., Blackmer, 284 U.S. at 437 (while Congressional legislation is generally construed to apply only within the territorial jurisdiction of the United States unless a contrary intent appears, "the question of its application, so far as citizens of the United States in foreign countries are concerned, is one of construction, not of legislative power."). In Blackmer, the Supreme Court upheld the contempt conviction of the defendant, a United States citizen, for failing to comply with a criminal subpoena that was served on him while he was a resident of France. The subpoena had been served pursuant to a Federal statute providing for the service of criminal trial subpoenas upon United States citizens "beyond the jurisdiction of the United States," through United States consul. Id. at 436 n.1. One of the defendant's objections to the statute was that it violated the due process clause of the Fifth

Amendment. Id. at 438. The Court distinguished the case before it from those "where

obligations inherent in allegiance are not involved." Id. at 438 n. 5. In holding that the

defendant's conviction did not violate due process, the Court explained that "[t]he jurisdiction of

the United States over its absent citizen, so far as the binding effect of its legislation is

concerned, is a jurisdiction in personam, as he is personally bound to take notice of the laws that

are applicable to him and to obey them." Id. at 438.

Since the decision in Blackmer, numerous courts have discussed and affirmed the

authority of Congress to apply criminal statutes to the activities of United States citizens

overseas. These decisions indicate that the exercise of such jurisdiction comports with both

international law and constitutional protections under the due process clause. While the contexts

of these discussions vary, they generally indicate that citizenship alone is sufficient to justify the

exercise of jurisdiction over United States citizens for acts committed overseas.[13] See, e.g.,

Mitchell, 553 F.2d at 1001 (noting that "citizenship alone is generally recognized as a

relationship sufficient to justify the exercise of jurisdiction by a state."); United States v. Reeh,

780 F.2d 1541, 1543 at n. 2. (11th Cir. 1986) (stating that a state may punish the wrongful

conduct of its citizens no matter where it takes place); Plummer, 221 F.3d at 1307 (noting that

the nationality principle "permits a state to exercise criminal jurisdiction over one of its nationals

... Plummer is concededly a United States citizen, and therefore exercising jurisdiction over him

in this case is proper.") (internal citations omitted). See also United States v. Hill, 279 F.3d 731,

---

[13] While some of the case law uses the phrase "United States citizen," many of these cases
address a broader class of persons with strong ties to the United States and would support the
application of Section 2423(c) to permanent resident aliens.

740 (9th Cir. 2002); United States v. Harvey, 2 F.3d 1318, 1329 (3rd Cir. 1993).

In United States v. Juda, 46 F.3d 961, 966-67 (9th Cir. 1995), the court upheld the application of the Maritime Drug Enforcement Act to the drug-related activities of a United States citizen on a stateless vessel, outside the territorial waters of the United States. The court in Juda found that the challenged application of federal penal law comported with due process even absent a connection between the defendant's activities and the United States (such as the intent to import the drugs). Id. at 966. The court based its holding that no nexus was required, in part, on the broad recognition under international law that a nation may exert jurisdiction over its citizens and distinguished cases involving the assertion of jurisdiction over foreign nationals. Id. at 966-67. See also White, 51 F.Supp.2d at 1011 ("where the government seeks to prosecute a United States citizen for acts occurring in foreign lands, due process does not require a demonstration of nexus."). The benefits of American citizenship also carry the obligation to follow applicable laws. The citizenship of the offender is sufficient to make the exercise of criminal jurisdiction comport with due process.

In the present case, the exercise of criminal jurisdiction over the defendant is further supported by his close ties to the United States in addition to his citizenship. The Defendant maintained active voting status and a valid Florida drivers license during the time period involved in this case. See Attachments C, D. While the Defendant describes himself as "living abroad," his travel records show that he regularly traveled back and forth between the United States and countries such as Cambodia and spent significant amounts of time in the United States during 2003. See Attachment B. The numerous trips that the defendant took during this time period included countries such as Costa Rica, Taiwan, Cambodia, Thailand and Vietnam; for

48

each trip he used a United States passport. <u>See</u> Attachment A. The Defendant's claim that

Section 2423(c) violates due process also neglects the strong circumstantial evidence that he

defendant traveled with illegal intent, in that he allegedly engaged in illicit sexual conduct during

both his earlier and later trips to Cambodia during the time frame alleged in the indictment. This

further strengthens the interest of the United States in exercising jurisdiction. The defendant also

used assets derived from the United States and American credit cards to finance the overseas

trips during which he allegedly engaged in illicit sexual conduct. <u>See</u> Attachments E, F. There is

even evidence that the defendant used American sources of money to pay for cash purchases

overseas; this evidence includes his $3,000 cash withdrawal on his Mastercard at a bank in

Cambodia on December 13, 2003. <u>See</u> Attachment F. It is reasonable to assume that this money

could have been used for the alleged commercial sexual activity at issue in this case.

     Because the Defendant is a United States citizen with strong ties to this Country, the

assertion of federal jurisdiction over his overseas acts does not violate due process.

**B.**    **18 United States Code Section 2251A is Constitutional as Applied to Frank**

     The Defendant also asserts that 18 U.S.C. § 2251A is unconstitutional as applied in this

case, on the grounds that it violates his due process rights and is beyond Congressional power

under the commerce clause. For the same reasons and under much of the same authority as is

discussed with regard to 18 U.S.C. § 2423(c), the Defendant's motion should be denied.

     **1.**    **Section 2251A is Within Congressional Authority as Applied**

     The application of Section 2251A in this case is within Congress's authority to regulate

the channels and instrumentalities of foreign commerce and activities that substantially affect

foreign commerce. Contrary to the defendant's assertion that Section 2251A does not contain

any jurisdictional element, the Statute provides, in relevant part, that it applies when "in the course of the conduct described in such subsections the minor or the actor traveled in or was transported in interstate or foreign commerce." See 18 U.S.C. § Section 2251A(c)(1). This element, which is alleged in the instant Indictment through the language "having traveled in interstate and foreign commerce," is the jurisdictional provision applicable to the Defendant.

The Defendant's extensive focus on whether the sexually explicit images involved in the present case had been deleted from the memory sticks of his camera is therefore irrelevant. Section 2251A(b)(2)(A) constitutionally applies to the Defendant because he traveled in interstate and foreign commerce and then purchased minors for the purposes of sexual exploitation prohibited by the Statute. The Government is not required to show that he intended to transport any images produced to the United States or that any images were actually transported. The Government would note, however, that although many images had been deleted from the memory sticks, this media also contains *undeleted* sexually explicit images of multiple minors, including the four minors listed in the Indictment. There are also multiple undeleted images, dated September 24, 2003, showing the defendant himself engaging in sexual acts with Minor A.

Section 2251A(b)(2)(A) was upheld in United States v. Bredimus, 234 F.Supp.2d 639 (N.D. Texas 2002), which involved facts similar to those in the present case. Bredimus had traveled to Thailand, where he brought minors to his hotel room and paid them to take sexually explicit photographs and engage in sexual acts. Bredimus was caught in Thailand and the images were never shown to have been brought to the United States by him. Id. at 641. The Court in Bredimus refused to dismiss the Section 2251A charge, concentrating primarily on whether the

50

statute was intended to have extraterritorial application and whether such application comported

with international law.  Id. at 647-650.

The court in Bredimus appeared to assume that Section 2251A(b)(2)(A) criminalized

travel "for the *purpose* of creating child pornography."  Id. at 650. (emphasis added).  The court

then summarily found, in a footnote, that the statute is a valid exercise of Congress's authority

under the commerce clause "[f]or the same reasons it determined that § 2423(b) is a valid

exercise of Congress's Commerce Clause authority."  Id. at 650, n. 8.  Because it is the

Government's position in this case that the phrase "in the course of the conduct" does not require

a showing of intent at the time of travel, but only that the travel was in connection with the

offense, the Government will not rely on the court's commerce clause analysis in Bredimus.

Even if where the Defendant's travel in interstate and foreign commerce is not shown to

be for the purpose of producing child pornography, Section 2251A(b)(2)(A) is a constitutional

exercise of Congress's power to regulate commerce.  As is the case with Section 2423(c), Section

2251A(b)(2)(A) specifically regulates the use of the facilities of foreign (and interstate)

commerce to facilitate prohibited conduct.  The evidence shows that soon after his arrival in Asia

during both trips at issue in this case, the Defendant began creating images of child pornography.

Although not necessary to establish that the channels and instrumentalities of commerce were

used in connection with this offense, there is also strong evidence that the Defendant traveled

with the intent to create child pornography, since the images at issue in this case were created

during two subsequent trips to Asia in 2003.  Under these circumstances, Section

2251A(b)(2)(A) is a valid regulation of the channels and instrumentalities of interstate and

foreign commerce as applied to the Defendant.

The application of 2251A(b)(2)(A) to the defendant is also authorized by Congress's authority to regulate activity that substantially affects interstate and foreign commerce. It is highly significant that this case involves the regulation of commercial activity, under a statute entitled "Selling or Buying of Children." Although the defendant quite surprisingly asserts that this case does not involve economic activity, the specific facts of this case involve the *purchase* of minors for the purpose of producing child pornography. This case also involves extensive commercial activity in the movement of the Defendant through the channels of interstate and foreign commerce and his purchases while overseas. Even if the recent Eleventh Circuit decision United States v. Maxwell had not been vacated, it would not have barred the application of Section 2251A to the economic activity of purchasing a minor for the purpose of creating child pornography. 386 F.3d 1042 (11th Cir. 2004), judgement vacated by 126 F.3d 321 (2005). Moreover, the reasoning in Maxwell would not have invalidated the jurisdictional element at issue in this case, which involves the movement of the defendant himself in interstate or foreign commerce.

Cases including Ballinger and Raich indicate that, like Section 2423(c), Section 2251A(b)(2)(A) is within Congress's commerce power as applied to the Defendant.

### 2.      Section 2251A(b)(2)(A) Comports with Due Process as Applied

The application of Section 2251A(b)(2)(A) in this case does not violate the Defendant's due process rights.

This Statute has clear extraterritorial application. The opinion in Bredimus contains an extensive discussion finding that Section 2251A(b)(2)(A) is meant to apply to extraterritorial acts despite the presumption against extraterritorial jurisdiction. 234 F.Supp.2d at 647-650. The

52

court in Bredimus noted that Section 2251A is part of a comprehensive legislative system to combat child pornography, and that this system would be less effective if it did not reach the "conduct of United States citizens on foreign soil." Id. at 649-650.

The court in Bredimus also cited the decision in United States v. Thomas, 893 F.2d 1066, 1068 (9th Cir. 1990), in which the court held that the prohibitions of a related child pornography production statute, 18 U.S.C. § 2251, applied extraterritorially to the acts of a United States citizen overseas. In making this determination, the court in Thomas relied on the broad statutory scheme of the act containing the production statute and the fact that the extraterritorial application of a statute to the acts of a United States national comported with international law. Id. at 1086-69. See also Harvey, 2 F.3d at 1327.

While the court in Bredimus noted that, generally, defendants who produce child pornography would be inclined to bring such images back with them, there was no more evidence of such importation in Bredimus than in the present case. The plain language of the jurisdictional element contained in Section 2251A(c)(1) indicates that, where a defendant "traveled in ... interstate or foreign commerce" in the course of the conduct involved in the offense, Section 2251A(b)(2)(A) applies. See, e.g., United States v. Hill, 279 F.3d 731, 739 (9th Cir. 2002) (relying on the inclusion of "foreign commerce" and the nationality principle to hold that 18 U.S.C. § 228 (the Deadbeat Parents Punishment Act) and a related harboring offense under 18 U.S.C. § 1071 apply extraterritorially).

The bulk of the Defendant's arguments in support of his claim that application of Section 2251A violates the due process clause are also discussed above with respect to the application of Section 2423(c), and the Government will only briefly touch on these points here. The

53

Defendant's status as a United States citizen creates a sufficient nexus with the United States, so that the application of federal law to him is neither arbitrary nor fundamentally unfair. For the same reason, the extraterritorial application of United States laws comports with international law. In assessing the Defendant's challenge to the application of Section 2251A, it should also be noted once more that the Defendant's ties with the United States are not limited to citizenship. The defendant used his United States passport and funding derived from United States sources to engage in extensive travel between the United States and other countries during 2003. He is thus sufficiently connected to the United States to be subject to federal jurisdiction and bound to take notice of American laws. See, e.g., Blackmer, 284 U.S. at 437.

While the Defendant alleges that his conduct was not illegal in Cambodia if the Minor Girls were over fifteen, several of the minors depicted in sexually explicit images contained on the memory sticks of the Defendant's camera appear to be prepubescent. In addition, it does not violate due process to exercise federal jurisdiction over acts that were legal in the place where committed. See, e.g., Bach, 400 F.3d at 628-29. More important, due process does not require knowledge that conduct is unlawful but only knowledge of the acts constituting the offense. See, e.g., Bryan, 524 U.S. at 192-93; Lynch, 233 F.3d at 1141. In the context of the *production* of child pornography, it is not even required that a defendant know that the person engaging in sexually explicit conduct was under eighteen. See, e.g., United States v. Griffith, 284 F.3d 338 (2nd Cir. 2002) (for prosecutions under Sections 2251(a) and 2423(a), government is not required to prove that defendant knew victim's minority status); United States v. X-Citement Video, 513 U.S. 64, 76-77 (1994) (in *dicta*, distinguishing knowledge requirement under 18 U.S.C. § 2252 from lack of such requirement under the child pornography production *statute*, 18

54

U.S.C. § 2251, which does not require knowledge that the person depicted was under eighteen). The Defendant does not claim that his alleged conduct in paying minors to engage in sexual conduct, including the production of visual depictions of such conduct, was somehow done without knowledge that he was performing such acts.

The due process clause does not bar the application of Section 2251A to the Defendant, an American citizen who traveled multiple times in interstate and foreign commerce between the United States and Cambodia and engaged in the commercial sexual exploitation of minors. His Motion to Dismiss Counts 6 through 9 should therefore be dismissed.

## V.    CONCLUSION

Accordingly, for all of the reasons stated above, the United States respectfully request that the Defendant's motions be denied.

Respectfully submitted,

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY


By: _____
WENDY WALDRON
Trial Attorney, U.S. Department of Justice
1400 New York Ave. N.W.
Washington, D.C. 20005
Telephone: (202) 514-5780
Facsimile: (202) 514-1793

By _____

for  JONATHAN LOPEZ
      Assistant United States Attorney
      Court ID Number A5500750
      99 NE 4th Street, Suite 400
      Miami, FL  33132-2111
      Tel: 305-961-9377
      Fax: 305-530-7976

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was delivered by facsimile and United States mail this ____ day of November, 2005, to:

James S. Benjamin
One Financial Plaza, Suite 1615
Ft. Lauderdale, FL 33394
Fax: 954-779-1771

for  Wendy Waldron
      Trial Attorney, U.S. Department of Justice

56

# EXHIBIT A



*The Secretary of State*
*of the United States of America*
*hereby requests all whom it may concern to permit the citizen/*
*national of the United States named herein to pass*
*without delay or hindrance and in case of need to*
*give all lawful aid and protection.*

*Le Secrétaire d'Etat*
*des Etats-Unis d'Amérique*
*prie par les présentes toutes autorités compétentes de laisser passer*
*le citoyen ou ressortissant des Etats-Unis titulaire du présent passeport*
*sans délai ni difficulté et, en cas de besoin, de lui accorder*
*toute aide et protection légitimes.*

SIGNATURE OF BEARER/SIGNATURE DU TITULAIRE

NOT VALID UNTIL SIGNED

UNITED STATES OF AMERICA

| | | |
|---|---|---|
| Type / Caté gorie | Code of issuing / Code du pays State USA émetteur | PASSPORT NO./NO DU PASSEPORT |
| P | | |

Surname / Nom
**FRANK**

Given names / Prénoms
**KENT**

Nationality / Nationalité
UNITED STATES OF AMERICA

Date of birth / Date de naissance
17 DEC / DEC 56

Sex / Sexe     Place of birth / Lieu de naissance
M     OKLAHOMA, U.S.A.

Date of issue / Date de délivrance
22 NOV / NOV 99

Date of expiration / Date d'expiration
21 NOV / NOV 09

Authority / Autorité
U.S. Embassy

Amendments / Modifications
SEE PAGE 24

SAN JOSE, COSTA RICA

PASSPORT
PASSEPORT

P<USAFRANK<<KENT<<<<<<<<<<<<<<<<<<<<<<<<<<<<<<
USA5612178M0911212<<<<<<<<<<<<<<0



00397



Entrées       Départures
Entries · Entradas   VISAS   Sorties · Salidas

This supplement, under seal, forms
a part of the passport.
Ce supplement, sous sceau, fait
partie integrante du passeport.
Este suplemento, bajo sello,
forma parte integral del
presente pasaporte.

This supplement is an attachment
to passport no. 301462014
Issued on: Nov. 22. 1999
Authority: Phnom Penh, Cambodia.
Date: Dec. 16. 03

Entrées / Entradas

**Visas**

Départures
Salies / Salidas

# KINGDOM OF CAMBODIA - VISA

Issuing Post __POCHENTONG__  Fee __25 USD__

Surname __FRANK__

Given Name __KENT__  Visa Type Class __E__

Passport Number _____

**I053388**  Entries __01__  Issue Date __03·03·02__  Expiry Date __03 04 02__

Remarks __✓__

Holder permitted to remain in Cambodia for: __02__ month(s) from date of arrival

Maj. Tho Sreng
Chief of visa service

00399



KINGDOM OF CAMBODIA - VISA

Issuing Post ______ Fee ______

Surname Frank. Kent

Given Name ______

Visa Type Class T

Passport Number X

I014560

Entries ______ Issue Date 25.06.02 Expiry Date 25-07-02

Remark I-117 492

Holder permitted to remain in Cambodia for ______ month(s) from date of arrival.

KINGDOM OF CAMBODIA - VISA

Issuing Post Pochentong Fee 20 US$

Surname FRANK

Given Name KENT Visa Type Class T

Passport Number ______ 250602

I117402

Entries 01 Issue Date 250502 Expiry Date ______

Remarks ______

Holder permitted to remain in Cambodia for 01 month(s) from date of arrival.

Maj. Chhour Kimny
Chief of visa service

**KINGDOM OF CAMBODIA - VISA**

20 USD

Issuing Post _Pochentong_          Fee ____

Surname _FRANK_

Given Name _KENT_          Visa Type Class _T_

Passport Number ____

Entries _01_  Issue Date _13·09·02_  Expiry Date _13·10·02_

Remarks ____

Holder permitted to remain in Cambodia for _14_ month(s) from date of arrival

Maj. Tho Sreng
Chief of visa service

I 231782















KINGDOM OF CAMBODIA

Issuing Post: Pochentong Fee: 20USD

Surname: FRANK

Given Name: KENT Visa Type Class: T

Passport Number:

I 0427983

Entries: 1 Issue Date: 08-08-03 Expiry Date: [illegible]

Remarks:

Holder permitted to remain in Cambodia for 1 month(s) from date of arrival.

Maj. Tho Sreng
Chief of visa service

USED

# KINGDOM OF CAMBODIA - VISA

USED

Issuing Post: Pochentong Fee: 20USD

Surname: FRANK

Given Name: KENT Visa Type Class: T

Passport Number:

I319473

Entries: 01 Issue Date: 02-12-02 Expiry Date: 02-01-03

Remarks:

Holder permitted to remain in Cambodia for 01 month(s) from date of arrival.

Maj. Tho Sreng
Chief of visa service

KINGDOM OF CAMBODIA VISA

Issuing Post: Pochentong Fee: 25 US$

Surname: FRANK

Given Name: KENT Visa Type Class: E

Passport Number: I 0456669

Entries: 01 Issue Date: 09-05-03 Expiry Date: 09-06-03

Remarks

Holder permitted to remain in Cambodia for 01 month(s) from date of arrival.

Maj. Kang Chanthia

Deputy chief of visa service

# KINGDOM OF CAMBODIA - VISA

Issuing Post ភ្នំពេញ Fee

Surname FRANK

Given Name KENT Visa Type Class E

Passport Number

I 050661 ៤ខែ 10 JUN 2003 09 DEC 2003

Entries Issue Date Expiry Date

Remarks I 0456669

Holder permitted to remain in Cambodia for ...... month(s) from date of arrival.

Hel Pundy

00410



00411

# EXHIBIT B

```
RUN DATE = 03/09/05    RUN TIME = 11:35
NOTE: TIME SHOWN IS SYSTEM HOST TIME.

                              TECS II
                   PASSENGER ACTIVITY REPORT                PAGE NO.   1

REQUESTED BY: MATTHEWS,RICHARD W          ID: 139763784
FROM 01/01/03 AT 00:00 TO 03/09/05 AT 00:00
PRINTER LOCATION: N2R1982


PASSENGER SURNAME                    FIRST NAME     OTHER NAME   BIRTHDTE
CROSS DATE/TIME    LOCA  TERMID  LTYP  DOCUMENT NUMBER  CTRY  TYP  INSPECTOR
QYAGN   QYRSLT  TECS-RECORD-ID   API  ARCDE   FLNBR   ARRLC   DEPLC
SITE - DESCRIPTION              DIRECTION    AGN REF IND
─────────────────────────────────────────────────────────────────────────
FRANK                                KENT                      12/17/56
12/06/04  11:20         :K20    API   701646014        US   P   569513261
CUS    TECSHT  P9E01690500CBK   C    UA     876   SEA   NRT
SEATTLE/TACOMA INTL                    C

FRANK                                KENT                      12/17/56
11/08/03  00:00        QB10     API   701646014        US   P   APIS QRY
CUS    NOMTCH                   R    AA    2117   SJO   MIA
SAN JOSE, JUAN SANTAMARIA INTL         N

FRANK                                KENT                      12/17/56
11/11/03  18:05        XY64     API   701646014        US   P   262639310
CUS    NOMTCH                   C    AA     988   MIA   SJO
MIAMI INTL, FL                         N

FRANK                                KENT                      12/17/56
11/24/03  00:00        ::07     API   701646014        US   P   APIS QRY
CUS    NOMTCH                   R    TG     775   BKK   LAX
BANGKOK                                N

FRANK                                KENT                      12/17/56
10/09/03  00:00        CU52     API   701646014        US   P   APIS QRY
CUS    NOMTCH                   R    BR     112   LAX   TPE
LOS ANGELES, CA INTL                   N

FRANK                                KENT                      12/17/56
10/09/03  17:46   2720  A$20    AIR   701646014        US   P   777777756
INS    NOMTCH  EN000132560B01   N    ZZZ      1
A273 - LOS ANGELES, BRADLEY AIRP       N

FRANK                                KENT                      12/17/56
10/20/03  00:00        BK09     API   701646014        US   P   APIS QRY
CUS    NOMTCH                   R    AA     981   SJO   MIA
SAN JOSE, JUAN SANTAMARIA INTL         N

FRANK                                KENT                      12/17/56
10/30/03  18:04        W$16     API   701646014        US   P   594482545
CUS    NOMTCH                   C    AA     988   MIA   SJO
MIAMI INTL, FL                         N
```

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

DATE = 03/09/05      RUN TIME = 11:35
NOTE: TIME SHOWN IS SYSTEM HOST TIME.

                                    TECS II
                         PASSENGER ACTIVITY REPORT              PAGE NO.   2

REQUESTED BY: MATTHEWS,RICHARD W          ID: 139763784
FROM 01/01/03 AT 00:00 TO 03/09/05 AT 00:00
PRINTER LOCATION: N2R1982

PASSENGER SURNAME                      FIRST NAME    OTHER NAME    BIRTHDTE
CROSS DATE/TIME   LOCA  TERMID   LTYP  DOCUMENT NUMBER   CTRY  TYP  INSPECTOR
QYAGN   QYRSLT    TECS-RECORD-ID  API  ARCDE   FLNBR   ARRLC   DEPLC
SITE - DESCRIPTION               DIRECTION   AGN REF IND
--------------------------------------------------------------------------
FRANK                                  KENT                        12/17/56
09/17/03  00:00           01    API   701646014        US    P   APIS QRY
CUS    NOMTCH                    R     BR      17       TPE    SFO
TAIPEI, CHIANG KAI SHEK                      N

FRANK                                  KENT                        12/17/56
07/21/03  14:30           CU66  API   701646014        US    P   562674714
INS    NOMTCH                    C     TG      774      LAX    BKK
LOS ANGELES, CA INTL                         N

FRANK                                  KENT                        12/17/56
05/08/03  00:00           XY09  API   701646014        US    P   APIS QRY
INS    NOMTCH                    R     TG      773      BKK    LAX
B' KOK                                       N

FRANK                                  KENT                        12/17/56
04/02/03  13:33           CU62  API   701646014        US    P   459911262
INS    NOMTCH                    C     TG      772      LAX    BKK
LOS ANGELES, CA INTL                         N

FRANK                                  KENT                        12/17/56
02/27/03  00:00           QS16  API   701646014        US    P   APIS QRY
INS    NOMTCH                    R     TG      773      NRT    LAX
NARITA, TOKYO                                N

    OFFICIAL USE ONLY -- TECS II INFORMATION -- OFFICIAL USE ONLY

# EXHIBIT C

# STATE OF FLORIDA
## Department of Highway Safety & Motor Vehicles

## D river  A nd  V ehicle  I nformation  D atabase

**DIGITAL IMAGES ARE RESTRICTED TO LAW ENFORCEMENT USE PURSUANT TO S. 322.142(4), FLORIDA STATUTES - IMAGES INCLUDE PHOTOGRAPHS AND SIGNATURES**



**DRIVER LICENSE Transaction on 06-23-00**

| **DL/ID Number** | **Class** |
|---|---|
| F652-500-56-457-0 | E |

**Name**
KENT FRANK

**Address**
619 MICHIGAN AV #1
MIAMI BEACH, FL 33139-6048

| **Date of Birth** | **Sex** | **Height** |
|---|---|---|
| 12-17-56 | M | 5'06 |

| **Restrictions** | **Endorsements** |
|---|---|
| A | |

**Fingerprint on file**
None

| **Issue Date** | **Issue Time** |
|---|---|
| 10-30-98 | 15:51:09 |

| **Expiration Date** | **Duplicate Date** |
|---|---|
| 12-17-04 | 06-23-00 |

**Form Number**
E030006230363

**Conditional Messages**

| Associated Application | Older | Main | Return to Search |

Printed by Andrew E. Posch at 192.143.22.35 on February 5 2004 at 09:58AM

# STATE OF FLORIDA
## Department of Highway Safety & Motor Vehicles

## D river  A nd  V ehicle  I nformation  D atabase

**DIGITAL IMAGES ARE RESTRICTED TO LAW ENFORCEMENT USE PURSUANT TO
S. 322.142(4), FLORIDA STATUTES - IMAGES INCLUDE PHOTOGRAPHS AND SIGNATURES**

**DL Number:** F652-500-56-457-0
**Name:** KENT FRANK



## Image Data

| Image | DL Number | Name | Transaction Date |
|---|---|---|---|
| 1 | F652-500-56-457-0 | KENT FRANK | 06/23/2000 |
| 2 | F652-500-56-457-0 | KENT FRANK | 02/02/2000 |

If you suspect driver license fraud, please contact DL FRAUD

Printed by Andrew L. Posch at 162.143.22.35 on February 5,2004 at 09:58AM

# FLORIDA Department of Highway Safety and Motor Vehicles
## Application for Driver License/I.D. Card or Receipt
# DRIVER LICENSE

DL/ID Nbr: **F652-500-56-457-0**  Class: **E**  County: **2**

**KENT FRANK**

Address: **619 MICHIGAN AV #1**
**MIAMI BEACH, FL 33139-6048**

Issue type: **Duplicate**

I do hereby certify that the answers given by me on this application are true. I also understand the operation of a motor vehicle constitutes consent to any sobriety test required by law and consent to release of driving records required by law.

| Date of birth | Race | Sex | Height | Restrictions | Endorsements | Issue date | Issue time | Expiration date | Duplicate date |
|---|---|---|---|---|---|---|---|---|---|
| 2-17-56 | W | M | 5'06 | A | | 10-30-98 | 15:51:09 | 12-17-04 | 06-23-00 |

| Social Security Nbr. | Form number | Examiner Name/ID | Cashier Name/ID | Office | DL/ID Issued |
|---|---|---|---|---|---|
| | E030006230363 | (E50) DORIS/5164 | (E50) DORIS/5164 | E03 | Yes |

## EXAMINATIONS

| Road Sign | Road Rule | Drive Test | MC Rule | MC Skill | Oral Exam | DELAP | Non-English Exam |
|---|---|---|---|---|---|---|---|
| | * | * | | | No | No | No |

| Vision | Tag Number | Contact Lenses | Visual Acuity WITHOUT Correction Left / Right / Both | | Vision Report | Medical Report | Hearing |
|---|---|---|---|---|---|---|---|
| | | No | | | | | Good |

## CDL EXAMINATIONS

| | Gen Knowledge | Air Brakes | Comb. Veh. | Passenger | Double/Triple | Tanker |
|---|---|---|---|---|---|---|
| Comply 391 | Haz. Mat. | Inspect | Basic Skill | Skill Test | Third Party No | Knowledge Type |

CDL Applicant: Do you operate a CMV outside the State of Florida? (Y/N) **No**

## OUT OF STATE LICENSE INFORMATION

| State | Issue Date | License Number | Expiration | Disposition |
|---|---|---|---|---|
| | 00-00-00 | | 12-17-92 | Destroyed |

## STATEMENT OF APPLICANT CONCERNING LICENSE OR ID CARD

[ ] I have been convicted of DWI/DUI 2 or more times within the last 5 years or 3 or more times within the past 10 years in any state.

[ ] I have in my possession or under my control a valid driver license issued by the State of Florida, or any other state.

ave been licensed in another state.

[ ] Due to my part time residence/employment or military assignment in the State, it is necessary for me to retain my out-of-state driver license.

## IDENTIFICATION AND PHYSICAL/MENTAL QUALIFICATIONS

[ ] Ever adjudged by a court to be afflicted with or suffering from any mental disorder or disease?

State:  Date:  If yes, have you been restored to compentency as required by law?  Restored:

[ ] Have you suffered from epilepsy, fainting, or dizzy spells within the past two years?

If YES explain:

[ ] Are you addicted to drugs or intoxicants?  If YES explain:

[ ] Has your driving privilege ever been revoked, suspended or denied in any state?

State:  Date:  Reason:  Restored:

Sexual Predator?  [ ] Sexual Offender?  [ ] Convicted Felon?  [ ] Rights Restored?

Identification:  Disabilities: **None**  Fingerprint on file: **None**

## REMARKS

Issue Comments: **LOST DL**

| Previous FL Number | Change Type | FL Disposition | Donor Info | US Citizen | FL Resident |
|---|---|---|---|---|---|
| | None | Lost | | Yes | Yes |

| Guardian: | | | | Relationship | |
|---|---|---|---|---|---|

| Deposit | FR Refee | Service Fee | Lic/ID Fee | Delinquent Marlin | Tax Collector | Donation Amount |
|---|---|---|---|---|---|---|
| 0.00 | $0.00 | $0.00 | $10.00 | No | $0.00 | $0.00 |

| Total Amount | Money Type | Receipt Number | Log Number | Data Source | Program Version |
|---|---|---|---|---|---|
| 10.00 | CA | | 0363 | Host | VER 1 |

Printed by Andrew L. Posch at 162.143.22.35 on February 5, 2004 at 09:58AM

# EXHIBIT D



**Miami-Dade County Elections Department**
2700 NW 87th Avenue
Miami, Florida 33172
T 305-499-VOTE  F 305-499-8547
TTY: 305-499-8480

miamidade.gov

## <u>VOTER STATUS CERTIFICATION</u>

STATE OF FLORIDA)                                              COUNTY OF MIAMI-DADE)
This certifies that:

_KENT FRANK_                                    _619 Michigan ave #1_
(Name)                                                       (Address)

_12-17-56_                                       _____
(Date of Birth)                                        (Social Security Number)

☑ is <u>presently</u> registered to vote in Miami-Dade County since _6-8-190_ and
_____ never voted        <u>or</u>        last voted on _11-5-02_ .

☐ was <u>previously</u> a registered voter from _____ to _____ .

The reason for removal was:    ___ Deceased                    ___ Felony conviction

___ Mentally incapacitated        ___ Moved out of jurisdiction

___ Self cancelled                    ___ Administratively cancelled

☐ was <u>never</u> registered to vote in Miami-Dade County.

WITNESS MY HAND AND OFFICIAL            LESTER SOLA
SEAL, AT MIAMI-DADE COUNTY,              SUPERVISOR OF ELECTIONS
FLORIDA, ON THIS _22_ DAY                MIAMI-DADE COUNTY, FLORIDA
OF _NOVEMBER_ 20_05_ .

By: _____
                                                              Deputy

24:md

*(Véase traducción al español al dorso)*
*(Pou vèsyon Kreyòl fan gade lòt bò paj la)*

# EXHIBIT E

AAA   3 20 1
5998

ACCOUNT NUMBER

5411

KENT FRANK
5182 VERNON RIDGE
DRIVE
DUNWOODY      GA 30338-4209

HOLD                              PAGE  1 OF  3

| ACCOUNT NUMBER | CREDIT LIMIT | AVAILABLE CREDIT | DAYS IN BILLING CYCLE | BILLING CYCLE CLOSING DATE |
|---|---|---|---|---|
| 5411 | 24133 | 24069 | 0 | 09/29/03 |

| DATE OF TRANS | POST | REFERENCE NUMBER | CHARGES, CREDITS AND ADJUSTMENTS SINCE LAST STATEMENT | AMOUNT |
|---|---|---|---|---|
| 0829 | 0831 | 80417347JGM F64D5 | DELTA    00621572371744 BIRMINGHAM  AL | 75.00 |
| 0828 | 0831 | 70464947H5Z WIN9Y | DONNA S CAFE CALERA  AL | 14.04 |
| 0828 | 0831 | 71483827HAFM4FABD | WM SUPERCENTER    SE2 HOOVER E  AL | 98.17 |
| 0829 | 0901 | 80444007KK2I 5GPK8 | HMSHOST-BHM-AIR    #03 BIRMINGHAM  AL | 2.69 |
| 0829 | 0901 | 80444007KK2I 3GEMT | HMSHOST-BHM-AIR    #03 BIRMINGHAM  AL | 7.86 |
| 0901 | 0902 | 80444007MK45 GNRJ6 | STUDIO PLUS HOTEL-IVER BIRMINGHAM  AL | 238.74 |
| 0831 | 0903 | 81444007MK4C 2EBZQ | KING KULLEN #58    SGF PORT WASHINGT NY | 28.96 |
| | 0903 | 70434257M6V B4Z9A | CVS #2431 BROOKLYN  NY | 29.74 |
| | 0903 | 70434257M6V B4Z9U | CVS #2431 BROOKLYN  NY | 28.41 |
| | 0903 | 7043845TN77 XYYLP | PC RICHARD AND SON 35 BROOKLYN  NY | 10.82 |
| 0903 | 0904 | 81444007PK5 M3B8 | PUBLIX 0882 *GROC  SA1 BIRMINGHAM  AL | 44.85 |
| 0903 | 0904 | 70447327N2D PBN8Z | BIRMINGHAM ARPRT AUTHR BIRMINGHAM  AL | 39.00 |
| 0903 | 0904 | 70464947N5Z WIN8H | DONNA S CAFE CALERA  AL | 7.02 |
| 0904 | 0905 | 70410197P8K 35XPX | BEST BUY    00003830 BIRMINGHAM  AL | 7.55 |
| 0824 | 0905 | 75410197PB1I NHPF3 | GOLDEN CORRAL 29107Q BIRMINGHAM  AL | 7.55 |
| 0903 | 0905 | 23432867P00 QE0ZS | SHELL OIL  50116310017 CHELSEA  AL | 24.66 |
| 0904 | 0905 | 70464947P5Z WIN5 | DONNA S CAFE CALERA  AL | 7.02 |
| 0903 | 0905 | 70547517P79 NVFMS | CARTS-BIRMINGHAM  Q39 WHITE BEAR LA MN | 3.00 |
| 0905 | 0907 | 70453707R8A SF8NA | GOLDEN CHINA CALERA  AL | 7.43 |

| PURCHASES | CASH ADVANCES | CREDITS | DEBIT ADJUSTMENTS |
|---|---|---|---|
| | | | |

AN AMOUNT FOLLOWED BY A MINUS SIGN (-) IS A CREDIT UNLESS OTHERWISE INDICATED

AAA

AAA  3 20 1
AAA
5998

| ACCOUNT NUMBER |
|---|
| 5411 |

KENT FRANK
5182 VERNON RIDGE
DRIVE
DUNWOODY     GA 30338-4209

HOLD                                    PAGE  2 OF  3

| ACCOUNT NUMBER | CREDIT LIMIT | AVAILABLE CREDIT | DAYS IN BILLING CYCLE | BILLING CYCLE CLOSING DATE |
|---|---|---|---|---|
| 5411 | 24133 | 24069 | 0 | 09/29/03 |

| DATE OF TRANS | POST | REFERENCE NUMBER | CHARGES, CREDITS AND ADJUSTMENTS SINCE LAST STATEMENT | AMOUNT |
|---|---|---|---|---|
| 0907 | 0908 | 2340197SHK47XDS1 | BP OIL         35285345 BIRMINGHAM  AL | 24.94 |
| 0907 | 0909 | 7840197VBTGHDR1F | GOLDEN CORRAL 29107Q BIRMINGHAM  AL | 7.55 |
| 0907 | 0909 | 7043707V8AKJ3TFL | SHOGUN JAPANESE SIKHOU BIRMINGHAM  AL | 39.99 |
| 0908 | 0910 | 7040197WPTVYZY83 | MACARONI GR17400001743 BIRMINGHAM  AL | 22.42 |
| 0909 | 0910 | 8044007XK7Z82LV5 | STUDIO PLUS HOTEL-IVER BIRMINGHAM  AL | 100.44 |
| 0909 | 0910 | 7044947W5S92R7H4 | DONNA S CAFE CALERA  AL | 10.80 |
| 0908 | 0910 | 7044947W5S92R76J | DONNA S CAFE CALERA  AL | 12.96 |
| 0909 | 0911 | 2345017Y7B4HPXCQ | SUBWAY # 6775 BIRMINGHAM  AL | 9.80 |
| | 0911 | 2242867X00N2F44L | EZGOV  *UTILITY FEE      866-EZANBXE  GA | 3.00 |
| | 0911 | 2242867X00N2F477 | EZGOV  *TIKIB UTILITY    866-EZANBXE  GA | 17.78 |
| 0910 | 0911 | 7044947X5ZWWIN99 | DONNA S CAFE CALERA  AL | 12.96 |
| 0911 | 0912 | 7044947Y5ZWWINA2 | DONNA S CAFE CALERA  AL | 12.96 |
| 0911 | 0914 | 7814117Z0069EZ10 | AT&T WIRELESS SERVICES    800-88876.0  WA | 161.49 |
| 0911 | 0914 | 7045370726030SHDM | SHOGUN JAPANESE SIKHOU BIRMINGHAM  AL | 43.15 |
| 0912 | 0914 | 7044947Z5S92R79A | DONNA S CAFE CALERA  AL | 12.96 |
| 0912 | 0915 | 7044117807BGHGH3J | CANTON HOUSE CHAMBLEE  GA | 13.56 |
| 0912 | 0915 | 80444008IK9AMYN6B | STUDIO PLUS HOTEL-IVER BIRMINGHAM CREDIT | 32.22- |
| 0913 | 0915 | 81444008IK9IXLGHP | PUBLIX 0647 *GROC  SA1 ATLANTA  GA | 41.16 |
| 0913 | 0915 | 81444008IK9IXLGQ1 | PUBLIX 0647 *GROC  SA1 ATLANTA  GA | 21.90 |

| PURCHASES | CASH ADVANCES | CREDITS | DEBIT ADJUSTMENTS |
|---|---|---|---|
| | | | |

AN AMOUNT FOLLOWED BY A MINUS SIGN (-) IS A CREDIT UNLESS OTHERWISE INDICATED.

AAA

AAA   3 20 1
5998

ACCOUNT NUMBER

5411

KENT FRANK
5182 VERNON RIDGE
DRIVE
DUNWOODY        GA 30338-4209

HOLD                                    PAGE 3 OF 3

| ACCOUNT NUMBER | CREDIT LIMIT | AVAILABLE CREDIT | DAYS IN BILLING CYCLE | BILLING CYCLE CLOSING DATE |
|---|---|---|---|---|
| 5411 | 24133 | 24069 | 0 | 09/29/03 |

| DATE OF TRANS | POST | REFERENCE NUMBER | CHARGES, CREDITS AND ADJUSTMENTS SINCE LAST STATEMENT | AMOUNT |
|---|---|---|---|---|
| 0913 | 0915 | 2341734813J4Y7AM1 | UA PERIMETER POINTE 10 ATLANTA  GA | 10.50 |
| 0912 | 0915 | 23432868100SSV196 | SHELL OIL  57524561909 TALLAPO SA  GA | 17.71 |
| 0912 | 0915 | 70432868100VA88Y4 | TEXACO INC 91002390184 COLUMBI NA  AL | 36.60 |
| 0913 | 0915 | 704867781BLH0ZXIL | VIETNAM HOUSE RESTAURA ATLANTA  GA | 8.44 |
| 0913 | 0915 | 93499678175Y68KMP | AIRLINES 69581177698115 LOS AN ELES  CA | 1135.00 |
| 0917 | 0919 | 704602985811G118D | IN-MOTION PICTURES        877-333-8646 FL | 21.40 |
| 0916 | 0919 | 23486758504JQ9RP9 | NATHANS FAMOUS ATLANTA  GA | 4.92 |
| | 0922 | 33404888800TGED2E | GRAND PRESIDENT EXECUT BANGKOK  TH | 143.12 |
| | | | 0309        5717.63 764        0 025031350 | |
| 0923 | 0922 | 7341272897A0VA6E7 | EVA AIRWAYS CORP **        TAIPE | 14.87 |
| | | | 0309        500.00 901        0 029740000 | |
| 0920 | 0922 | 7843286870082E8SD | WWW*EARTHLINK.NET        800-7 9-4660 GA | 21.95 |
| 0919 | 0923 | 75404888900Y34A0V | SURAWONGSE MEDICALCENT BANGKOK  TH | 92.07 |
| | | | 0309        3650.00 764        0 025224657 | |
| 0919 | 0923 | 75404888900Y34A13 | SURAWONGSE MEDICALCENT BANGKOK  TH | 100.90 |
| | | | 0309        4000.00 764        0 025225000 | |
| 0922 | 0924 | 88541868A03RF0JMP | SIRIUS MONTHLY SERVICE     888-5 9-7474 NY | 12.95 |
| 0928 | 0929 | 83181708GPA086JAK | CALTEX BOKOR STATION KHAN CHAM ARM KH | 7.90 |
| 0923 | 0929 | 83181708GP9S9F23K | CAM GSM CO., LTD CAMBODIA  KH | 100.00 |

| PURCHASES | CASH ADVANCES | CREDITS | DEBIT ADJUSTMENTS |
|---|---|---|---|
| 2980.55 | 0.00 | 32.22 | 0.00 |

AN AMOUNT FOLLOWED BY A MINUS SIGN (-) IS A CREDIT UNLESS OTHERWISE INDICATED.

REPORT LOST/STOLEN CARDS IMMEDIATELY 24HRS 800-426-2441

AAA

AAA   3 20 1
5998

| ACCOUNT NUMBER |
| --- |
| 5411 |

KENT FRANK
5182 VERNON RIDGE
DRIVE
DUNWOODY        GA 30338-4209

HOLD                                    PAGE 1 OF 3

| ACCOUNT NUMBER | | CREDIT LIMIT | AVAILABLE CREDIT | DAYS IN BILLING CYCLE | BILLING CYCLE CLOSING DATE | |
| --- | --- | --- | --- | --- | --- | --- |
| 5411 | • | 21400 | 21400 | 0 | 10/29/03 | |

| DATE OF TRANS | POST | REFERENCE NUMBER | CHARGES, CREDITS AND ADJUSTMENTS SINCE LAST STATEMENT | AMOUNT |
| --- | --- | --- | --- | --- |
| 0929 | 0930 | 83181708HP96PZ25P | PHARMACIE DE LAGARE   AMBODIA   KH | 64.60 |
| 0924 | 0930 | 83181708HP96PZ256 | PHARMACIE DE LAGARE   AMBODIA   KH | 27.00 |
| 1001 | 1002 | 83181708KP9ATHWR1 | CALTEX APSARA STATION KHAN DAUN PEN KH | 10.25 |
| 1004 | 1006 | 83181708PP990B6WG | LUCKY SUPER MARKET CAMBODIA   KH | 19.15 |
| 1007 | 1008 | 83181708TP987LYAP | PHARMACIE DE LAGARE   AMBODIA   KH | 217.00 |
| 1009 | 1012 | 70450788V4AENG70L | I LOVE LA - TERMINAL 5 LOS ANGELES  CA | 6.48 |
| 1009 | 1012 | 23483078V87XFWEBE | MCDONALD'S #15752 LA   CA | 5.66 |
| 1011 | 1013 | 23410198XBKEHMQRM | BP OIL       394726 3 DUNWOODY  GA | 18.89 |
| 1011 | 1013 | 23410198XBKEM5KX1 | BP OIL       382040 5 WILDWOOD   FL | 13.72 |
| 1011 | 1013 | 23410198X3VANY9KRG | BP OIL       394726 3 DUNWOODY  GA | 3.16 |
| 1011 | 1013 | 23410198X3VP7TSWW | BP OIL       448304 6 VALDOSTA  GA | 17.94 |
| 1010 | 1013 | 23411498W232EHK75 | PICCADILLY CAFETERIA CHAMBLEE  GA | 8.11 |
| 0923 | 1013 | 75181708YA27LQ7F0 | PHARMACIE DE LAGARE   AMBODIA   KH | 92.50 |
| 1011 | 1013 | 70453708X60KD2T1K | WILDWOOD INN WILDWOOD  FL | 42.80 |
| 1012 | 1013 | 23541868X03S3DZ5R | POMPANO BEACH CITGO POMPANO BEACH FL | 18.17 |
| 1012 | 1014 | 70410198Y44A68FK0 | WALGREEN     000316 5 MIAMI BEACH  FL | 60.83 |
| 1012 | 1014 | 80444008YKF598G3Y | HMS HOST-FL TURNPK #15 PORT ST LUCIE FL | 2.03 |
| 1011 | 1014 | 70546558YDH6PT61A | IHOP 36-165 WILDWOOD  FL | 8.88 |
| 1013 | 1014 | 80436878Z3JEBN77B | LE PETIT BISTRO AVENTU AVENTURA  FL | 7.97 |

| PURCHASES | CASH ADVANCES | CREDITS | DEBIT ADJUSTMENTS | |
| --- | --- | --- | --- | --- |
| | | | | |

AN AMOUNT FOLLOWED BY A MINUS SIGN (-) IS A CREDIT UNLESS OTHERWISE INDICATED

AAA

AAA   3 20 1
AAA
5998

ACCOUNT NUMBER

5411

KENT FRANK
5182 VERNON RIDGE
DRIVE
DUNWOODY      GA 30338-4209

HOLD                                    PAGE  2 OF  3

| ACCOUNT NUMBER | CREDIT LIMIT | AVAILABLE CREDIT | DAYS IN BILLING CYCLE | BILLING CYCLE CLOSING DATE |
|---|---|---|---|---|
| 5411 | 21400 | 21400 | 0 | 10/29/03 |

| DATE OF TRANS | POST | REFERENCE NUMBER | CHARGES, CREDITS AND ADJUSTMENTS SINCE LAST STATEMENT | AMOUNT |
|---|---|---|---|---|
| 1014 | 1015 | 234101982P8QKLB7P | AMOCO OIL       01 28829 MIAMI BEACH   FL | 25.36 |
| 1013 | 1015 | 704631282QKM71WDA | TEXAS TACO FACTORY EXP MIAMI BEACH   FL | 12.95 |
| 1012 | 1015 | 705465582DH6PT5LX | IHOP 36-165 WILLWOOD  FL | 11.42 |
| 1013 | 1015 | 705480782FQ12GVZ2 | WALDENBOOKS #122 MIAMI   FL | 6.41 |
| 1016 | 1017 | 8141601928DF8IIL3 | EPICURE MARKET        SD7 MIAMI BEACH   FL | 42.19 |
| 1017 | 1019 | 70410199344831T7G | WALGREEN        00 33985 ORLANDO  FL | 5.78 |
| 1016 | 1019 | 9314058924ASAVHAG | AMERICAN 0012122 087586 TICKET MAILED TX | 249.90 |
| 7 | 1019 | 8043687933JF6N4Q7 | PONDEROSA STEAKH USE ORLANDO    FL | 27.36 |
|  | 1020 | 7041019 93RSASK707 | DEFOROS CARAVA01 03029 ORLANDO   FL | 6.38 |
| 1018 | 1020 | 804440094KILAEWQ3 | HMSHOST FL TURNE #150 LAKE WORTH   FL | 3.02 |
| 1018 | 1020 | 804440094KILAEWEG | HMS HOST FL TURNK #15 OKEECHOBEE   FL | 1.93 |
| 1017 | 1020 | 804440094KT9NP513 | HMSHOST FL TURNE #150 LAKE WORTH   FL | 2.70 |
| 1018 | 1020 | 804440095KS ABHE41 | STUDIO PLUS #157 ORLANDO  FL | 72.48 |
| 1019 | 1020 | 90141119400BD89QJ | AT&T WS#00306656 2       800-8887600  WA | 91.90 |
| 1018 | 1020 | 2348307948G9Z541L | SUNOCO ORLANDO  FL | 16.17 |
| 1018 | 1020 | 714838293AG3TYED7 | WM SUPERCENTER      SE2 ORLANDO SW  FL | 44.94 |
| 1017 | 1020 | 23541869403IRWMBN | FORT DRUM CITGO  KEECHOBEE   FL | 14.85 |
| 1018 | 1020 | 705480794F0J0233T | ELECTS BOUTIQUE #386 MIAMI  FL | 87.71 |
| 1018 | 1020 | 8043687943JFFF98T | PONDEROSA STEAKHOUSE ORLANDO   FL | 14.61 |

| PURCHASES | CASH ADVANCES | CREDITS | DEBIT ADJUSTMENTS | |
|---|---|---|---|---|
|  |  |  |  |  |

AN AMOUNT FOLLOWED BY A MINUS SIGN (-) IS A CRED' UNLESS OTHERWISE INDICATED.

AA

00546

AAA   3 20 1
5998

| ACCOUNT NUMBER |
|---|
| 5411 _____ |

.

KENT FRANK
5182 VERNON RIDGE
DRIVE
DUNWOODY        GA 30338-4209

HOLD                                        PAGE 3 OF 3

| ACCOUNT NUMBER | CREDIT LIMIT | AVAILABLE CREDIT | DAYS IN BILLING CYCLE | BILLING CYCLE CLOSING DATE |
|---|---|---|---|---|
| 5411 | 21400 | 21400 | 0 | 10/29/03 |

| DATE OF TRANS | POST | REFERENCE NUMBER | CHARGES, CREDITS AND ADJUSTMENTS SINCE LAST STATEMENT | AMOUNT |
|---|---|---|---|---|
| .019 | 1021 | 234328695000KPP16 | SHELL OIL   27528561601 MIAMI   FL | 23.04 |
| .019 | 1021 | 70500809500PPNA22 | ATLANTA BREAD COMPANY CORAL GABLES   FL | 6.73 |
| .021 | 1022 | 7843286960011FZ1D | WWW*EARTHLINK.NET        800-719-4660 GA | 21.95 |
| .022 | 1024 | 88541869803RKSBKY | SIRIUS MONTHLY SERVICE   888-539-7474 NY | 12.95 |
| .022 | 1024 | 8318043978KVX63BV | VIAJES NACIONALES ISLA SAN JOSE   CR | 413.73 |
|  |  |  | 0310        168328.00 188      0.002457879 |  |
| L023 | 1026 | 8318043988LVK5KNQ | HOTEL PRESIDENTE SAN JOSE   CR | 206.95 |
|  |  |  | 0310        84233.00 188      0.002456875 |  |

| PURCHASES | CASH ADVANCES | CREDITS | DEBIT ADJUSTMENTS | |
|---|---|---|---|---|
| 2068.55 | 0.00 | 0.00 | 0.00 | |

AN AMOUNT FOLLOWED BY A MINUS SIGN (-) IS A CREDIT UNLESS OTHERWISE INDICATED.

REPORT LOST/STOLEN CARDS IMMEDIATELY 24HRS 800-426-2441

AAA

AAA   3 20 1
5998

| ACCOUNT NUMBER |
| --- |
| 5411 |

KENT FRANK
5182 VERNON RIDGE
DRIVE
DUNWOODY       GA 30338-4209

HOLD                                    PAGE  1 OF  4

| ACCOUNT NUMBER | CREDIT LIMIT | AVAILABLE CREDIT | DAYS IN BILLING CYCLE | BILLING CYCLE CLOSING DATE |
| --- | --- | --- | --- | --- |
| 5411 | 14858 | 14700 | 0 | 11/28/03 |

| DATE OF TRANS | POST | REFERENCE NUMBER | CHARGES, CREDITS AND ADJUSTMENTS SINCE LAST STATEMENT | AMOUNT |
| --- | --- | --- | --- | --- |
| .030 | 1031 | 83180439F8STQ33MH | BURGER KING AEROPUERTO ALAJUELA  CR | 8.61 |
|  |  |  | 0310          3511.00 188      0.002452292 |  |
| .030 | 1102 | 83180439F8VRF169V | CAFE BRITT - CAFETAL ALAJUELA  CR | 10.00 |
| .101 | 1103 | 81444009JL03DBN42 | PUBLIX 0621 *GROC  SA1 MIAMI BEACH  FL | 85.83 |
| .101 | 1104 | 70463129KDNMS9F2Y | SUSHI SIAM AVENTURA  FL | 39.91 |
| .106 | 1107 | 78447329N2DB68SPT | FORTE INTERNET SOFTWAR CARLSBAD  CA | 29.00 |
| .107 | 1110 | 80444009TL3DWDNW4 | BARNES & NOBLE #1857 N MIAMI    FL | 32.64 |
| .8 | 1110 | 80444009TL3W1RLA1 | HMSHOST MIA-AIRPT #152 MIAMI    FL | 2.33 |
| .8 | 1110 | 80444009TL3W1RLQA | HMSHOST MIA-AIRPT #551 MIAMI    FL | 8.32 |
|  | 1110 | 93417349RGZ2B96YN | DELTA     00675291252031  LOS ANGELES  CA | 115.00 |
| .107 | 1110 | 93417349RGZ2BY8TA | THAI AIRW 21781189448373 LOS ANGELES  CA | 985.00 |
| .107 | 1110 | 93417349RGZ2Q2NE7 | AGNT FEE 89081189448355 C & H INTERNA CA | 20.00 |
| .108 | 1110 | 70140589T4ARV12AQ | AMERICAN 00121613730924 MIAMI    FL | 249.90 |
| .107 | 1110 | 70463129IDNMS9FCH | SUSHI SIAM AVENTURA  FL | 18.61 |
| .109 | 1111 | 83180439T94MXME9Y | FARMACIA SALUD SAN JOSE  CR | 6.48 |
|  |  |  | 0311          2650.00 188      0.002445283 |  |
| .111 | 1112 | 83180439V95MZW8Z1 | HOTEL COSTA RICA MORAZ SAN JOSE  CR | 137.80 |
|  |  |  | 0311          56331.60 188      0.002446229 |  |
| .112 | 1114 | 23483079X97K14D8G | SUNGLO MIAMI  FL | 23.07 |

| PURCHASES | CASH ADVANCES | CREDITS | DEBIT ADJUSTMENTS |
| --- | --- | --- | --- |
|  |  |  |  |

AN AMOUNT FOLLOWED BY A MINUS SIGN (-) IS A CREDIT UNLESS OTHERWISE INDICATED

A

AAA  3 20 1
5998

ACCOUNT NUMBER

5411 _____

KENT FRANK
5182 VERNON RIDGE
DRIVE
DUNWOODY      GA 30338-4209

HOLD                                    PAGE 2 OF 4

| ACCOUNT NUMBER | CREDIT LIMIT | AVAILABLE CREDIT | DAYS IN BILLING CYCLE | BILLING CYCLE CLOSING DATE |
|---|---|---|---|---|
| 5411 | 14858 | 14700 | 0 | 11/28/03 |

| DATE OF TRANS | POST | REFERENCE NUMBER | CHARGES, CREDITS AND ADJUSTMENTS SINCE LAST STATEMENT | AMOUNT |
|---|---|---|---|---|
| 115 | 1116 | 8042814A0WGNYYWP | KING BUFFET N MIAMI BCH  FL | 24.22 |
| 115 | 1117 | 7041019928K8A47Z9 | BEST BUY      00005587 AVENTURA  FL | 534.16 |
| 116 | 1118 | 2344400A1L8KKIH2M | WENDYS #1713         Q25 MIAMI  FL | 4.27 |
| 118 | 1119 | 2341019A2P8DM7WH | AMOCO OIL    01259829 MIAMI  FL | 22.90 |
| 118 | 1119 | 8053606A30RP6AHJB | LEE ANN DRUG, INC. MIAMI BEACH  FL | 83.66 |
| 119 | 1120 | 2341019A3P8DNQI20 | AMOCO OIL    07948607 LAKE PARK  GA | 26.65 |
| 119 | 1120 | 8044400A4LAG97IX5 | CLOCK RESTAURANT #266 FT PIERCE  FL | 7.17 |
| 119 | 1120 | 7843286A300TAVWF | WWW*EARTHLINK.NET        800-719-4660 GA | 21.95 |
| | 1120 | 2245079A33DWMMGJ | SUNPASS OPERATIONS       516-487-8501  FL | 50.00 |
| | 1120 | 9014111A300FTIM1 | AT&T WS#0030665622       800-8887600  WA | 69.67 |
| 119 | 1120 | 2354186A303SSXX2B | CANOE CREEK CTIGO ST CLOUD  FL | 17.82 |
| 120 | 1121 | 2341019A4BJWFIMXM | BP OIL       39472618 DUNWOODY  GA | 21.99 |
| 119 | 1121 | 7041019A4MG9WOIR2 | RADIO SHACK   00187294 ATLANTA  GA | 80.23 |
| 119 | 1121 | 8044400A4LALXVIJ4 | HMS HOST-FL TURNPK #15 FORT ST LUCIE FL | 1.92 |
| 119 | 1121 | 2346042A4TAFFQI3Y | CHEVRON #0052089 JENNINGS  FL | 2.52 |
| 119 | 1121 | 7014111A400FZ4Z4W | AT&T WIRELESS ATLANTA  GA | 320.99 |
| 119 | 1121 | 7014111A400FZ4ZEZ | AT&T WIRELESS ATLANTA  GA | 26.74 |
| 119 | 1121 | 8014037A4LAN4BWA | CINNABAR HEALTH SPA MA LAKE PARK  GA | 65.80 |
| 119 | 1121 | 8014037A4LAN4BCXL | WESTERN SIZZLIN ADEL  GA | 7.04 |

| PURCHASES | CASH ADVANCES | CREDITS | DEBIT ADJUSTMENTS |
|---|---|---|---|
| | | | |

AN AMOUNT FOLLOWED BY A MINUS SIGN (-) IS A CREDIT UNLESS OTHERWISE INDICATED.

00549

AAA  3 20 1
5998

ACCOUNT NUMBER

5411

KENT FRANK
5182 VERNON RIDGE
DRIVE
DUNWOODY      GA 30338-4209

HOLD

PAGE 3 OF 4

| ACCOUNT NUMBER | CREDIT LIMIT | AVAILABLE CREDIT | DAYS IN BILLING CYCLE | BILLING CYCLE CLOSING DATE |
|---|---|---|---|---|
| 5411 | 14858 | 14700 | 0 | 11/28/03 |

| DATE OF TRANS | POST | REFERENCE NUMBER | CHARGES, CREDITS AND ADJUSTMENTS SINCE LAST STATEMENT | AMOUNT |
|---|---|---|---|---|
| 120 | 1123 | 2341149A52 2FLRSQ | PICCADILLY CAFETERIA CHAMBLEE  GA | 6.73 |
| 120 | 1123 | 7043425A56 7B6V7T | CVS #4537 ATLANTA  GA | 140.50 |
| 121 | 1123 | 7054880A60 8M8Z2S | SANTI THAI RESTAURANT ATLANTA  GA | 7.55 |
| 121 | 1124 | 7042135A7V A7E6ZY | MAD ITALIAN CHAMBLEE  GA | 20.27 |
| 122 | 1124 | 7043425A76 7B5910 | CVS #4537 ATLANTA  GA | 13.73 |
| 122 | 1124 | 7048382A69 J13RJL | WAL MART ATLANTA N  GA | 39.66 |
| 122 | 1124 | 7854186A70 3R4NU6E | SIRIUS MONTHLY SERVICE    888-539-7474 NY | 12.95 |
| 122 | 1124 | 7054751A63 82SSX4 | CALIFORNIA PIZZA 039 ATLANTA  GA | 18.02 |
| | 1125 | 7041019A8F 5WM8J9 | MACARONI GRILL00000364 DUNWOODY  GA | 14.83 |
| 125 | 1125 | 8044400A8L 5K769Q | HMS HOST - ATL AIRPT # ATLANTA  GA | 2.10 |
| 125 | 1126 | 8344482A9C JWRV0F | BUMRUNGRAD MEDICAL CEN BANGKOK  TH | 87.46 |
| | | | 0311      3455.00 764     0.025314037 | |
| 125 | 1126 | 8344482A9C 7N0N3J2 | TOKYU SUPERMARKET BANGKOK  TH | 8.30 |
| | | | 0311      328.00 764     0.025304878 | |
| 125 | 1127 | 7540488AA0 RHML1Z | TAKARA BANGKOK  TH | 26.84 |
| | | | 0311      1060.00 764     0.025320754 | |
| 125 | 1127 | 7540488AA0 DWZF5W | SURAWONGSE MEDICALCENT BANGKOK  TH | 30.38 |
| | | | 0311      1200.00 764     0.025316666 | |
| 126 | 1127 | 8344482AA0 1XGL5KQ | BUMRUNGRAD MEDICAL CEN BANGKOK  TH | 123.31 |

| PURCHASES | CASH ADVANCES | CREDITS | DEBIT ADJUSTMENTS | |
|---|---|---|---|---|
| | | | | |

AN AMOUNT FOLLOWED BY A MINUS SIGN (-) IS A CREDIT UNLESS OTHERWISE INDICATED.

AA

AAA 3 20 1
5998

ACCOUNT NUMBER

5411

KENT FRANK
5182 VERNON RIDGE
DRIVE
DUNWOODY        GA 30338-4209

HOLD                                    PAGE  4 OF  4

| ACCOUNT NUMBER | CREDIT LIMIT | AVAILABLE CREDIT | DAYS IN BILLING CYCLE | BILLING CYCLE CLOSING DATE |
|---|---|---|---|---|
| 5411 | 14858 | 14700 | 0 | 11/28/03 |

| DATE OF TRANS. | POST. | REFERENCE NUMBER | CHARGES, CREDITS AND ADJUSTMENTS SINCE LAST STATEMENT | AMOUNT |
|---|---|---|---|---|
| 1126 | 1128 | 1340488AB00P3DG2X | 0311      4870.00 764    0 025320328<br>GRAND PRESIDENT EXECUT BANGKOK  TH<br>0311      3441.90 764    0 025314506 | 87.13 |

| PURCHASES | CASH ADVANCES | CREDITS | DEBIT ADJUSTMENTS | |
|---|---|---|---|---|
| 3795.95 | 0.00 | 0.00 | 0.00 | |

AN AMOUNT FOLLOWED BY A MINUS SIGN (-) IS A CREDIT UNLESS OTHERWISE INDICATED.

REPORT LOST/STOLEN CARDS IMMEDIATELY 24HRS 800-426-2441

AAA

AAA   3 20 1
5998

| ACCOUNT NUMBER |
|---|
| 5411 |

KENT FRANK
5182 VERNON RIDGE
DRIVE
DUNWOODY      GA 30338-4209

HOLD                                                    PAGE 1 OF 2

| ACCOUNT NUMBER | CREDIT LIMIT | AVAILABLE CREDIT | DAYS IN BILLING CYCLE | BILLING CYCLE CLOSING DATE |
|---|---|---|---|---|
| 5411 | 21783 | 21783 | 0 | 12/30/03 |

| DATE OF TRANS | POST | REFERENCE NUMBER | CHARGES, CREDITS AND ADJUSTMENTS SINCE LAST STATEMENT | AMOUNT |
|---|---|---|---|---|
| 1129 | 1202 | 8347886AE010T1JL0 | USD SASCO DUTY FREE SH HO CHI MINH   VN | 29.29 |
| 1129 | 1202 | 8347886AE010T1RBL | DAI HOANG LONG HT(DATH HO CHI MINH   VN | 85.18 |
| 1201 | 1203 | 8347886AG010T1HO9 | USD VIETNAM AIRLINES N NHA TRANG    VN | 79.00 |
| 1207 | 1208 | 8318170ANP9DFQY65 | LUCKY SUPER MARKET CAMBODIA    KH | 15.80 |
| 1206 | 1208 | 8318170ANP9D5VFG4 | LUCKY SUPER MARKET CAMBODIA    KH | 43.35 |
| 1207 | 1209 | 8318170APP95DWM92 | MITTAPHEAP TOURS CAMBODIA   KH | 281.19 |
| 1208 | 1209 | 8318170APP98H644H | PHARMACIE DE LAGARE CAMBODIA   KH | 252.80 |
| 5 | 1209 | 8318170APP98H6449 | PHARMACIE DE LAGARE CAMBODIA   KH | 30.90 |
| | 1209 | 8347886AL010T1JN4 | USD SASCO DUTY FREE SH HO CHI MINH   VN | 20.00 |
| 1 5 | 1212 | 7541496AT1EQFGWX3 | TELE TECH (MALL NGAMO NON ABURI   TH | 36.64 |
| | | 0311        1442.00 764        0.025409153 | | |
| 1213 | 1215 | 8318170AXP99A67KP | CANADIA HEAD OFFICE CAMBODIA   KH | 3000.00 |
| 1215 | 1216 | 8318170AYP97748BT | LUCKY SUPER MARKET CAMBODIA   KH | 38.90 |
| 1215 | 1219 | 8318170B1P97S66NH | CAM GEM CO., LTD CAMBODIA   KH | 100.00 |
| 1216 | 1219 | 8318170B1P987LMGR | PHARMACIE DE LAGARE CAMBODIA   KH | 168.00 |
| 1128 | 1219 | 7545968B1977QK7QK | THU HAI DUONG REST. HO CHI MINH   VN | 16.27 |
| 1128 | 1219 | 7545968B1977QK7QV | THU HAI DUONG REST. HO CHI MINH   VN | 8.40 |
| 1219 | 1221 | 7843286B100WHX03M | WAW*EARTHLINK.NET        800-719-4660 GA | 21.95 |
| 1219 | 1221 | 90141111B100KMX2RR | AT&T WS#0030665622       800-8887600  WA | 104.95 |

| PURCHASES | CASH ADVANCES | CREDITS | DEBIT ADJUSTMENTS |
|---|---|---|---|
| | | | |

AN AMOUNT FOLLOWED BY A MINUS SIGN (-) IS A CREDIT UNLESS OTHERWISE INDICATED

AAA

AAA
AAA   3 20 1
5998

| ACCOUNT NUMBER |
|---|
| 5411 |

KENT FRANK
5182 VERNON RIDGE
DRIVE
DUNWOOLY       GA 30338-4209

HOLD                                    PAGE  2 OF  2

| ACCOUNT NUMBER | CREDIT LIMIT | AVAILABLE CREDIT | DAYS IN BILLING CYCLE | BILLING CYCLE CLOSING DATE |
|---|---|---|---|---|
| 5411 | 21783 | 21783 | 0 | 12/30/03 |

| DATE OF TRANS | POST | REFERENCE NUMBER | CHARGES, CREDITS AND ADJUSTMENTS SINCE LAST STATEMENT | AMOUNT |
|---|---|---|---|---|
| 223 | 1224 | 8318170B6P983PIU8 | LUCKY SUPER MARKET CAMBODIA   KH | 37.00 |
| 223 | 1225 | 7854186B603TM2HR6 | SIRIUS MONTHLY SERVICE    888-539-7474 NY | 12.95 |
| 228 | 1229 | 8318170BBP9KE3ZFZ | TOTAL MONIVONG CAMBODIA   KH | 3.10 |

| PURCHASES | CASH ADVANCES | CREDITS | DEBIT ADJUSTMENTS |
|---|---|---|---|
| 1385.67 | 3000.00 | 0.00 | 0.00 |

AN AMOUNT FOLLOWED BY A MINUS SIGN (-) IS A CREDIT UNLESS OTHERWISE INDICATED.

REPORT LOST/STOLEN CARDS IMMEDIATELY 24HRS 800-426-2441

AA

AAA A 3 20 1
5998

| ACCOUNT NUMBER |
|---|
| 5411 |

KENT FRANK
5182 VERNON RIDGE
DRIVE
DUNWOODY      GA 30338-4209

HOD

| ACCOUNT NUMBER | CREDIT LIMIT | AVAILABLE CREDIT | DAYS IN BILLING CYCLE | BILLING CYCLE CLOSING DATE |
|---|---|---|---|---|
| 5411 | 3073 | NONE | 0 | 01/29/04 |

| DATE OF | | REFERENCE NUMBER | CHARGES, CREDITS AND ADJUSTMENTS SINCE LAST STATEMENT | AMOUNT |
|---|---|---|---|---|
| TRANS | POST | | | |
| 1206 | 0104 | 7541496QJ687D2GHS | SHARKY BAR AND RESTAUR CAMBODIA    TH | 12.04 |
| 0109 | 0109 | 8318170Q1P97MER4A | CAMBODIA ASIA BANK CAMBODIA    KH | 2500.00 |
| 0113 | 0113 | 8318170QKP96GRV7ER | CAMBODIA ASIA BANK CAMBODIA    KH | 2000.00 |
| 0114 | 0114 | 8318170QYP972QD3Z | CAMBODIA ASIA BANK CAMBODIA    KH | 2000.00 |
| 0116 | 0119 | 8318170D3P98VKEZZ | CAMBODIA ASIA BANK CAMBODIA    KH | 2000.00 |
| 0117 | 0119 | 8318170D3P98VKFON | CAMBODIA ASIA BANK CAMBODIA    KH | 2000.00 |
| 0118 | 0119 | 8318170D3P98VKF20 | CAMBODIA ASIA BANK CAMBODIA    KH | 2000.00 |
| 0119 | 0119 | 8318170D3P9954LR9 | CAMBODIA ASIA BANK CAMBODIA    KH | 2000.00 |
| 0120 | 0120 | 7843286D300RJ3FVS | WWW*EARTHLINK.NET         800-719-4660 CA | 21.95 |
| 0120 | 0120 | 8318170D4P96GRV7IW | CAMBODIA ASIA BANK CAMBODIA    KH | 2000.00 |
| 0119 | 0120 | 9014111D300R1Y2EG | AT&T WS#0030665622       800-8887600  WA | 103.82 |
| 0122 | 0125 | 7854186D703RMM9AN | SIRIUS MONTHLY SERVICE   888-539-7474 NY | 12.95 |
| 0126 | 0126 | 8318170DAP9ALSHQG | CAMBODIA ASIA BANK CAMBODIA    KH | 2000.00 |
| 0127 | 0128 | 8318170D3P95JNHSE | CAMBODIA ASIA BANK CAMBODIA    KH | 2000.00 |

| PURCHASES | CASH ADVANCES | CREDITS | DEBIT ADJUSTMENTS |
|---|---|---|---|
| 150.76 | 20500.00 | 0.00 | 0.00 |

AN AMOUNT FOLLOWED BY A MINUS SIGN (-) IS A CREDIT UNLESS OTHERWISE INDICATED.

REPORT LOST/STOLEN CARDS IMMEDIATELY 24HRS 800-426-2441

AA

# EXHIBIT F



**San Jose Mercury News**
*The Newspaper of Silicon Valley*

加華銀行
Canadia Bank Ltd.

BILL NO.

CANADIA BANK H.O
N265-269.ANG DUONG ST.
PHNOM PENH, CAMBODIA

TERM 01049011      MERN 000000001040013
CARD TYPE MASTERCARD
5410
KENT FRANK
CASH                    EXPY DATE 11/05
BATCH NO. 000073        TRACE NO. 033093
DATE/TIME DEC 13, 03 11:48
REF.NO. 121311402601    APPR.CODE 017687

TOTAL       US$3,000.00
CASH ADVANCE
SIGN X
I AGREE TO PAY ABOVE TOTAL AMOUNT
ACCORDING TO CARD ISSUER AGREEMENT

--- CUSTOMER COPY ---



**All Suites Hotel**
**At Standard Rates**

173 Pham Ngu Lao Street, Dist I - Ho Chi Minh City
Tel: (84-8) 8361935 - 8369268 - 8364759 *Fax: (84-8) 8367279
Email: gd-hotel@hcm.vnn.vn *Email: ctydaihung@hcm.vnn.vn

นพ. ชาญวิทย์ โคธีรานุรักษ์
**DR. CHARNVIT KOTHEERANURAK M.D.**

สูรวงศ์ เมดี คลีนิค              **Surawong Medical Center**
รับปรึกษาปัญหา              **Consulting for Erectile dysfunction**
โรคหย่อนสมรรถภาพทางเพศ

จ - ศ 17.00 - 20.00          Mon - Fri 17.00-20.00
ส - อา 12.00 - 19.00         Sat - Sun 12.00-19.00
โทร. 0-2236-2662-4           Tel. 0-2236-2662-4
มือถือ. 0-1311-5758          Mobile. 0-1311-5758

Men's Health for
**Happy Family**

**PALADAR**
# Amistad
# de Lanzarote
LA MEJOR COMIDA CRIOLLA E INTERNACIONAL
**NERY**          **Te invita**

Amistad # 211
e/ Neptuno y San Miguel
Centro Habana, Cdad. Habana          Telf.: 863-6172

**Ben Stocking**
Vietnam Correspondent

11 Tran Hung Dao
Hanoi, Vietnam
Office: (84-4) 933.4082, 4083
Mobile: 091 359 9584
Fax: (84-4) 933.4084
E-mail: bstocking@fpt.vn
sjmn@fpt.vn

[ KNIGHT RIDDER ]

**TAKARA** NO 1
TURKISH BATH & MASSAGE
*For your fantastic experience step
unto the best turkish bath & massage*
54-56 Patpong 1 Road, Bangkok. Tel. 634-0008.



**SEA VIEW HOTEL**
- Khách sạn kề biển, có thang má
  bể bơi, có nơi đậu xe an toàn
- Thu đổi ngoại tệ, thẻ tín dụng
- Next to the best beach, lift,
  swimming pool, to Park of card s...
- Foreign exchange

Add: 4* Biệt Thự - Nha Trang
Tel: 058.524333 - 058.5243
Fax: 058.524335
Email: Seaviewhotel@dng.vn

00160

AMERICAN AIRLINES
BOARDING PASS

NAME OF PASSENGER
FRANK/KENT

3A 48653024

SAN JOSE CR SJO
MIAMI INTERNTNL
AMERICAN AIRLINES

CARRIER FLIGHT   CLASS DATE   TIME
AA 968   N  11NOV 148P

2   T03P   12G  NO
GROUP 5

3BL  /SJO

CARDMEMBER COPY

*Dietcombank*

VISA

CARDMEMBER SIGNATURE
X

MERCHANT

TERMINAL ID
MERCHANT NO

TRAN
TYPE                    EXPIRY DATE
BATCH                   TRACE
NO                      NO
DATE
TIME                    APP
REF NO                  CODE

NO REFUND

NOTE : See Reverse For Terms & Conditions

*pag 2*

*box 1*

Box 4





Royal Executive Class
Boarding Pass

FRANK, KENTMR

LOS ANGELES / LAX
BANGKOK / BKK
THAI AIRWAYS INTL.

TG 773 C 27NOV

121 122 20 NO

137

LAX/BS TG# 0C37371

00109

## San Jose Mercury News
*The Newspaper of Silicon Valley*

**Ben Stocking**
Phóng viên thường trú tại Việt Nam

11 Trần Hưng Đạo
Hà Nội, Việt Nam
Điện thoại: (84-4) 933.4082, 4083
Mobile: 091 359 9584
Fax: (84-4) 933.4084
E-mail: bstocking@fpt.vn
sjmn@fpt.vn

---

SJ-8

No   27843

### GRAND PRESIDENT
— EXECUTIVE SERVICED APARTMENTS —
+ SUITE (NO 31M)

☐ SUITCASES        ☐ COAT HANGER
☐ BAGS             ☐ JACKETS
☐ CARTONS          ☑ 1 APTT CONS

Date  20/9/03
Name  Mr KENT FRANK
Room No.  1822

---

ROYAL HOTEL
富港旅店
Tel & Fax : 034 933488   Mobile : 016 886188
Street N° 109 Section6 Center2

---

**WORKSHOP**
*ANH TUẤN Artist*
- PORTRAITS
- OIL & SILK PAINTINGS
- MIX CERAMICS PRODUCTION
- REPRODUCTION OF ALL FAMOUS PAINTING
- INTERIOR DECORATION & ADVERTISEMENT

ADDRESS: - 12 Ho Huan Nghiep
- 263 De Tham            Tel: 82500
Dist.1 - HOCHIMINH CITY
E-mail  :  anhtuan68@hotmail.com





00159





00152

# EXHIBIT G



**Office of the High Commissioner for Human Rights**



| **Texts** |
| --- |
| The Convention on the Rights of the Child |
| Optional Protocol on children in armed conflict |
| Optional Protocol on the sale of children, child prostitution and child pornography |

| **Status of ratification** |
| --- |
| The Convention |
| Optional Protocol on children in armed conflict |
| Optional Protocol on the sale of children, child prostitution and child pornography |

| **Reservations and declarations** |
| --- |
| The Convention |
| Optional Protocol on children in armed conflict |
| Optional Protocol on the sale of children, child prostitution and child pornography |

# Optional Protocol to the Convention on the Rights of the Child on the sale of children, child prostitution and child pornography

**Adopted and opened for signature, ratification and accession by General Assembly resolution A/RES/54/263 of 25 May 2000**

**entered into force on 18 January 2002**

**F I S I A I C I R**

The States Parties to the present Protocol,

Considering that, in order further to achieve the purposes of the Convention on the Rights of the Child and the implementation of its provisions, especially articles 1, 11, 21, 32, 33, 34, 35 and 36, it would be appropriate to extend the measures that States Parties should undertake in order to guarantee the protection of the child from the sale of children, child prostitution and child pornography,

Considering also that the Convention on the Rights of the Child recognizes the right of the child to be protected from economic exploitation and from performing any work that is likely to be hazardous or to interfere with the child's education, or to be harmful to the child's health or physical, mental, spiritual, moral or social development,

Gravely concerned at the significant and increasing international traffic in children for the purpose of the sale of children, child prostitution and child pornography,

Deeply concerned at the widespread and

## Committee on the Rights of the Child

| **Reporting to the Committee** |
| --- |
| **Guidelines** -States and Partners |
| **Sessions** -Upcoming and Past |

| Days of General Discussion |
| --- |
| General Comments |
| Recommendations |
| Rules of Procedure |

Where can I get help?

| Treaty body database |
| --- |
| Press Releases |
| Publications |

| **Other links** |
| --- |
| CRIN |
| The United Nations is not responsible for the content of external sites. |

**UN Cyberschoolbus**

continuing practice of sex tourism, to which children are especially vulnerable, as it directly promotes the sale of children, child prostitution and child pornography,

Recognizing that a number of particularly vulnerable groups, including girl children, are at greater risk of sexual exploitation and that girl children are disproportionately represented among the sexually exploited,

Concerned about the growing availability of child pornography on the Internet and other evolving technologies, and recalling the International Conference on Combating Child Pornography on the Internet, held in Vienna in 1999, in particular its conclusion calling for the worldwide criminalization of the production, distribution, exportation, transmission, importation, intentional possession and advertising of child pornography, and stressing the importance of closer cooperation and partnership between Governments and the Internet industry,

Believing that the elimination of the sale of children, child prostitution and child pornography will be facilitated by adopting a holistic approach, addressing the contributing factors, including underdevelopment, poverty, economic disparities, inequitable socio-economic structure, dysfunctioning families, lack of education, urban-rural migration, gender discrimination, irresponsible adult sexual behaviour, harmful traditional practices, armed conflicts and trafficking in children,

Believing also that efforts to raise public awareness are needed to reduce consumer demand for the sale of children, child prostitution and child pornography, and believing further in the importance of strengthening global partnership among all actors and of improving law enforcement at the national level,

Noting the provisions of international legal instruments relevant to the protection of children, including the Hague Convention on Protection of Children and Cooperation in Respect of Intercountry Adoption, the Hague Convention on the Civil Aspects of

Case 1:04-cr-20778-AJ   Document 64   Entered on FLSD Docket 11/30/2005   Page 108 of 166

International Child Abduction, the Hague Convention on Jurisdiction, Applicable Law, Recognition, Enforcement and Cooperation in Respect of Parental Responsibility and Measures for the Protection of Children, and International Labour Organization Convention No. 182 on the Prohibition and Immediate Action for the Elimination of the Worst Forms of Child Labour,

Encouraged by the overwhelming support for the Convention on the Rights of the Child, demonstrating the widespread commitment that exists for the promotion and protection of the rights of the child,

Recognizing the importance of the implementation of the provisions of the Programme of Action for the Prevention of the Sale of Children, Child Prostitution and Child Pornography and the Declaration and Agenda for Action adopted at the World Congress against Commercial Sexual Exploitation of Children, held in Stockholm from 27 to 31 August 1996, and the other relevant decisions and recommendations of pertinent international bodies,

Taking due account of the importance of the traditions and cultural values of each people for the protection and harmonious development of the child,

Have agreed as follows:

### Article 1

States Parties shall prohibit the sale of children, child prostitution and child pornography as provided for by the present Protocol.

### Article 2

For the purposes of the present Protocol:

(a) Sale of children means any act or transaction whereby a child is transferred by any person or group of persons to another for remuneration or any other consideration;

(b) Child prostitution means the use of a

Case 1:04-cr-20778-AJ Document 64 Entered on FLSD Docket 11/30/2005 Page 109 of 166

child in sexual activities for remuneration or any other form of consideration;

(c) Child pornography means any representation, by whatever means, of a child engaged in real or simulated explicit sexual activities or any representation of the sexual parts of a child for primarily sexual purposes.

### Article 3

1. Each State Party shall ensure that, as a minimum, the following acts and activities are fully covered under its criminal or penal law, whether such offences are committed domestically or transnationally or on an individual or organized basis:

(a) In the context of sale of children as defined in article 2:

(i) Offering, delivering or accepting, by whatever means, a child for the purpose of:

a. Sexual exploitation of the child;

b. Transfer of organs of the child for profit;

c. Engagement of the child in forced labour;

(ii) Improperly inducing consent, as an intermediary, for the adoption of a child in violation of applicable international legal instruments on adoption;

(b) Offering, obtaining, procuring or providing a child for child prostitution, as defined in article 2;

(c) Producing, distributing, disseminating, importing, exporting, offering, selling or possessing for the above purposes child pornography as defined in article 2.

2. Subject to the provisions of the national law of a State Party, the same shall apply to an attempt to commit any of the said acts and to complicity or participation in any of the said acts.

3. Each State Party shall make such offences punishable by appropriate penalties that take into account their grave nature.

4. Subject to the provisions of its national law, each State Party shall take measures, where appropriate, to establish the liability of legal persons for offences established in paragraph 1 of the present article. Subject to the legal principles of the State Party, such liability of legal persons may be criminal, civil or administrative.

5. States Parties shall take all appropriate legal and administrative measures to ensure that all persons involved in the adoption of a child act in conformity with applicable international legal instruments.

### Article 4

1. Each State Party shall take such measures as may be necessary to establish its jurisdiction over the offences referred to in article 3, paragraph 1, when the offences are commited in its territory or on board a ship or aircraft registered in that State.

2. Each State Party may take such measures as may be necessary to establish its jurisdiction over the offences referred to in article 3, paragraph 1, in the following cases:

 (a) When the alleged offender is a national of that State or a person who has his habitual residence in its territory;

 (b) When the victim is a national of that State.

3. Each State Party shall also take such measures as may be necessary to establish its jurisdiction over the aforementioned offences when the alleged offender is present in its territory and it does not extradite him or her to another State Party on the ground that the offence has been committed by one of its nationals.

4. The present Protocol does not exclude any criminal jurisdiction exercised in accordance with internal law.

Case 1:04-cr-20778-AJ Document 64 Entered on FLSD Docket 11/30/2005 Page 111 of 166

## Article 5

1. The offences referred to in article 3, paragraph 1, shall be deemed to be included as extraditable offences in any extradition treaty existing between States Parties and shall be included as extraditable offences in every extradition treaty subsequently concluded between them, in accordance with the conditions set forth in such treaties.

2. If a State Party that makes extradition conditional on the existence of a treaty receives a request for extradition from another State Party with which it has no extradition treaty, it may consider the present Protocol to be a legal basis for extradition in respect of such offences. Extradition shall be subject to the conditions provided by the law of the requested State.

3. States Parties that do not make extradition conditional on the existence of a treaty shall recognize such offences as extraditable offences between themselves subject to the conditions provided by the law of the requested State.

4. Such offences shall be treated, for the purpose of extradition between States Parties, as if they had been committed not only in the place in which they occurred but also in the territories of the States required to establish their jurisdiction in accordance with article 4.

5. If an extradition request is made with respect to an offence described in article 3, paragraph 1, and the requested State Party does not or will not extradite on the basis of the nationality of the offender, that State shall take suitable measures to submit the case to its competent authorities for the purpose of prosecution.

## Article 6

1. States Parties shall afford one another the greatest measure of assistance in connection with investigations or criminal or extradition proceedings brought in respect of the offences set forth in article 3, paragraph 1, including assistance in obtaining evidence at their disposal

necessary for the proceedings.

2. States Parties shall carry out their obligations under paragraph 1 of the present article in conformity with any treaties or other arrangements on mutual legal assistance that may exist between them. In the absence of such treaties or arrangements, States Parties shall afford one another assistance in accordance with their domestic law.

### Article 7

States Parties shall, subject to the provisions of their national law:

(a) Take measures to provide for the seizure and confiscation, as appropriate, of:

(i) Goods, such as materials, assets and other instrumentalities used to commit or facilitate offences under the present protocol;

(ii) Proceeds derived from such offences;

(b) Execute requests from another State Party for seizure or confiscation of goods or proceeds referred to in subparagraph (a);

(c) Take measures aimed at closing, on a temporary or definitive basis, premises used to commit such offences.

### Article 8

1. States Parties shall adopt appropriate measures to protect the rights and interests of child victims of the practices prohibited under the present Protocol at all stages of the criminal justice process, in particular by:

(a) Recognizing the vulnerability of child victims and adapting procedures to recognize their special needs, including their special needs as witnesses;

(b) Informing child victims of their rights, their role and the scope, timing and progress of the proceedings and of the disposition of their cases;

(c) Allowing the views, needs and concerns of child victims to be presented and considered in proceedings where their personal interests are affected, in a manner consistent with the procedural rules of national law;

(d) Providing appropriate support services to child victims throughout the legal process;

(e) Protecting, as appropriate, the privacy and identity of child victims and taking measures in accordance with national law to avoid the inappropriate dissemination of information that could lead to the identification of child victims;

(f) Providing, in appropriate cases, for the safety of child victims, as well as that of their families and witnesses on their behalf, from intimidation and retaliation;

(g) Avoiding unnecessary delay in the disposition of cases and the execution of orders or decrees granting compensation to child victims.

2. States Parties shall ensure that uncertainty as to the actual age of the victim shall not prevent the initiation of criminal investigations, including investigations aimed at establishing the age of the victim.

3. States Parties shall ensure that, in the treatment by the criminal justice system of children who are victims of the offences described in the present Protocol, the best interest of the child shall be a primary consideration.

4. States Parties shall take measures to ensure appropriate training, in particular legal and psychological training, for the persons who work with victims of the offences prohibited under the present Protocol.

5. States Parties shall, in appropriate cases, adopt measures in order to protect the safety and integrity of those persons and/or organizations involved in the prevention and/or protection and rehabilitation of

Case 1:04-cr-20778-AJ   Document 64   Entered on FLSD Docket 11/30/2005   Page 114 of 166

victims of such offences.

6. Nothing in the present article shall be construed to be prejudicial to or inconsistent with the rights of the accused to a fair and impartial trial.

## Article 9

1. States Parties shall adopt or strengthen, implement and disseminate laws, administrative measures, social policies and programmes to prevent the offences referred to in the present Protocol. Particular attention shall be given to protect children who are especially vulnerable to such practices.

2. States Parties shall promote awareness in the public at large, including children, through information by all appropriate means, education and training, about the preventive measures and harmful effects of the offences referred to in the present Protocol. In fulfilling their obligations under this article, States Parties shall encourage the participation of the community and, in particular, children and child victims, in such information and education and training programmes, including at the international level.

3. States Parties shall take all feasible measures with the aim of ensuring all appropriate assistance to victims of such offences, including their full social reintegration and their full physical and psychological recovery.

4. States Parties shall ensure that all child victims of the offences described in the present Protocol have access to adequate procedures to seek, without discrimination, compensation for damages from those legally responsible.

5. States Parties shall take appropriate measures aimed at effectively prohibiting the production and dissemination of material advertising the offences described in the present Protocol.

## Article 10

1. States Parties shall take all necessary steps to strengthen international cooperation by multilateral, regional and bilateral arrangements for the prevention, detection, investigation, prosecution and punishment of those responsible for acts involving the sale of children, child prostitution, child pornography and child sex tourism. States Parties shall also promote international cooperation and coordination between their authorities, national and international non-governmental organizations and international organizations.

2. States Parties shall promote international cooperation to assist child victims in their physical and psychological recovery, social reintegration and repatriation.

3. States Parties shall promote the strengthening of international cooperation in order to address the root causes, such as poverty and underdevelopment, contributing to the vulnerability of children to the sale of children, child prostitution, child pornography and child sex tourism.

4. States Parties in a position to do so shall provide financial, technical or other assistance through existing multilateral, regional, bilateral or other programmes.

### Article 11

Nothing in the present Protocol shall affect any provisions that are more conducive to the realization of the rights of the child and that may be contained in:

(a) The law of a State Party;

(b) International law in force for that State.

### Article 12

1. Each State Party shall, within two years following the entry into force of the present Protocol for that State Party, submit a report to the Committee on the Rights of the Child providing comprehensive information on the measures it has taken to implement the

provisions of the Protocol.

2. Following the submission of the comprehensive report, each State Party shall include in the reports they submit to the Committee on the Rights of the Child, in accordance with article 44 of the Convention, any further information with respect to the implementation of the present Protocol. Other States Parties to the Protocol shall submit a report every five years.

3. The Committee on the Rights of the Child may request from States Parties further information relevant to the implementation of the present Protocol.

### Article 13

1. The present Protocol is open for signature by any State that is a party to the Convention or has signed it.

2. The present Protocol is subject to ratification and is open to accession by any State that is a party to the Convention or has signed it. Instruments of ratification or accession shall be deposited with the Secretary- General of the United Nations.

### Article 14

1. The present Protocol shall enter into force three months after the deposit of the tenth instrument of ratification or accession.

2. For each State ratifying the present Protocol or acceding to it after its entry into force, the Protocol shall enter into force one month after the date of the deposit of its own instrument of ratification or accession.

### Article 15

1. Any State Party may denounce the present Protocol at any time by written notification to the Secretary- General of the United Nations, who shall thereafter inform the other States Parties to the Convention and all States that have signed the Convention. The denunciation shall take effect one year after the date of receipt of the notification by the Secretary-General.

Case 1:04-cr-20778-AJ   Document 64   Entered on FLSD Docket 11/30/2005   Page 117 of 166

2. Such a denunciation shall not have the effect of releasing the State Party from its obligations under the present Protocol in regard to any offence that occurs prior to the date on which the denunciation becomes effective. Nor shall such a denunciation prejudice in any way the continued consideration of any matter that is already under consideration by the Committee on the Rights of the Child prior to the date on which the denunciation becomes effective.

### Article 16

1. Any State Party may propose an amendment and file it with the Secretary-General of the United Nations. The Secretary-General shall thereupon communicate the proposed amendment to States Parties with a request that they indicate whether they favour a conference of States Parties for the purpose of considering and voting upon the proposals. In the event that, within four months from the date of such communication, at least one third of the States Parties favour such a conference, the Secretary-General shall convene the conference under the auspices of the United Nations. Any amendment adopted by a majority of States Parties present and voting at the conference shall be submitted to the General Assembly of the United Nations for approval.

2. An amendment adopted in accordance with paragraph 1 of the present article shall enter into force when it has been approved by the General Assembly and accepted by a two-thirds majority of States Parties.

3. When an amendment enters into force, it shall be binding on those States Parties that have accepted it, other States Parties still being bound by the provisions of the present Protocol and any earlier amendments they have accepted.

### Article 17

1. The present Protocol, of which the Arabic, Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited in the archives of the United Nations.

Case 1:04-cr-20778-AJ   Document 64   Entered on FLSD Docket 11/30/2005   Page 118 of 166

2. The Secretary-General of the United
Nations shall transmit certified copies of the
present Protocol to all States Parties to the
Convention and all States that have signed
the Convention.

---

OHCHR HOME |SITE MAP | INDEX | SEARCH | CONTACT US

© Copyright 1996-2002
**Office of the United Nations High Commissioner for Human Rights - Geneva, Switzerland**

# EXHIBIT H



**Office of the High Commissioner for Human Rights**



**Committee main**

# Status of Ratifications of the Optional Protocol to the Convention on the Rights of the Child on the sale of children, child prostitution and child pornography

## Number of States parties as of 14 November 2003: 67

| State | Signature | Ratification, Accession (a) |
|---|---|---|
| Afghanistan | | 19 Sep 2002 a |
| Andorra | 7 Sep 2000 | 30 Apr 2001 |
| Antigua and Barbuda | 18 Dec 2001 | 30 Apr 2002 |
| Argentina | 1 Apr 2002 | 25 Sep 2003 |
| Armenia | 24 Sep 2003 | |
| Australia | 18 Dec 2001 | |
| Austria | 6 Sep 2000 | |
| Azerbaijan | 8 Sep 2000 | 3 Jul 2002 |
| Bangladesh | 6 Sep 2000 | 6 Sep 2000 |
| Belarus | | 23 Jan 2002 a |
| Belgium | 6 Sep 2000 | |
| Belize | 6 Sep 2000 | |
| Benin | 22 Feb 2001 | |
| Bolivia | 10 Nov 2001 | 3 Jun 2003 |
| Bosnia and Herzegovina | 7 Sep 2000 | 4 Sep 2002 |
| Botswana | | 24 Sep 2003 |
| Brazil | 6 Sep 2000 | |
| Bulgaria | 8 Jun 2001 | 12 Feb 2002 |
| Burkina Faso | 16 Nov 2001 | |
| Cambodia | 27 Jun 2000 | 30 May 2002 |
| Cameroon | 5 Oct 2001 | |
| Canada | 10 Nov 2001 | |
| Cape Verde | | 10 May 2002 a |
| Chad | 8 May 2002 | 28 Aug 2002 |
| Chile | 2 June 2000 | 6 Feb 2003 |
| China | | 3 Dec 2002 |
| Colombia | 6 Sep 2000 | |
| Costa Rica | 7 Sep 2000 | 9 Apr 2002 |
| Croatia | 8 May 2002 | 13 May 2002 |
| Cuba | 13 Oct 2000 | 25 Sep 2001 |
| Cyprus | 8 Feb 2001 | |
| Democratic Republic of the Congo | | 11 Nov 2001 a |
| Denmark | 7 Sep 2000 | 24 Jul 2003 |
| Dominica | | 20 Sep 2002 a |
| Ecuador | 6 Sep 2000 | |

Case 1:04-cr-20778-AJ   Document 64   Entered on FLSD Docket 11/30/2005   Page 121 of 166

| | | |
|---|---|---|
| Egypt | | 12 Jul 2002 a |
| El Salvador | 13 Sep 2002 | |
| Equatorial Guinea | | 7 Feb 2003 A |
| Estonia | 24 Sep 2003 | |
| Finland | 7 Sep 2000 | |
| France | 6 Sep 2000 | 5 Feb 2003 |
| Gabon | 8 Sep 2000 | |
| Gambia | 21 Dec 2000 | |
| Germany | 6 Sep 2000 | |
| Ghana | 24 Sep 2003 | |
| Greece | 7 Sep 2000 | |
| Guatemala | 7 Sep 2000 | 9 May 2002 |
| Guinea-Bissau | 8 Sep 2000 | |
| Haiti | 15 Aug 2002 | |
| Holy See | 10 Oct 2000 | 24 Oct 2001 |
| Honduras | | 8 May 2002 a |
| Hungary | 11 Mar 2002 | |
| Iceland | 7 Sep 2000 | 9 Jul 2001 |
| Indonesia | 24 Sep 2001 | |
| Ireland | 7 Sep 2000 | |
| Israel | 14 Nov 2001 | |
| Italy | 6 Sep 2000 | 9 May 2002 |
| Jamaica | 8 Sep 2000 | |
| Japan | 10 May 2002 | |
| Jordan | 6 Sep 2000 | |
| Kazakhstan | 6 Sep 2000 | 24 Aug 2001 |
| Kenya | 8 Sep 2000 | |
| Kyrgyztan | | 12 Feb 2003 a |
| Latvia | 1 Feb 2002 | |
| Lebanon | 10 Oct 2001 | |
| Lesotho | 6 Sep 2000 | 24 Sep 2003 |
| Liechtenstein | 8 Sep 2000 | |
| Luxembourg | 8 Sep 2000 | |
| Madagascar | 7 Sep 2000 | |
| Malawi | 7 Sep 2000 | |
| Maldives | 10 May 2002 | 10 May 2002 |
| Mali | | 16 May 2002 a |
| Malta | 7 Sep 2000 | |
| Mauritius | 11 Nov 2001 | |
| Mexico | 7 Sep 2000 | 15 Mar 2002 |
| Micronesia (Federated States of) | 8 May 2002 | |
| Monaco | 26 Jun 2000 | |
| Mongolia | 12 Nov 2001 | 27 Jun 2003 |
| Morocco | 8 Sep 2000 | 2 Oct 2001 |
| Mozambique | | 6 Mar 2003 a |
| Namibia | 8 Sep 2000 | 16 Apr 2002 |
| Nauru | 8 Sep 2000 | |
| Nepal | 8 Sep 2000 | |
| Netherlands | 7 Sep 2000 | |
| New Zealand | 7 Sep 2000 | |

| | | |
|---|---|---|
| Niger | 27 Mar 2002 | |
| Nigeria | 8 Sep 2000 | |
| Norway | 13 Jun 2000 | 2 Oct 2001 |
| Pakistan | 26 Sep 2001 | |
| Panama | 31 Oct 2000 | 9 Feb 2001 |
| Paraguay | 13 Sep 2000 | 18 Aug 2003 |
| Peru | 1 Nov 2000 | 8 May 2002 |
| Philippines | 8 Sep 2000 | 28 May 2002 |
| Poland | 13 Feb 2002 | |
| Portugal | 6 Sep 2000 | 16 May 2003 |
| Qatar | | 14 Dec 2001 a |
| Republic of Korea | 6 Sep 2000 | |
| Republic of Moldova | 8 Feb 2002 | |
| Romania | 6 Sep 2000 | 18 Oct 2001 |
| Rwanda | | 14 Mar 2002 a |
| San Marino | 5 Jun 2000 | |
| Senegal | 8 Sep 2000 | |
| Serbia and Montenegro | 8 Oct 2001 | 10 Oct 2002 |
| Seychelles | 23 Jan 2001 | |
| Sierra Leone | 8 Sep 2000 | 17 Sep 2001 |
| Slovakia | 30 Nov 2001 | |
| Slovenia | 8 Sep 2000 | |
| South Africa | | 30 Jun 2003 a |
| Spain | 6 Sep 2000 | 18 Dec 2001 |
| Sri Lanka | 8 May 2002 | |
| Suriname | 10 May 2002 | |
| Sweden | 8 Sep 2000 | |
| Switzerland | 7 Sep 2000 | |
| Syrian Arab Republic | | 15 May 2003 a |
| Tajikistan | | 5 Aug 2002 a |
| The Former Yugoslav Republic of Macedonia | 17 Jul 2001 | 17 Oct 2003 |
| Timor-Leste | | 29 Jan 2003 a |
| Togo | 15 Nov 2001 | |
| Tunisia | 22 Apr 2002 | 13 Sep 2002 |
| Turkey | 8 Sep 2000 | 19 Aug 2002 |
| Uganda | | 30 Nov 2001 a |
| Ukraine | 7 Sep 2000 | 3 Jul 2003 |
| United Kingdom of Great Britain and Northern Ireland | 7 Sep 2000 | |
| United Republic of Tanzania | | 24 Apr 2003 a |
| United States of America | | 23 Dec 2002 |
| Uruguay | 7 Sep 2000 | 3 Jul 2003 |
| Venezuela | 7 Sep 2000 | 8 May 2002 |
| Viet Nam | 8 Sep 2000 | 20 Dec 2001 |

OHCHR HOME |SITE MAP | INDEX | SEARCH | CONTACT US

© Copyright 1996-2002

Case 1:04-cr-20778-AJ   Document 64   Entered on FLSD Docket 11/30/2005   Page 123 of 166

**Office of the United Nations High Commissioner for Human Rights - Geneva, Switzerland**

# EXHIBIT I

 **Office of the High Commissioner for Human Rights** 

| Texts |
| --- |
| The Convention on the Rights of the Child |
| Optional Protocol on children in armed conflict |
| Optional Protocol on the sale of children, child prostitution and child pornography |

| Status of ratification |
| --- |
| The Convention |
| Optional Protocol on children in armed conflict |
| Optional Protocol on the sale of children, child prostitution and child pornography |

| Reservations and declarations |
| --- |
| The Convention |
| Optional Protocol on children in armed conflict |
| Optional Protocol on the sale of children, child prostitution and child pornography |

# Convention on the Rights of the Child

**Adopted and opened for signature, ratification and accession by General Assembly resolution 44/25 of 20 November 1989**

***entry into force* 2 September 1990, in accordance with article 49**

**Languages: A I C I F I R I S**

*Preamble*

The States Parties to the present Convention,

Considering that, in accordance with the principles proclaimed in the Charter of the United Nations, recognition of the inherent dignity and of the equal and inalienable rights of all members of the human family is the foundation of freedom, justice and peace in the world,

Bearing in mind that the peoples of the United Nations have, in the Charter, reaffirmed their faith in fundamental human rights and in the dignity and worth of the human person, and have determined to promote social progress and better standards of life in larger freedom,

Recognizing that the United Nations has, in the Universal Declaration of Human Rights and in the International Covenants on Human Rights, proclaimed and agreed that everyone is entitled to all the rights and freedoms set forth therein, without distinction of any kind, such as race, colour, sex, language, religion, political

## Committee on the Rights of the Child

| Reporting to the Committee |
| --- |
| **Guidelines** -States and Partners |
| **Sessions** -Upcoming and Past |

| |
| --- |
| Days of General Discussion |
| General Comments |
| Recommendations |
| Rules of Procedure |

| |
| --- |
| Where can I get help? |

| |
| --- |
| Treaty body database |
| Press Releases |
| Publications |

| Other links |
| --- |
| CRIN |
| The United Nations is not responsible for the content of external sites. |

**UN Cyberschoolbus**

or other opinion, national or social origin, property, birth or other status,

Recalling that, in the Universal Declaration of Human Rights, the United Nations has proclaimed that childhood is entitled to special care and assistance,

Convinced that the family, as the fundamental group of society and the natural environment for the growth and well-being of all its members and particularly children, should be afforded the necessary protection and assistance so that it can fully assume its responsibilities within the community,

Recognizing that the child, for the full and harmonious development of his or her personality, should grow up in a family environment, in an atmosphere of happiness, love and understanding,

Considering that the child should be fully prepared to live an individual life in society, and brought up in the spirit of the ideals proclaimed in the Charter of the United Nations, and in particular in the spirit of peace, dignity, tolerance, freedom, equality and solidarity,

Bearing in mind that the need to extend particular care to the child has been stated in the Geneva Declaration of the Rights of the Child of 1924 and in the Declaration of the Rights of the Child adopted by the General Assembly on 20 November 1959 and recognized in the Universal Declaration of Human Rights, in the International Covenant on Civil and Political Rights (in particular in articles 23 and 24), in the International Covenant on Economic, Social and Cultural Rights (in particular in article 10)

and in the statutes and relevant instruments of specialized agencies and international organizations concerned with the welfare of children, '

Bearing in mind that, as indicated in the Declaration of the Rights of the Child, "the child, by reason of his physical and mental immaturity, needs special safeguards and care, including appropriate legal protection, before as well as after birth",

Recalling the provisions of the Declaration on Social and Legal Principles relating to the Protection and Welfare of Children, with Special Reference to Foster Placement and Adoption Nationally and Internationally; the United Nations Standard Minimum Rules for the Administration of Juvenile Justice (The Beijing Rules) ; and the Declaration on the Protection of Women and Children in Emergency and Armed Conflict,

Recognizing that, in all countries in the world, there are children living in exceptionally difficult conditions, and that such children need special consideration,

Taking due account of the importance of the traditions and cultural values of each people for the protection and harmonious development of the child,

Recognizing the importance of international co-operation for improving the living conditions of children in every country, in particular in the developing countries,

Have agreed as follows:

## PART I

### *Article 1*

For the purposes of the present Convention, a child means every human being below the age of eighteen years unless under the law applicable to the child, majority is attained earlier.

### Article 2

1. States Parties shall respect and ensure the rights set forth in the present Convention to each child within their jurisdiction without discrimination of any kind, irrespective of the child's or his or her parent's or legal guardian's race, colour, sex, language, religion, political or other opinion, national, ethnic or social origin, property, disability, birth or other status.

2. States Parties shall take all appropriate measures to ensure that the child is protected against all forms of discrimination or punishment on the basis of the status, activities, expressed opinions, or beliefs of the child's parents, legal guardians, or family members.

### Article 3

1. In all actions concerning children, whether undertaken by public or private social welfare institutions, courts of law, administrative authorities or legislative bodies, the best interests of the child shall be a primary consideration.

2. States Parties undertake to ensure the child such protection and care as is necessary for his or her well-being, taking into account the rights and duties of his or her parents, legal guardians, or other individuals legally responsible for him or her, and, to this end, shall take all appropriate legislative and administrative measures.

3. States Parties shall ensure that the institutions, services and facilities responsible for the care or protection of children shall conform with the standards established by competent authorities, particularly in the areas of safety, health, in the number and suitability of their staff, as well as competent supervision.

### Article 4

States Parties shall undertake all appropriate legislative, administrative, and other measures for the implementation of the rights recognized in the present Convention. With regard to economic, social and cultural rights, States Parties shall undertake such measures to the maximum extent of their available resources and, where needed, within the framework of international co-operation.

### Article 5

States Parties shall respect the responsibilities, rights and duties of parents or, where applicable, the members of the extended family or community as provided for by local custom, legal guardians or other persons legally responsible for the child, to provide, in a manner consistent with the evolving capacities of the child, appropriate direction and guidance in the exercise by the child of the rights recognized in the present Convention.

### Article 6

1. States Parties recognize that every child has the inherent right to life.

2. States Parties shall ensure to the maximum extent possible the survival and development of the

child.

## Article 7

1. The child shall be registered immediately after birth and shall have the right from birth to a name, the right to acquire a nationality and. as far as possible, the right to know and be cared for by his or her parents.

2. States Parties shall ensure the implementation of these rights in accordance with their national law and their obligations under the relevant international instruments in this field, in particular where the child would otherwise be stateless.

## Article 8

1. States Parties undertake to respect the right of the child to preserve his or her identity, including nationality, name and family relations as recognized by law without unlawful interference.

2. Where a child is illegally deprived of some or all of the elements of his or her identity, States Parties shall provide appropriate assistance and protection, with a view to re-establishing speedily his or her identity.

## Article 9

1. States Parties shall ensure that a child shall not be separated from his or her parents against their will, except when competent authorities subject to judicial review determine, in accordance with applicable law and procedures, that such separation is necessary for the best interests of the child. Such determination may be necessary in a particular case such as one involving abuse or neglect of the child by the

parents, or one where the parents are living separately and a decision must be made as to the child's place of residence.

2. In any proceedings pursuant to paragraph 1 of the present article, all interested parties shall be given an opportunity to participate in the proceedings and make their views known.

3. States Parties shall respect the right of the child who is separated from one or both parents to maintain personal relations and direct contact with both parents on a regular basis, except if it is contrary to the child's best interests. 4. Where such separation results from any action initiated by a State Party, such as the detention, imprisonment, exile, deportation or death (including death arising from any cause while the person is in the custody of the State) of one or both parents or of the child, that State Party shall, upon request, provide the parents, the child or, if appropriate, another member of the family with the essential information concerning the whereabouts of the absent member(s) of the family unless the provision of the information would be detrimental to the well-being of the child. States Parties shall further ensure that the submission of such a request shall of itself entail no adverse consequences for the person(s) concerned.

### Article 10

1. In accordance with the obligation of States Parties under article 9, paragraph 1, applications by a child or his or her parents to enter or leave a State Party for the purpose of family reunification shall be dealt with by States Parties in a positive, humane and expeditious

manner. States Parties shall further ensure that the submission of such a request shall entail no adverse consequences for the applicants and for the members of their family.

2. A child whose parents reside in different States shall have the right to maintain on a regular basis, save in exceptional circumstances personal relations and direct contacts with both parents. Towards that end and in accordance with the obligation of States Parties under article 9, paragraph 1, States Parties shall respect the right of the child and his or her parents to leave any country, including their own, and to enter their own country. The right to leave any country shall be subject only to such restrictions as are prescribed by law and which are necessary to protect the national security, public order (ordre public), public health or morals or the rights and freedoms of others and are consistent with the other rights recognized in the present Convention.

### Article 11

1. States Parties shall take measures to combat the illicit transfer and non-return of children abroad.

2. To this end, States Parties shall promote the conclusion of bilateral or multilateral agreements or accession to existing agreements.

### Article 12

1. States Parties shall assure to the child who is capable of forming his or her own views the right to express those views freely in all matters affecting the child, the views of the child being given due weight in accordance

with the age and maturity of the child.

2. For this purpose, the child shall in particular be provided the opportunity to be heard in any judicial and administrative proceedings affecting the child, either directly, or through a representative or an appropriate body, in a manner consistent with the procedural rules of national law.

## Article 13

1. The child shall have the right to freedom of expression; this right shall include freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing or in print, in the form of art, or through any other media of the child's choice.

2. The exercise of this right may be subject to certain restrictions, but these shall only be such as are provided by law and are necessary:

(a) For respect of the rights or reputations of others; or

(b) For the protection of national security or of public order (ordre public), or of public health or morals.

## Article 14

1. States Parties shall respect the right of the child to freedom of thought, conscience and religion.

2. States Parties shall respect the rights and duties of the parents and, when applicable, legal guardians, to provide direction to the child in the exercise of his or her right in a manner consistent with the evolving capacities of the child.

3. Freedom to manifest one's religion or

beliefs may be subject only to such limitations as are prescribed by law and are necessary to protect public safety, order, health or morals, or the fundamental rights and freedoms of others.

### Article 15

1. States Parties recognize the rights of the child to freedom of association and to freedom of peaceful assembly.

2. No restrictions may be placed on the exercise of these rights other than those imposed in conformity with the law and which are necessary in a democratic society in the interests of national security or public safety, public order (ordre public), the protection of public health or morals or the protection of the rights and freedoms of others.

### Article 16

1. No child shall be subjected to arbitrary or unlawful interference with his or her privacy, family, home or correspondence, nor to unlawful attacks on his or her honour and reputation.

2. The child has the right to the protection of the law against such interference or attacks.

### Article 17

States Parties recognize the important function performed by the mass media and shall ensure that the child has access to information and material from a diversity of national and international sources, especially those aimed at the promotion of his or her social, spiritual and moral well-being and physical and mental health. To this end, States Parties shall:

(a) Encourage the mass media to disseminate information and material of social and cultural benefit to the child and in accordance with the spirit of article 29;

(b) Encourage international co-operation in the production, exchange and dissemination of such information and material from a diversity of cultural, national and international sources;

(c) Encourage the production and dissemination of children's books;

(d) Encourage the mass media to have particular regard to the linguistic needs of the child who belongs to a minority group or who is indigenous;

(e) Encourage the development of appropriate guidelines for the protection of the child from information and material injurious to his or her well-being, bearing in mind the provisions of articles 13 and 18.

### Article 18

1. States Parties shall use their best efforts to ensure recognition of the principle that both parents have common responsibilities for the upbringing and development of the child. Parents or, as the case may be, legal guardians, have the primary responsibility for the upbringing and development of the child. The best interests of the child will be their basic concern.

2. For the purpose of guaranteeing and promoting the rights set forth in the present Convention, States Parties shall render appropriate assistance to parents and legal guardians in the performance of their child-rearing responsibilities and shall ensure the development of institutions, facilities and services for the care of children.

3. States Parties shall take all appropriate measures to ensure that children of working parents have the right to benefit from child-care services and facilities for which they are eligible.

### Article 19

1. States Parties shall take all appropriate legislative, administrative, social and educational measures to protect the child from all forms of physical or mental violence, injury or abuse, neglect or negligent treatment, maltreatment or exploitation, including sexual abuse, while in the care of parent(s), legal guardian(s) or any other person who has the care of the child.

2. Such protective measures should, as appropriate, include effective procedures for the establishment of social programmes to provide necessary support for the child and for those who have the care of the child, as well as for other forms of prevention and for identification, reporting, referral, investigation, treatment and follow-up of instances of child maltreatment described heretofore, and, as appropriate, for judicial involvement.

### Article 20

1. A child temporarily or permanently deprived of his or her family environment, or in whose own best interests cannot be allowed to remain in that environment, shall be entitled to special protection and assistance provided by the State.

2. States Parties shall in accordance with their national laws ensure alternative care for such a child.

3. Such care could include, inter alia, foster placement, kafalah of Islamic law, adoption or if necessary placement in suitable institutions for the care of children. When considering solutions, due regard shall be paid to the desirability of continuity in a child's upbringing and to the child's ethnic, religious, cultural and linguistic background.

### Article 21

States Parties that recognize and/or permit the system of adoption shall

ensure that the best interests of the child shall be the paramount consideration and they shall:

(a) Ensure that the adoption of a child is authorized only by competent authorities who determine, in accordance with applicable law and procedures and on the basis of all pertinent and reliable information, that the adoption is permissible in view of the child's status concerning parents, relatives and legal guardians and that, if required, the persons concerned have given their informed consent to the adoption on the basis of such counselling as may be necessary;

(b) Recognize that inter-country adoption may be considered as an alternative means of child's care, if the child cannot be placed in a foster or an adoptive family or cannot in any suitable manner be cared for in the child's country of origin;

(c) Ensure that the child concerned by inter-country adoption enjoys safeguards and standards equivalent to those existing in the case of national adoption;

(d) Take all appropriate measures to ensure that, in inter-country adoption, the placement does not result in improper financial gain for those involved in it;

(e) Promote, where appropriate, the objectives of the present article by concluding bilateral or multilateral arrangements or agreements, and endeavour, within this framework, to ensure that the placement of the child in another country is carried out by competent authorities or organs.

### *Article 22*

1. States Parties shall take appropriate measures to ensure that a child who is seeking refugee status or who is considered a refugee in accordance with applicable international or domestic law

and procedures shall, whether unaccompanied or accompanied by his or her parents or by any other person, receive appropriate protection and humanitarian assistance in the enjoyment of applicable rights set forth in the present Convention and in other international human rights or humanitarian instruments to which the said States are Parties.

2. For this purpose, States Parties shall provide, as they consider appropriate, co-operation in any efforts by the United Nations and other competent intergovernmental organizations or non-governmental organizations co-operating with the United Nations to protect and assist such a child and to trace the parents or other members of the family of any refugee child in order to obtain information necessary for reunification with his or her family. In cases where no parents or other members of the family can be found, the child shall be accorded the same protection as any other child permanently or temporarily deprived of his or her family environment for any reason , as set forth in the present Convention.

### Article 23

1. States Parties recognize that a mentally or physically disabled child should enjoy a full and decent life, in conditions which ensure dignity, promote self-reliance and facilitate the child's active participation in the community.

2. States Parties recognize the right of the disabled child to special care and shall encourage and ensure the extension, subject to available resources, to the eligible child and those responsible for his or her care, of assistance for which application is made and which is appropriate to the child's condition and to the circumstances of the parents or others caring for the child. 3. Recognizing the special needs of a disabled child, assistance extended in accordance with paragraph 2 of the

present article shall be provided free of charge, whenever possible, taking into account the financial resources of the parents or others caring for the child, and shall be designed to ensure that the disabled child has effective access to and receives education, training, health care services, rehabilitation services, preparation for employment and recreation opportunities in a manner conducive to the child's achieving the fullest possible social integration and individual development, including his or her cultural and spiritual development

4. States Parties shall promote, in the spirit of international cooperation, the exchange of appropriate information in the field of preventive health care and of medical, psychological and functional treatment of disabled children, including dissemination of and access to information concerning methods of rehabilitation, education and vocational services, with the aim of enabling States Parties to improve their capabilities and skills and to widen their experience in these areas. In this regard, particular account shall be taken of the needs of developing countries.

### Article 24

1. States Parties recognize the right of the child to the enjoyment of the highest attainable standard of health and to facilities for the treatment of illness and rehabilitation of health. States Parties shall strive to ensure that no child is deprived of his or her right of access to such health care services.

2. States Parties shall pursue full implementation of this right and, in particular, shall take appropriate measures:

(a) To diminish infant and child mortality;

(b) To ensure the provision of necessary medical assistance and

health care to all children with emphasis on the development of primary health care;

(c) To combat disease and malnutrition, including within the framework of primary health care, through, inter alia, the application of readily available technology and through the provision of adequate nutritious foods and clean drinking-water, taking into consideration the dangers and risks of environmental pollution;

(d) To ensure appropriate pre-natal and post-natal health care for mothers;

(e) To ensure that all segments of society, in particular parents and children, are informed, have access to education and are supported in the use of basic knowledge of child health and nutrition, the advantages of breastfeeding, hygiene and environmental sanitation and the prevention of accidents;

(f) To develop preventive health care, guidance for parents and family planning education and services.

3. States Parties shall take all effective and appropriate measures with a view to abolishing traditional practices prejudicial to the health of children.

4. States Parties undertake to promote and encourage international co-operation with a view to achieving progressively the full realization of the right recognized in the present article. In this regard, particular account shall be taken of the needs of developing countries.

### Article 25

States Parties recognize the right of a child who has been placed by the competent authorities for the purposes of care, protection or treatment of his or her physical or mental health, to a periodic review of the treatment provided to the child and all other

circumstances relevant to his or her placement.

### *Article 26*

1. States Parties shall recognize for every child the right to benefit from social security, including social insurance, and shall take the necessary measures to achieve the full realization of this right in accordance with their national law.

2. The benefits should, where appropriate, be granted, taking into account the resources and the circumstances of the child and persons having responsibility for the maintenance of the child, as well as any other consideration relevant to an application for benefits made by or on behalf of the child.

### *Article 27*

1. States Parties recognize the right of every child to a standard of living adequate for the child's physical, mental, spiritual, moral and social development.

2. The parent(s) or others responsible for the child have the primary responsibility to secure, within their abilities and financial capacities, the conditions of living necessary for the child's development.

3. States Parties, in accordance with national conditions and within their means, shall take appropriate measures to assist parents and others responsible for the child to implement this right and shall in case of need provide material assistance and support programmes, particularly with regard to nutrition, clothing and housing.

4. States Parties shall take all appropriate measures to secure the recovery of maintenance for the child from the parents or other persons having financial responsibility for the child, both within the State Party and

from abroad. In particular, where the person having financial responsibility for the child lives in a State different from that of the child, States Parties shall promote the accession to international agreements or the conclusion of such agreements, as well as the making of other appropriate arrangements.

### Article 28

1. States Parties recognize the right of the child to education, and with a view to achieving this right progressively and on the basis of equal opportunity, they shall, in particular:

(a) Make primary education compulsory and available free to all;

(b) Encourage the development of different forms of secondary education, including general and vocational education, make them available and accessible to every child, and take appropriate measures such as the introduction of free education and offering financial assistance in case of need;

(c) Make higher education accessible to all on the basis of capacity by every appropriate means;

(d) Make educational and vocational information and guidance available and accessible to all children;

(e) Take measures to encourage regular attendance at schools and the reduction of drop-out rates.

2. States Parties shall take all appropriate measures to ensure that school discipline is administered in a manner consistent with the child's human dignity and in conformity with the present Convention.

3. States Parties shall promote and encourage international cooperation in matters relating to education, in

particular with a view to contributing to the elimination of ignorance and illiteracy throughout the world and facilitating access to scientific and technical knowledge and modern teaching methods. In this regard, particular account shall be taken of the needs of developing countries.

### Article 29 ☑ *General comment on its implementation*

1. States Parties agree that the education of the child shall be directed to:

(a) The development of the child's personality, talents and mental and physical abilities to their fullest potential;

(b) The development of respect for human rights and fundamental freedoms, and for the principles enshrined in the Charter of the United Nations;

(c) The development of respect for the child's parents, his or her own cultural identity, language and values, for the national values of the country in which the child is living, the country from which he or she may originate, and for civilizations different from his or her own;

(d) The preparation of the child for responsible life in a free society, in the spirit of understanding, peace, tolerance, equality of sexes, and friendship among all peoples, ethnic, national and religious groups and persons of indigenous origin;

(e) The development of respect for the natural environment.

2. No part of the present article or article 28 shall be construed so as to interfere with the liberty of individuals and bodies to establish and direct educational institutions, subject always to the observance of the principle set

forth in paragraph 1 of the present article and to the requirements that the education given in such institutions shall conform to such minimum standards as may be laid down by the State.

### Article 30

In those States in which ethnic, religious or linguistic minorities or persons of indigenous origin exist, a child belonging to such a minority or who is indigenous shall not be denied the right, in community with other members of his or her group, to enjoy his or her own culture, to profess and practise his or her own religion, or to use his or her own language.

### Article 31

1. States Parties recognize the right of the child to rest and leisure, to engage in play and recreational activities appropriate to the age of the child and to participate freely in cultural life and the arts.

2. States Parties shall respect and promote the right of the child to participate fully in cultural and artistic life and shall encourage the provision of appropriate and equal opportunities for cultural, artistic, recreational and leisure activity.

### Article 32

1. States Parties recognize the right of the child to be protected from economic exploitation and from performing any work that is likely to be hazardous or to interfere with the child's education, or to be harmful to the child's health or physical, mental, spiritual, moral or social development.

2. States Parties shall take legislative, administrative, social and educational measures to ensure the implementation of the present article. To this end, and having regard to the relevant provisions of other international instruments,

States Parties shall in particular:

(a) Provide for a minimum age or minimum ages for admission to employment;

(b) Provide for appropriate regulation of the hours and conditions of employment;

(c) Provide for appropriate penalties or other sanctions to ensure the effective enforcement of the present article.

### Article 33

States Parties shall take all appropriate measures, including legislative, administrative, social and educational measures, to protect children from the illicit use of narcotic drugs and psychotropic substances as defined in the relevant international treaties, and to prevent the use of children in the illicit production and trafficking of such substances.

### Article 34

States Parties undertake to protect the child from all forms of sexual exploitation and sexual abuse. For these purposes, States Parties shall in particular take all appropriate national, bilateral and multilateral measures to prevent:

(a) The inducement or coercion of a child to engage in any unlawful sexual activity;

(b) The exploitative use of children in prostitution or other unlawful sexual practices;

(c) The exploitative use of children in pornographic performances and materials.

### Article 35

States Parties shall take all appropriate national, bilateral and multilateral

measures to prevent the abduction of, the sale of or traffic in children for any purpose or in any form.

### Article 36

States Parties shall protect the child against all other forms of exploitation prejudicial to any aspects of the child's welfare.

### Article 37

States Parties shall ensure that:

(a) No child shall be subjected to torture or other cruel, inhuman or degrading treatment or punishment. Neither capital punishment nor life imprisonment without possibility of release shall be imposed for offences committed by persons below eighteen years of age;

(b) No child shall be deprived of his or her liberty unlawfully or arbitrarily. The arrest, detention or imprisonment of a child shall be in conformity with the law and shall be used only as a measure of last resort and for the shortest appropriate period of time;

(c) Every child deprived of liberty shall be treated with humanity and respect for the inherent dignity of the human person, and in a manner which takes into account the needs of persons of his or her age. In particular, every child deprived of liberty shall be separated from adults unless it is considered in the child's best interest not to do so and shall have the right to maintain contact with his or her family through correspondence and visits, save in exceptional circumstances;

(d) Every child deprived of his or her liberty shall have the right to prompt access to legal and other appropriate assistance, as well as the right to challenge the legality of the deprivation of his or her liberty before a court or other competent, independent and impartial authority, and to a prompt

decision on any such action.

### Article 38

1. States Parties undertake to respect and to ensure respect for rules of international humanitarian law applicable to them in armed conflicts which are relevant to the child.

2. States Parties shall take all feasible measures to ensure that persons who have not attained the age of fifteen years do not take a direct part in hostilities.

3. States Parties shall refrain from recruiting any person who has not attained the age of fifteen years into their armed forces. In recruiting among those persons who have attained the age of fifteen years but who have not attained the age of eighteen years, States Parties shall endeavour to give priority to those who are oldest.

4. In accordance with their obligations under international humanitarian law to protect the civilian population in armed conflicts, States Parties shall take all feasible measures to ensure protection and care of children who are affected by an armed conflict.

### Article 39

States Parties shall take all appropriate measures to promote physical and psychological recovery and social reintegration of a child victim of: any form of neglect, exploitation, or abuse; torture or any other form of cruel, inhuman or degrading treatment or punishment; or armed conflicts. Such recovery and reintegration shall take place in an environment which fosters the health, self-respect and dignity of the child.

### Article 40

1. States Parties recognize the right of every child alleged as, accused of, or recognized as having infringed the

penal law to be treated in a manner consistent with the promotion of the child's sense of dignity and worth, which reinforces the child's respect for the human rights and fundamental freedoms of others and which takes into account the child's age and the desirability of promoting the child's reintegration and the child's assuming a constructive role in society.

2. To this end, and having regard to the relevant provisions of international instruments, States Parties shall, in particular, ensure that:

(a) No child shall be alleged as, be accused of, or recognized as having infringed the penal law by reason of acts or omissions that were not prohibited by national or international law at the time they were committed;

(b) Every child alleged as or accused of having infringed the penal law has at least the following guarantees:

(i) To be presumed innocent until proven guilty according to law;

(ii) To be informed promptly and directly of the charges against him or her, and, if appropriate, through his or her parents or legal guardians, and to have legal or other appropriate assistance in the preparation and presentation of his or her defence;

(iii) To have the matter determined without delay by a competent, independent and impartial authority or judicial body in a fair hearing according to law, in the presence of legal or other appropriate assistance and, unless it is considered not to be in the best interest of the child, in particular, taking into account his or her age or situation, his or her parents or legal guardians;

(iv) Not to be compelled to give testimony or to confess guilt; to examine or have examined adverse witnesses and to obtain the participation and examination of

witnesses on his or her behalf under conditions of equality;

(v) If considered to have infringed the penal law, to have this decision and any measures imposed in consequence thereof reviewed by a higher competent, independent and impartial authority or judicial body according to law;

(vi) To have the free assistance of an interpreter if the child cannot understand or speak the language used;

(vii) To have his or her privacy fully respected at all stages of the proceedings. 3. States Parties shall seek to promote the establishment of laws, procedures, authorities and institutions specifically applicable to children alleged as, accused of, or recognized as having infringed the penal law, and, in particular:

3. States Parties shall seek to promote the establishment of laws, procedures, authorities and institutions specifically applicable to children alleged as, accused of, or recognized as having infringed the penal law and in particular:

(a) The establishment of a minimum age below which children shall be presumed not to have the capacity to infringe the penal law;

(b) Whenever appropriate and desirable, measures for dealing with such children without resorting to judicial proceedings, providing that human rights and legal safeguards are fully respected.

4. A variety of dispositions, such as care, guidance and supervision orders; counselling; probation; foster care; education and vocational training programmes and other alternatives to institutional care shall be available to ensure that children are dealt with in a manner appropriate to their well-being

and proportionate both to their circumstances and the offence.

### Article 41

Nothing in the present Convention shall affect any provisions which are more conducive to the realization of the rights of the child and which may be contained in:

(a) The law of a State party; or

(b) International law in force for that State.

### PART II

### Article 42

States Parties undertake to make the principles and provisions of the Convention widely known, by appropriate and active means, to adults and children alike.

### Article 43

1. For the purpose of examining the progress made by States Parties in achieving the realization of the obligations undertaken in the present Convention, there shall be established a Committee on the Rights of the Child, which shall carry out the functions hereinafter provided.

2. The Committee shall consist of ten experts of high moral standing and recognized competence in the field covered by this Convention. The members of the Committee shall be elected by States Parties from among their nationals and shall serve in their personal capacity, consideration being given to equitable geographical distribution, as well as to the principal legal systems.

3. The members of the Committee shall be elected by secret ballot from a list of persons nominated by States Parties. Each State Party may nominate one

person from among its own nationals.

4. The initial election to the Committee shall be held no later than six months after the date of the entry into force of the present Convention and thereafter every second year. At least four months before the date of each election, the Secretary-General of the United Nations shall address a letter to States Parties inviting them to submit their nominations within two months. The Secretary-General shall subsequently prepare a list in alphabetical order of all persons thus nominated, indicating States Parties which have nominated them, and shall submit it to the States Parties to the present Convention.

5. The elections shall be held at meetings of States Parties convened by the Secretary-General at United Nations Headquarters. At those meetings, for which two thirds of States Parties shall constitute a quorum, the persons elected to the Committee shall be those who obtain the largest number of votes and an absolute majority of the votes of the representatives of States Parties present and voting.

6. The members of the Committee shall be elected for a term of four years. They shall be eligible for re-election if renominated. The term of five of the members elected at the first election shall expire at the end of two years; immediately after the first election, the names of these five members shall be chosen by lot by the Chairman of the meeting.

7. If a member of the Committee dies or resigns or declares that for any other cause he or she can no longer perform the duties of the Committee, the State Party which nominated the member shall appoint another expert from among its nationals to serve for the remainder of the term, subject to the approval of the Committee.

8. The Committee shall establish its own rules of procedure.

9. The Committee shall elect its officers for a period of two years.

10. The meetings of the Committee shall normally be held at United Nations Headquarters or at any other convenient place as determined by the Committee. The Committee shall normally meet annually. The duration of the meetings of the Committee shall be determined, and reviewed, if necessary, by a meeting of the States Parties to the present Convention, subject to the approval of the General Assembly.

11. The Secretary-General of the United Nations shall provide the necessary staff and facilities for the effective performance of the functions of the Committee under the present Convention.

12. With the approval of the General Assembly, the members of the Committee established under the present Convention shall receive emoluments from United Nations resources on such terms and conditions as the Assembly may decide.

### Article 44

1. States Parties undertake to submit to the Committee, through the Secretary-General of the United Nations, reports on the measures they have adopted which give effect to the rights recognized herein and on the progress made on the enjoyment of those rights:

(a) Within two years of the entry into force of the Convention for the State Party concerned;

(b) Thereafter every five years.

2. Reports made under the present article shall indicate factors and difficulties, if any, affecting the degree of fulfilment of the obligations under the present Convention. Reports shall also contain sufficient information to provide the Committee with a comprehensive understanding of the

implementation of the Convention in the country concerned.

3. A State Party which has submitted a comprehensive initial report to the Committee need not, in its subsequent reports submitted in accordance with paragraph 1 (b) of the present article, repeat basic information previously provided.

4. The Committee may request from States Parties further information relevant to the implementation of the Convention.

5. The Committee shall submit to the General Assembly, through the Economic and Social Council, every two years, reports on its activities.

6. States Parties shall make their reports widely available to the public in their own countries.

### Article 45

In order to foster the effective implementation of the Convention and to encourage international co-operation in the field covered by the Convention:

(a) The specialized agencies, the United Nations Children's Fund, and other United Nations organs shall be entitled to be represented at the consideration of the implementation of such provisions of the present Convention as fall within the scope of their mandate. The Committee may invite the specialized agencies, the United Nations Children's Fund and other competent bodies as it may consider appropriate to provide expert advice on the implementation of the Convention in areas falling within the scope of their respective mandates. The Committee may invite the specialized agencies, the United Nations Children's Fund, and other United Nations organs to submit reports on the implementation of the Convention in areas falling within the scope of their activities;

(b) The Committee shall transmit, as it may consider appropriate, to the specialized agencies, the United Nations Children's Fund and other competent bodies, any reports from States Parties that contain a request, or indicate a need, for technical advice or assistance, along with the Committee's observations and suggestions, if any, on these requests or indications;

(c) The Committee may recommend to the General Assembly to request the Secretary-General to undertake on its behalf studies on specific issues relating to the rights of the child;

(d) The Committee may make suggestions and general recommendations based on information received pursuant to articles 44 and 45 of the present Convention. Such suggestions and general recommendations shall be transmitted to any State Party concerned and reported to the General Assembly, together with comments, if any, from States Parties.

### PART III

### Article 46

The present Convention shall be open for signature by all States.

### Article 47

The present Convention is subject to ratification. Instruments of ratification shall be deposited with the Secretary-General of the United Nations.

### Article 48

The present Convention shall remain open for accession by any State. The instruments of accession shall be deposited with the Secretary-General of the United Nations.

### Article 49

1. The present Convention shall enter into force on the thirtieth day following the date of deposit with the Secretary-General of the United Nations of the twentieth instrument of ratification or accession.

2. For each State ratifying or acceding to the Convention after the deposit of the twentieth instrument of ratification or accession, the Convention shall enter into force on the thirtieth day after the deposit by such State of its instrument of ratification or accession.

### Article 50

1. Any State Party may propose an amendment and file it with the Secretary-General of the United Nations. The Secretary-General shall thereupon communicate the proposed amendment to States Parties, with a request that they indicate whether they favour a conference of States Parties for the purpose of considering and voting upon the proposals. In the event that, within four months from the date of such communication, at least one third of the States Parties favour such a conference, the Secretary-General shall convene the conference under the auspices of the United Nations. Any amendment adopted by a majority of States Parties present and voting at the conference shall be submitted to the General Assembly for approval.

2. An amendment adopted in accordance with paragraph 1 of the present article shall enter into force when it has been approved by the General Assembly of the United Nations and accepted by a two-thirds majority of States Parties.

3. When an amendment enters into force, it shall be binding on those States Parties which have accepted it, other States Parties still being bound by the provisions of the present Convention and any earlier amendments which they have accepted.

### Article 51

1. The Secretary-General of the United Nations shall receive and circulate to all States the text of reservations made by States at the time of ratification or accession.

2. A reservation incompatible with the object and purpose of the present Convention shall not be permitted.

3. Reservations may be withdrawn at any time by notification to that effect addressed to the Secretary-General of the United Nations, who shall then inform all States. Such notification shall take effect on the date on which it is received by the Secretary-General

### Article 52

A State Party may denounce the present Convention by written notification to the Secretary-General of the United Nations. Denunciation becomes effective one year after the date of receipt of the notification by the Secretary-General.

### Article 53

The Secretary-General of the United Nations is designated as the depositary of the present Convention.

### Article 54

The original of the present Convention, of which the Arabic, Chinese, English, French, Russian and Spanish texts are equally authentic, shall be deposited with the Secretary-General of the United Nations.

IN WITNESS THEREOF the undersigned plenipotentiaries, being duly authorized thereto by their respective governments, have signed the present Convention.

OHCHR HOME |SITE MAP | INDEX | SEARCH | CONTACT US

© Copyright 1996-2002
Office of the United Nations High Commissioner for Human Rights - Geneva, Switzerland

# EXHIBIT J




**Office of the High Commissioner for Human Rights**

<u>Committee main</u>

# Status of ratification of the Convention on the Rights of the Child

### Number of States parties as of 14 November 2003: 192

| State | Signature | Ratification, Acceptance (A), Accession (a), Succession (d) |
|-------|-----------|------------------------------------------------------------|
| Afghanistan | 27 Sep 1990 | 28 Mar 1994 |
| Albania | 26 Jan 1990 | 27 Feb 1992 |
| Algeria | 26 Jan 1990 | 16 Apr 1993 |
| Andorra | 2 Oct 1995 | 2 Jan 1996 |
| Angola | 14 Feb 1990 | 5 Dec 1990 |
| Antigua and Barbuda | 12 Mar 1991 | 5 Oct 1993 |
| Argentina | 29 Jun 1990 | 4 Dec 1990 |
| Armenia | | 23 Jun 1993 a |
| Australia | 22 Aug 1990 | 17 Dec 1990 |
| Austria | 26 Aug 1990 | 6 Aug 1992 |
| Azerbaijan | | 13 Aug 1992 a |
| Bahamas | 30 Oct 1990 | 20 Feb 1991 |
| Bahrain | | 13 Feb 1992 a |
| Bangladesh | 26 Jan 1990 | 3 Aug 1990 |
| Barbados | 19 Apr 1990 | 9 Oct 1990 |
| Belarus | 26 Jan 1990 | 1 Oct 1990 |
| Belgium | 26 Jan 1990 | 16 Dec 1991 |
| Belize | 2 Mar 1990 | 2 May 1990 |
| Benin | 25 Apr 1990 | 3 Aug 1990 |
| Bhutan | 4 Jun 1990 | 1 Aug 1990 |
| Bolivia | 8 Mar 1990 | 26 Jun 1990 |
| Bosnia and Herzegovina | | 1 Sep 1993 d |
| Botswana | | 14 Mar 1995 a |
| Brazil | 26 Jan 1990 | 24 Sep 1990 |
| Brunei Darussalam | | 27 Dec 1995 a |
| Bulgaria | 31 May 1990 | 3 Jun 1991 |
| Burkina Faso | 26 Jan 1990 | 31 Aug 1990 |
| Burundi | 8 May 1990 | 19 Oct 1990 |
| Cambodia | | 15 Oct 1992 a |
| Cameroon | 25 Sep 1990 | 11 Jan 1993 |
| Canada | 28 May 1990 | 13 Dec 1991 |
| Cape Verde | | 4 Jun 1992 a |
| Central African Republic | 30 Jul 1990 | 23 Apr 1992 |
| Chad | 30 Sep 1990 | 2 Oct 1990 |
| Chile | 26 Jan 1990 | 13 Aug 1990 |

| Country | | |
|---|---|---|
| China | 29 Aug 1990 | 2 Mar 1992 |
| Colombia | 26 Jan 1990 | 28 Jan 1991 |
| Comoros | 30 Sep 1990 | 22 Jun 1993 |
| Congo | | 14 Oct 1993 a |
| Cook Islands | | 6 Jun 1997 a |
| Costa Rica | 26 Jan 1990 | 21 Aug 1990 |
| Côte d'Ivoire | 26 Jan 1990 | 4 Feb 1991 |
| Croatia | | 12 Oct 1992 d |
| Cuba | 26 Jan 1990 | 21 Aug 1991 |
| Cyprus | 5 Oct 1990 | 7 Feb 1991 |
| Czech Republic | | 22 Feb 1993 d |
| Democratic People's Republic of Korea | 23 Aug 1990 | 21 Sep 1990 |
| Democratic Republic of the Congo | 20 Mar 1990 | 27 Sep 1990 |
| Denmark | 26 Jan 1990 | 19 Jul 1991 |
| Djibouti | 30 Sep 1990 | 6 Dec 1990 |
| Dominica | 26 Jan 1990 | 13 Mar 1991 |
| Dominican Republic | 8 Aug 1990 | 11 Jun 1991 |
| Ecuador | 26 Jan 1990 | 23 Mar 1990 |
| Egypt | 5 Feb 1990 | 6 Jul 1990 |
| El Salvador | 26 Jan 1990 | 10 Jul 1990 |
| Equatorial Guinea | | 15 Jun 1992 a |
| Eritrea | 20 Dec 1993 | 3 Aug 1994 |
| Estonia | | 21 Oct 1991 a |
| Ethiopia | | 14 May 1991 a |
| Fiji | 2 Jul 1993 | 13 Aug 1993 |
| Finland | 26 Jan 1990 | 20 Jun 1991 |
| France | 26 Jan 1990 | 7 Aug 1990 |
| Gabon | 26 Jan 1990 | 9 Feb 1994 |
| Gambia | 5 Feb 1990 | 8 Aug 1990 |
| Georgia | | 2 Jun 1994 a |
| Germany | 26 Jan 1990 | 6 Mar 1992 |
| Ghana | 29 Jan 1990 | 5 Feb 1990 |
| Greece | 26 Jan 1990 | 11 May 1993 |
| Grenada | 21 Feb 1990 | 5 Nov 1990 |
| Guatemala | 26 Jan 1990 | 6 Jun 1990 |
| Guinea | | 13 Jul 1990 a |
| Guinea-Bissau | 26 Jan 1990 | 20 Aug 1990 |
| Guyana | 30 Sep 1990 | 14 Jan 1991 |
| Haiti | 26 Jan 1990 | 8 Jun 1995 |
| Holy See | 20 Apr 1990 | 20 Apr 1990 |
| Honduras | 31 May 1990 | 10 Aug 1990 |
| Hungary | 14 Mar 1990 | 7 Oct 1991 |
| Iceland | 26 Jan 1990 | 28 Oct 1992 |
| India | | 11 Dec 1992 a |
| Indonesia | 26 Jan 1990 | 5 Sep 1990 |
| Iran (Islamic Republic of) | 5 Sep 1991 | 13 Jul 1994 |
| Iraq | | 15 Jun 1994 a |
| Ireland | 30 Sep 1990 | 28 Sep 1992 |
| Israel | 3 Jul 1990 | 3 Oct 1991 |
| Italy | 26 Jan 1990 | 5 Sep 1991 |

| | | |
|---|---|---|
| Jamaica | 26 Jan 1990 | 14 May 1991 |
| Japan | 21 Sep 1990 | 22 Apr 1994 |
| Jordan | 29 Aug 1990 | 24 May 1991 |
| Kazakhstan | 16 Feb 1994 | 12 Aug 1994 |
| Kenya | 26 Jan 1990 | 30 Jul 1990 |
| Kiribati | | 11 Dec 1995 a |
| Kuwait | 7 Jun 1990 | 21 Oct 1991 |
| Kyrgyzstan | | 7 Oct 1994 a |
| Lao People's Democratic Republic | | 8 May 1991 a |
| Latvia | | 14 Apr 1992 a |
| Lebanon | 26 Jan 1990 | 14 May 1991 |
| Lesotho | 21 Aug 1990 | 10 Mar 1992 |
| Liberia | 26 Apr 1990 | 4 Jun 1993 |
| Libyan Arab Jamahiriya | | 15 Apr 1993 a |
| Liechtenstein | 30 Sep 1990 | 22 Dec 1995 |
| Lithuania | | 31 Jan 1992 a |
| Luxembourg | 21 Mar 1990 | 7 Mar 1994 |
| Madagascar | 19 Apr 1990 | 19 Mar 1991 |
| Malawi | | 2 Jan 1991 a |
| Malaysia | | 17 Feb 1995 a |
| Maldives | 21 Aug 1990 | 11 Feb 1991 |
| Mali | 26 Jan 1990 | 20 Sep 1990 |
| Malta | 26 Jan 1990 | 30 Sep 1990 |
| Marshall Islands | 14 Apr 1993 | 4 Oct 1993 |
| Mauritania | 26 Jan 1990 | 16 May 1991 |
| Mauritius | | 26 Jul 1990 a |
| Mexico | 26 Jan 1990 | 21 Sep 1990 |
| Micronesia (Federated States of) | | 5 May 1993 a |
| Monaco | | 21 Jun 1993 a |
| Mongolia | 26 Jan 1990 | 5 Jul 1990 |
| Morocco | 26 Jan 1990 | 21 Jun 1993 |
| Mozambique | 30 Sep 1990 | 26 Apr 1994 |
| Myanmar | | 15 Jul 1991 a |
| Namibia | 26 Sep 1990 | 30 Sep 1990 |
| Nauru | | 27 Jul 1994 a |
| Nepal | 26 Jan 1990 | 14 Sep 1990 |
| Netherlands | 26 Jan 1990 | 6 Feb 1995 A |
| New Zealand | 1 Oct 1990 | 6 Apr 1993 |
| Nicaragua | 6 Feb 1990 | 5 Oct 1990 |
| Niger | 26 Jan 1990 | 30 Sep 1990 |
| Nigeria | 26 Jan 1990 | 19 Apr 1991 |
| Niue | | 20 Dec 1995 a |
| Norway | 26 Jan 1990 | 8 Jan 1991 |
| Oman | | 9 Dec 1996 a |
| Pakistan | 20 Sep 1990 | 12 Nov 1990 |
| Palau | | 4 Aug 1995 a |
| Panama | 26 Jan 1990 | 12 Dec 1990 |
| Papua New Guinea | 30 Sep 1990 | 2 Mar 1993 |
| Paraguay | 4 Apr 1990 | 25 Sep 1990 |
| Peru | 26 Jan 1990 | 4 Sep 1990 |

| | | |
|---|---|---|
| Philippines | 26 Jan 1990 | 21 Aug 1990 |
| Poland | 26 Jan 1990 | 7 Jun 1991 |
| Portugal | 26 Jan 1990 | 21 Sep 1990 |
| Qatar | 8 Dec 1992 | 3 Apr 1995 |
| Republic of Korea | 25 Sep 1990 | 20 Nov 1991 |
| Republic of Moldova | | 26 Jan 1993 a |
| Romania | 26 Jan 1990 | 28 Sep 1990 |
| Russian Federation | 26 Jan 1990 | 16 Aug 1990 |
| Rwanda | 26 Jan 1990 | 24 Jan 1991 |
| Saint Kitts and Nevis | 26 Jan 1990 | 24 Jul 1990 |
| Saint Lucia | 30 Sep 1990 | 16 Jun 1993 |
| Saint Vincent and the Grenadines | 20 Sep 1993 | 26 Oct 1993 |
| Samoa | 30 Sep 1990 | 29 Nov 1994 |
| San Marino | | 25 Nov 1991 a |
| Sao Tome and Principe | | 14 May 1991 a |
| Saudi Arabia | | 26 Jan 1996 a |
| Senegal | 26 Jan 1990 | 31 Jul 1990 |
| Serbia and Montenegro | | 12 March 2003d |
| Seychelles | | 7 Sep 1990 a |
| Sierra Leone | 13 Feb 1990 | 18 Jun 1990 |
| Singapore | | 5 Oct 1995 a |
| Slovakia | | 28 May 1993 d |
| Slovenia | | 6 Jul 1992 d |
| Solomon Islands | | 10 Apr 1995 a |
| Somalia | 9 May 2002 | |
| South Africa | 29 Jan 1993 | 16 Jun 1995 |
| Spain | 26 Jan 1990 | 6 Dec 1990 |
| Sri Lanka | 26 Jan 1990 | 12 Jul 1991 |
| Sudan | 24 Jul 1990 | 3 Aug 1990 |
| Suriname | 26 Jan 1990 | 1 Mar 1993 |
| Swaziland | 22 Aug 1990 | 7 Sep 1995 |
| Sweden | 26 Jan 1990 | 29 Jun 1990 |
| Switzerland | 1 May 1991 | 24 Feb 1997 |
| Syrian Arab Republic | 18 Sep 1990 | 15 Jul 1993 |
| Tajikistan | | 26 Oct 1993 a |
| Thailand | | 27 Mar 1992 a |
| The Former Yugoslav Republic of Macedonia | | 2 Dec 1993 d |
| Timor Leste | | 16 April 2003a |
| Togo | 26 Jan 1990 | 1 Aug 1990 |
| Tonga | | 6 Nov 1995 a |
| Trinidad and Tobago | 30 Sep 1990 | 5 Dec 1991 |
| Tunisia | 26 Feb 1990 | 30 Jan 1992 |
| Turkey | 14 Sep 1990 | 4 Apr 1995 |
| Turkmenistan | | 20 Sep 1993 a |
| Tuvulu | | 22 Sep 1995a |
| Uganda | 17 Aug 1990 | 17 Aug 1990 |
| Ukraine | 21 Feb 1990 | 28 Aug 1991 |
| United Arab Emirates | | 3 Jan 1997 a |
| United Kingdom of Great Britain and | | |

| | | |
|---|---|---|
| Northern Ireland | 19 Apr 1990 | 16 Dec 1991 |
| United Republic of Tanzania | 1 Jun 1990 | 10 Jun 1991 |
| United States of America | 16 Feb 1995 | |
| Uruguay | 26 Jan 1990 | 20 Nov 1990 |
| Uzbekistan | | 29 Jun 1994 a |
| Vanuatu | 30 Sep 1990 | 7 Jul 1993 |
| Venezuela | 26 Jan 1990 | 13 Sep 1990 |
| Viet Nam | 26 Jan 1990 | 28 Feb 1990 |
| Yemen | 13 Feb 1990 | 1 May 1991 |
| Zambia | 30 Sep 1990 | 6 Dec 1991 |
| Zimbabwe | 8 Mar 1990 | 11 Sep 1990 |

OHCHR HOME | SITE MAP | INDEX | SEARCH | CONTACT US

© Copyright 1996-2002
Office of the United Nations High Commissioner for Human Rights - Geneva, Switzerland

# EXHIBIT K

## NATIONAL

# NATIONAL Briefing

## New Motives Offered For Shooting of Singer

King Norodom Sihanouk said Sunday one of his supporters has suggested the Oct 21 shooting of popular singer Touch Srey Nich was not politically motivated, offering two possible scenarios instead. Either the singer, at the advice of her mother, rejected the advances of a "powerful and extremely rich man" or she gave in to his pursuit and was attacked on orders from his wife, the unnamed supporter said, according to a statement from the King. Touch Srey Nich, 24, who was shot three times by unidentified assailants, remains in a Bangkok hospital. Her mother was also shot in the attack and died later. "If it concerned politics, the assassins wouldn't have 'punished' the mother," the supporter told the King. "If a pretty Khmer says 'no' to a rich and powerful [man], the latter punishes her in a horrible manner, and if she says to him 'yes,' it's....'the cheated spouse' who punishes her." *(Wency Leung)*

## Two Charged in Slayings

Two men were arrested and charged on Wednesday in connection with the shooting deaths of two teenage boys in Svay Rieng province, police said Friday. The Tuesday night killings could be related to a recent Appeals Court ruling in a land dispute that favored the victims' family, police said. Duong Pha, 35, and Duong Samphors, 30, were arrested after villagers pointed them out to police as the suspects, Svay Rieng Police Chief Soth Nady said Friday. "They are jailed now," he said. "It was about revenge for losing the court case." Sar Socheat, 16, and Phea Sithorn, 15, were each shot six or seven times with an AK47 at close range as they slept in a hut while guarding a fishing pond near their homes in Kompong Ro district's Kset commune, Soth Nady said. *(Thann Ana)*

---

**Correction:** Saturday's article "US Beef Banned Due to Mad Cow Disease" (page 3) should have instead stated that the Ministry of Commerce is only urging Camcontrol officers to "raise its vigilance" in determining if imported beef has been properly

# Freed Debauchery Suspect Arrested Again

BY LUKE REYNOLDS
THE CAMBODIA DAILY

A US citizen accused of sex crimes and released on bond last week was arrested again Saturday when police spotted him with a young boy entering a Phnom Penh guest house, police said Sunday.

Richard Arthur Schmidt, 61, returned to police custody two days after a Municipal Court judge freed him. He was first arrested Dec 22 after police searched his Phnom Penh apartment and confiscated photographs of nude boys.

Judge Tan Senarong ruled late Thursday that a debauchery charge against Schmidt would stand, but that there was insufficient evidence to keep the suspect in jail. The court confiscated his passport as police continued their investigation.

Schmidt, from the US state of Maryland, is expected back in court this week.

"The question now is what the judge is going to say, whether he will revise his judgment or lose face and say there is no evidence" to detain Schmidt, said Damaudet Thierry, president of Action Pour Les Enfants, an NGO that cooperated in both arrests.

Police kept watch on Schmidt on Saturday and saw him take a boy into a guest house near the Japanese Friendship Bridge, said Pol Phiethey, chief of Municipal Foreign Police. Both Schmidt and the boy were dressed when police raided the room, said Thierry, and Schmidt told authorities that he intended to teach the boy English.

But "the floor was wet, the bed was wet and the towels were wet. The boy had taken a shower already," Thierry said.

Pol Phiethey said Sunday police were questioning Schmidt and the boy.

Police are working with the Ministry of Interior and the US to arrange Schmidt's extradition for trial in the US, Pol Phiethey said. An official from the US Customs Service has arrived in the capital and is monitoring the case.

Tan Senarong said Sunday he had not yet received a police report on Schmidt's arrest and could not say whether he would stay in police custody.

# Lack of Funds Stalls Free Ambulance Service

BY THET SAMBATH
AND DHYANA LEVEY
THE CAMBODIA DAILY

Samu Ambulance Service, which provides care to those unable to afford private services, will close its doors Wednesday because it lacks funds to continue, said a company representative.

"I am worried about the people on the street who will have no ambulance to take them to the hospital," said Svay Kamol, Samu Ambulance Service project manager. "The number of deaths will increase."

Svay Kamol said the service is free. If it is no longer available, the only other choice will be expensive, private services that many cannot afford, he added.

Funded by the Cambodian Red Cross and the French Red Cross, the service needs more than $40,000 a year to operate, Svay Kamol said. The funds are no longer available.

Cambodian Red Cross Deputy Secretary General Mguon Sakhon said requests for aid have been sent to other organizations, but there have been no favorable responses. "It will be a big problem," said Deputy Traffic Police Chief Sok Sochea. "It will be harder to get victims of traffic accidents to the hospital. The police have no ability to help because we have no ambulances."

Svay Kamol said both he and representatives from the Red Cross asked the Ministry of Health for help but received no response.

Ministry officials denied hearing about the closure. Minister of Health Hong Sun Huot said Samu Ambulance Service provides a valuable service to the public and should continue, but it is the responsibility of the Red Cross.

"We have a policy to have an ambulance at each hospital and the Red Cross helps us provide services to injured people," he said. "But the Ministry of Health is not directly involved. Will Samu Ambulance cease? I don't know."

The ambulance service began in September 1997 and now has 23 employees. Svay Kamol said the service has helped nearly 4,800 people since it began. *(Additional reporting by Lor Chandara)*

# Lawyer To Ask Court Not to Hold Sok Yoeun

BY VAN ROEUN
THE CAMBODIA DAILY

The lawyer for former Sam Rainsy Party activist Sok Yoeun, who has been in a Bangkok prison for three years, said Sunday he will appeal to the Military Court to allow his client to remain out of detention for health reasons if he is repatriated to Cambodia.

"If he remains in prison, he might die because he is very sick and old," Mao Sophearith said.

Sok Yoeun suffers from hepatitis, the lawyer said.

A Thai appeals court ruled on Nov 28 that Sok Yoeun should be extradited to Cambodia to stand

Prime Minister Hun Sen's motorcade. Ruling party officials have called the attack, which killed a bystander, an assassination attempt. No one in Hun Sen's entourage was injured.

Human rights groups and those aligned with the opposition party have said the case against Sok Yoeun was contrived for political reasons.

Sok Yoeun was arrested on Dec 24, 1999, for illegal entry into Thailand, where he was seeking asylum. The UN High Commissioner for Refugees had granted him refugee status the previous month.

Regional human rights organizations also said Sok Yoeun, who is from Battambang town, was in Phnom Penh at the time of the Siem Reap attack.

The monthly bulletin of King Norodom Sihanouk, issued last week, included a letter from Hun Sen that said the premier would not oppose a royal pardon request for Sok Yoeun, should he be convicted. Hun Sen also wrote to the King that he would allow Sok Yoeun to remain out of detention to receive medical care.

Hun Sen's adviser on human rights, Om Yentieng, said Sunday

forced a videotaped confession from Sok Yoeun on Oct 23 and Oct 24, 1999.

Forum Asia also said Sok Yoeun, who is from Battambang

**NATIONAL**

# Athletes Face Challenges in Paralympics

### By YUN SAMEAN
THE CAMBODIA DAILY

The award-winning national paralympic athletics team said they are apprehensive about competing in this week's Asean Para Games due to their lack of training and adequate artificial limbs.

"I am just not sure because I have had very short training time before the competition," said 25-year-old Nhork Kimhor, who won two gold medals in track at the first Asean Para Games in Malaysia in 2001. Before the last competition he had three months of training, he said, pointing to his artificial foot which is showing signs of age. "If I have good artificial feet I can run faster," he said.

The National Paralympic Committee of Cambodia is sending 15 disabled athletes—13 men and two women—to compete from Monday to Dec 29 in the second Asean Para Games in Hanoi, a committee official said Monday.

The athletes said that they will be using the same artificial feet that they used during the last games. National Paralympic Committee of Cambodia Secretary-General Yi Veasna said that because the committee lacks funding it has been forced to offer the athletes only two weeks of training before the event.

"Because the training is limited, it is necessary for the training federation to make sure the athletes practice a selection of athletics every day before going overseas to compete," he said.

After the first Asean Para Games, the team returned home with 13 medals—six gold, five silver and two bronze. Yi Veasna said that Thailand is the only other Asean country that gives Cambodia any competition because the two countries' disabled athletes are of equal ability.

"Through the sport disabled athletes can expose their ability," he said. "Disabled people can do the same things other people can do if we offer them time and chances. They are just normal human beings."

King Norodom Sihanouk offered $1,000, and Prime Minister Hun Sen donated more than $5,000 to assist participation costs. The Vietnamese government said

# US Citizen Arrested for Sex With Children

### By PHANN ANA
THE CAMBODIA DAILY

A US citizen was arrested Monday in Phnom Penh for allegedly having sex with minors, the second foreign national arrested on suspicion of sex crimes in less than a week.

Police say they seized pornographic photos from the apartment of Richard Arthur Schmidt, 61, from the US state of Maryland. Schmidt shielded his face from reporters as police searched his residence Monday afternoon.

He was taken to Phnom Penh Municipal Court for questioning but has not been charged.

"We confiscated one of his cameras with pictures of naked boys," said Municipal Foreign Police Chief Pol Phiethey. "Some documents were erased from his computer before police arrived at his room."

Hang Vibol, country director of the NGO Action Pour Les Enfants, said agents from his organization saw Schmidt picking up a young boy at the riverfront around 10 am Monday before reporting him to police.

"We have evidence but not enough yet," Pol Phiethey said. "We are searching for these underage boys."

Two of Schmidt's neighbors said that they had seen young boys and girls at the suspect's home.

"Many boys and girls come to his apartment every day," said a neighbor who claimed he had lived near Schmidt for about a month. "Those children said he was their godfather."

Police said the case remains under investigation and they had no further details.

In a separate case, prosecutor Yet Chakriya questioned Olivier Frenoy, a 34-year-old tourist from France, for several hours Monday for allegedly having sex with young boys. Frenoy will return to court for further questioning today. Police said they found him in a Phnom Penh guesthouse Friday evening with two boys, ages 14 and 15. According to Pol Phiethey, Frenoy, who had entered the country several times in the last year, confessed to having sex with the two boys and taking the pornographic photographs of them found in his room.

Darnaudet Thierry, president of Action Pour Les Enfants, said that the boys showed police where to find a digital camera memory card that contained the lewd pictures.

"The boys told police that the French man brought them to his room for oral sex," said Pol Phiethey, adding that the children said they have had sex with Frenoy on multiple occasions.

Thierry said Frenoy told authorities that he was sheltering the boys from the cold weather.

"For the French man, we have enough evidence," said Pol Phiethey, presenting a stack of about 60 photographs. "We have plenty of pictures of naked boys."

Action Pour Les Enfants suggested the court charge Frenoy with sex with a minor and possession of pornographic materials, but no charges were made Monday. Thierry said his organization had been following Frenoy's activities since February.

The two boys remained in the NGO's custody Monday, while Frenoy was detained on the order of the Municipal Foreign Police.

Action Pour Les Enfants was also responsible for leading authorities to the arrest of Ernst Ivankowitsch, a 73-year-old Austrian man who was discovered in November with a naked young girl in a Phnom Penh guesthouse.

Municipal Court Judge Kim Sophorn dropped charges of debauchery against Ivankowitsch later that month.

Action Pour Les Enfants is in the process of appealing that case, Thierry said. *(Additional reporting by Dhyana Levey and Luke Reynolds)*

---

# *Hun Sen...*

CONTINUED FROM PAGE ONE

deal to create a tripartite government and approve of the CPP's nomination of Hun Sen as prime minister. But, Funcinpec and the Sam Rainsy Party have since refused to discuss the issue of government and Assembly positions, saying they must first negotiate the political platforms of the new government.

Subsequent meetings between the three parties, including two that were held last week, have failed to result in any further agreements to end the nearly five months of political deadlock.

During his speech on Monday, Hun Sen repeated his demand to remain prime minister and added that the CPP would take 60 percent of the new government positions, while Funcinpec and the Sam Rainsy Party would split the other 40 percent. That would give CPP control of 14 ministries, leaving the other two parties with 6

type that the prime minister is Hun Sen and the CPP has three deputy prime ministers, Funcinpec has one deputy prime minister and Sam Rainsy has a deputy prime minister," Hun Sen said. "I plan to have five deputy prime ministers in accordance with the standard of 60, 20, 20."

Hun Sen also suggested that the CPP would take 30 of the secretary of state positions, while Funcinpec and the Sam Rainsy Party would each get 10. He added that the CPP should also have control of six of the nine committees in the Assembly.

Officials from Funcinpec and the Sam Rainsy Party's Alliance of Democrats, however, maintained they were not yet ready to discuss the subject of power-sharing.

Funcinpec Secretary-General Prince Norodom Sirivudh said Monday the Alliance wanted to first resolve national issues, including corruption and border disputes. He said he would continue to push for negotiations.

"If [the CPP] refuses to meet, it

Sirivudh said by telephone.

He said Hun Sen's suggestion of appointing five deputy premiers appeared to be excessive, but declined to comment on whether he, himself, would seek to hold such a position.

Observers have said recently that Prince Sirivudh is interested in becoming minister of Foreign Affairs and deputy prime minister.

Prince Sirivudh said he believed Prince Ranariddh did not want to continue as Assembly president. The Funcinpec president had earlier stated he wanted only to be a parliamentarian.

Also responding to the prime minister's statements Monday, Sam Rainsy Party spokesman Ung Bun-Ang said: "It's most regrettable that Mr Hun Sen doesn't get the point

"On the fifth of November, Mr Hun Sen openly offered those positions. We weren't interested in those positions," Ung Bun-Ang said.

He added: "The only way to create trust is to meet and talk. If

00154